**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NICOLE VILLANUEVA, | : | |
| | : | CA No. 04-258-JJF |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHRISTIANA CARE HEALTH SERVICES, INC. | : | |
| | : | |
| Defendant. | : | |

---

**APPENDIX TO DEFENDANT CHRISTIANA CARE HEALTH SERVICES INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

---

David H. Williams (#616)
dwilliams@morrisjames.com
James H. McMackin, III (#4284)
jmcmackin@morrisjames.com
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Ave., 10th Floor
P.O. Box 2306
Wilmington, DE 19899
302.888.6900/5849

Michael J. Ossip (admitted pro hac vice)
Thomas S. Bloom (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215.963.5543

Counsel for Defendant Christiana Care
Dated: May 31, 2006          Health Services, Inc.

# TABLE OF CONTENTS

| PAGE NO. | DESCRIPTION |
|---|---|
| A-1 | Deposition of Nicole Villanueva dated March 22, 2006 |
| A-26 | Deposition of Christine M. Collins dated April 26, 2006 |
| A-37 | Deposition of Karen E. McCloud dated April 26, 2006 |
| A-51 | Deposition of Carole Dye, L.P.N. dated April 26, 2006 |
| A-67 | Deposition of Edward M. Goldenberg, M.D. dated May 4, 2006 |
| A-86 | Note from Albert El-Roeiy, M.D., M.B.A. dated 12/02/2002 |
| A-87 | Letter from Edward M. Goldenberg, M.D. to Dr. Gordon Ostrum, M.D. dated 4/8/2003 |
| A-89 | Note from Dr. Edward M. Goldenberg, M.D. dated 4/8/2003 |
| A-90 | Christiana Care Employee Health Service Referral Form dated 4/9/2003 |
| A-91 | Cardiology Consultants, PA Note dated 4/9/2003 |
| A-92 | Cardiology Consultants, PA Note dated 4/10/2003 |
| A-93 | Christiana Care Employee Health Service Referral Form dated 4/15/2003 |
| A-94 | Cardiology Consultants, PA Note dated 4/22/2003 |
| A-95 | Cardiology Consultants, PA Note dated 4/23/2003 |
| A-96 | Letter from Karen McCloud, RN to Nicole Villanueva dated 4/24/2003 |
| A-97 | Memo from Christine Collins to Kerry Delgado dated 6/24/2003 |
| A-98 | Unit Clerk Job Specification and Physical Demands Checklist |
| A-102 | Patient Care Technician II Job Specification and Physical Demands Checklist |
| A-106 | Employee Handbook |
| A-127 | Employee Relations Practices Booklet |
| A-129 | Management Responsibilities Relative to Human Resources Policy |
| A-139 | Leaves of Absence Policy |
| A-147 | Christiana Care Unit Clerk Job Chart |



**WILCOX & FETZER LTD.**

In the Matter Of:

# Villanueva

## v.

# Christiana Care Health Services

### C.A. # 04-258-JJF

---

**Transcript of:**

**Nicole Villanueva**

**March 22, 2006**

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A-1

Page 1

```
           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE


    NICOLE VILLANUEVA,               )
                                     )
                  Plaintiff,         )
                                     )  Civil Action
    v.                               )  No. 04-258-JJF
                                     )
    CHRISTIANA CARE HEALTH           )
    SERVICES, INC.,                  )
                                     )
                  Defendants.        )
```

     Deposition of NICOLE VILLANUEVA taken pursuant to
notice at the law offices of Morris, James, Hitchens &
Williams, 222 Delaware Avenue, Wilmington, Delaware,
beginning at 10:37 a.m. on Tuesday, March 22, 2006,
before Lucinda M. Reeder, Registered Diplomate
Reporter and Notary Public.
APPEARANCES:
          LORI A. BREWINGTON, ESQ.
          Margolis Edelstein
            1509 Gilpin Avenue
            Wilmington, Delaware  19806
            for the Plaintiffs,
          THOMAS S. BLOOM, ESQ.
          Morgan Lewis & Bockius
            1701 Market Street
            Philadelphia, PA  19103-2921
            for the Defendant.
ALSO PRESENT:
     KERRY DELGADO, CHRISTIANA CARE HEALTH SERVICES, INC.


                         A-2
- - - - - - - - - - - - - - - - - - - - - - - - - - - --
                 WILCOX & FETZER, LTD.
     1330 King Street - Wilmington, Delaware  19801
                    (302) 655-0477
```

Villanueva
Nicole Villanueva

v.

C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

Page 2

1      NICOLE VILLANUEVA,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MR. BLOOM:
6    Q.  Good morning, Ms. Villanueva.  I'm Tom Bloom.
7    As you know, I represent Christiana Care in this case.
8    Would you, just please, state your full name?
9    A.  Nicole Villanueva.
10   Q.  Would you spell your last name?
11   A.  V-I-L-L-A-N-U-E-V-A.
12   Q.  Have you ever given a deposition before?
13   A.  No.
14   Q.  Okay.  This is really an opportunity for me to
15   just learn about what your claims are in this case, so
16   I am going to ask you a series of questions today.  As
17   you know, you have just been sworn under oath.  So
18   it's just as if you were testifying in court.  Do you
19   understand that?
20   A.  Yes.
21   Q.  Okay.  We have a court reporter here, so it's
22   important that you respond verbally to my questions as
23   opposed to nodding or going "uh-huh."  Will you do
24   that?

Page 3

1    A.  Yes.
2    Q.  Also, because we have a court reporter, it's
3    important that you let me finish the question before
4    you answer.  Even though you may know how my question
5    is going to end up, it helps the reporter if you wait
6    until I finish before you answer.  Will you do that?
7    A.  Okay.  Yes.
8    Q.  Are you taking any medication that affects your
9    memory?
10   A.  No.
11   Q.  Are you taking medication that would in any way
12   affect your ability to testify truthfully today?
13   A.  No.
14   Q.  And as I understand it, your claims in this
15   case are that Christiana Care discriminated against
16   you because of your pregnancy?
17   A.  Correct.
18   Q.  Is that right?
19   A.  Correct.
20   Q.  Could you just tell me in your own words how in
21   your view Christiana Care discriminated against you
22   because of your pregnancy?
23   A.  Basically, what had happened was I produced --
24   I saw a cardiologist.  I had heart problems,

Page 4

1    pregnancy-related heart problems that I had had with a
2    previous pregnancy, and I went to see the
3    cardiologist.  He recommended that I be put on
4    Lopressor to decrease my heart rate and light-duty.
5    And he wrote me the note.
6        I brought it into Christiana gave it to my
7    supervisor, Carol Dye, and she told me that I would
8    need to be cleared by Employee Health.  So I took the
9    note down to Employee Health, brought it back up, and
10   she said she would need to talk to Karen McCloud and
11   just sit down.
12       So I sat as a unit clerk while she went up
13   to speak to Karen McCloud.  She came back down and
14   said that she spoke to Karen and that they didn't
15   think they could do it based on the fact that if they
16   did it for me, they would have to do it for everyone
17   else.  I said, "Aren't you obligated to follow
18   doctor's orders and since that I am pregnant?"  She
19   said, "Well, I am going to have to speak to someone in
20   Employee Relations."  I said, "Okay."
21       So she went down to Employee Relations and
22   I guess spoke with Kerry Delgado.  I got a call to
23   come down.  I went down and was told, basically, that
24   Delaware is an employment at-will state.  They can

Page 5

1    fire me for any reason, and since I wasn't eligible
2    for FMLA, that if I didn't return to work in 12 days,
3    I'd be terminated.
4        So I said, "Well, I'll go back to the
5    doctor, have him write me my note to come back
6    full-duty."  She said, "Well, wouldn't that be lying?"
7    I said, "Well, you are kind of putting me in a
8    position.  You know the note is written for light-duty
9    for a month, but you are telling me if I don't return
10   in 12 days, I am going to be terminated anyway.  So
11   Catch-22."
12       So I went home.  I was told to clock out by
13   Kerry Delgado.  I clocked out, went home, called my
14   physician, spoke to his secretary, told him what had
15   happened.  I said, "Would it be possible for me to go
16   back full-duty?  I am four-and-a-half-months pregnant;
17   I can't afford to lose my job at this point."  And she
18   said, "Let me talk to Dr. Goldenberg.  I'll get back
19   to you."  So she called me back, and she said, "It's
20   fine.  He'll give you a note to go back.  Just keep in
21   touch with him, just let him know how you are feeling.
22   Fine."
23       So brought the note in the following day,
24   and gave it to Carol Dye.  She told me I had to be

**A-3**

2 (Pages 2 to 5)

Villanueva
Nicole Villanueva

v.

C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

Page 6

1  cleared by Employee Health. I went down -- and I
2  don't know if they were having a meeting. Whatever
3  reason, Employee Health was closed. I went back up to
4  the floor and told her. She said, "Well, clock out.
5  Go home for a week and come back."
6        So I did that. Came back a week later.
7  Came back during the day because I was supposed to
8  work a 3:00 to 11:00 shift that day. So I went in in
9  the morning. Went into Employee Health. Waited to
10  speak to Chris Collins. I don't know who, what the
11  nurse's name was that saw me. She told me she would
12  not clear me. I said, "Well, where is Chris Collins?"
13  She said, "She's in the office." I said, "I want to
14  speak to her." She said, "You can't." I said, "Why
15  not?" I said, "I want to find out why I am not being
16  cleared to go back to work since there has been no
17  physical done, nobody has checked my heart rate,
18  nobody has checked my blood pressure, so why am I not
19  being cleared?"
20        She said, "Here's her phone number. Call
21  her. Go home and call her." So I went home and
22  called her. And she told me that she did not want me
23  working on the floor in any capacity, that I was a
24  heart attack waiting to happen. And I said, "Well you

Page 7

1  need to speak to my cardiologist because he has
2  cleared me. And she said, that she was going to talk
3  to Dr. Colmorgen in High Risk and see if it was
4  acceptable for me to go back to work. I said, "Why
5  are you going to talk to him? He's not my doctor. He
6  doesn't know my history. You need to talk to my
7  cardiologist."
8        So she hung up with me. And I am assuming
9  she called Dr. Goldenberg's office because the next
10  thing I heard, Dr. Goldenberg's secretary called me
11  and told me that I needed to look into unemployment,
12  that I would not be going back. So that was,
13  basically, the gist of that.
14        I had called Chris Collins back and told
15  her that she had put me in a terrible position. I
16  said, "What are you expecting me to do?" She said, "I
17  don't know what to tell you. You picked a poor time
18  to get pregnant." I said, "Well, that's not really
19  your calling. I am not asking, you know, when it's an
20  appropriate time."
21        So I went down to apply for unemployment,
22  and I was not eligible. And went to my son's daycare
23  and told them I was going to withdraw him from care
24  because I had lost my job. And she had asked me, the

Page 8

1  woman that owned the business, she said if you'd like
2  to work here until you have the baby, you know, I can
3  certainly use your help.
4        So, hey, it's better than nothing, went
5  ahead and started working there and worked up until I
6  had my daughter.
7        I did call Kealey Barnes after I spoke with
8  Kerry Delgado and asked her what positions were
9  available as far as unit clerk positions. She told me
10  there were some available, but that I would have to
11  reapply as if I was never hired at Christiana. I
12  said, "Obviously, that's not going happen in 12 days."
13        So I received my letter stating that I was
14  being terminated because I wasn't eligible for FMLA.
15  And then Karen McCloud called me a few days later and
16  said that after I had the baby, I was more than
17  welcome to come back. And that was the end of it.
18  Q.  After you had the baby, did you ever contact
19  Christiana Care about going back to work?
20  A.  No.
21  Q.  Why not?
22  A.  Because at that point, I had already started
23  with the Department of Labor and initiated a lawsuit,
24  so I was not interested in going back.

Page 9

1  Q.  You referred a second ago to Kelly Barnes? Did
2  I get that name right?
3  A.  Kealey Barnes.
4  Q.  How do you spell that?
5  A.  K-E-A-L -- actually, I have her card in my
6  wallet. She's actually the -- she works in Employee
7  Resources. She hired me. I have her card on me. I
8  know I have it somewhere. Let me doublecheck that.
9  Q.  That's all right. I mean, you can look --
10  A.  K-E-A-L-E-Y Barnes, B-A-R-N-E-S.
11  Q.  And how is it that -- and I think you mentioned
12  a second ago that Kealey Barnes mentioned to you that
13  there might be open unit clerk --
14  A.  Positions. There was.
15  Q.  Can you tell me the conversation you had with
16  her?
17  A.  I, basically, told her what had happened. And
18  I said, "I am looking for a unit clerk position that I
19  can fill." She said, "There are some available."
20  There was an 11:00 to 7:00 available. I said, "You
21  know, can I take it?" She said, "Well, you are going
22  to have to reapply as if you were never hired. You
23  are going to have to go through the entire hiring
24  process again." I said, "Well, that's kind of

Villanueva
Nicole Villanueva

v.

C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

Page 10

1   ridiculous. I'm already employed." And that was the
2   end of that.
3       Q.   So I take it you did not apply for the
4   position?
5       A.   No, no.
6       Q.   Do you know where the unit clerk position was?
7       A.   There was several actually at Wilmington
8   Hospital and there was one on 5D on 11:00 to 7:00.
9       Q.   Anything other than your conversation with
10  Kealey Barnes that leads you to believe there were
11  open unit clerk positions?
12      A.   Well, I mean, at any time, I could look up on
13  the computer system and see unit clerk positions
14  available. I mean, that's an entry level position.
15  You know, a lot of the nurses start out as unit clerks
16  and then move up, you know, when they become nurses
17  into a nursing position. They're readily available.
18      Q.   Did you do that at the time, go on the computer
19  system?
20      A.   Yes.
21      Q.   What did you find in the computer system?
22      A.   There were some available. I do not know what
23  floors they were on.
24      Q.   Okay.

Page 11

1       A.   Carol Dye had initially told me when I had
2   given her the note, she said, "I don't know that I can
3   use on this floor, but we may be able to place you on
4   other floors." I said, "That's fine. It's only for a
5   month. It's not going to be for the rest of my
6   pregnancy. It's not going to be forever." So.
7       Q.   Why would it only be for the next month?
8       A.   Because I was supposed to -- I started the
9   medicine, and I was supposed to see him back in a
10  month and he was going to return me to full-duty at
11  that point.
12      Q.   Why? What would have changed in a month?
13      A.   Because I was taking medication at that point.
14  And I -- just on assumption, that the medication
15  would have kicked in by then and lowered my heart
16  rate, knowing that we had been around the corner once
17  before with my son.
18      Q.   Did you print anything out from the Christiana
19  Care computer system about available unit clerk
20  positions?
21      A.   No. I didn't expect to lose my job at that
22  point, and once I did realize it that I was going to
23  lose my job, I didn't have access to the computer.
24      Q.   Why is it that you didn't apply for a unit

Page 12

1   clerk position?
2       A.   I was hired as a unit clerk.
3       Q.   Let me rephrase the question. When you were
4   told by Kealey Barnes that you would need to reapply
5   in order to get a unit clerk position, is there a
6   reason why you didn't do that?
7       A.   Because I knew I wouldn't make it in time. It
8   took me over three months to get in the first time. I
9   knew I wasn't going to make it in 12 days before I was
10  going to be terminated, by the time I'd go through the
11  hiring process all over again. I mean, by the time
12  you go through your application process and then they
13  do your lifting, it took almost three months for me to
14  get in. So I knew within 12 days I wasn't going to
15  get another position.
16      Q.   Did you discuss that timetable with anybody at
17  Christiana Care or was that an assumption on your part
18  that you couldn't get it done in time?
19      A.   I talked to him on the phone. I said,
20  "Obviously, I am not going to get this done in 12 days
21  before I'm terminated," so.
22      Q.   Did she say anything in response to that?
23      A.   No.
24      Q.   You described a minute ago a conversation with

Page 13

1   somebody in your doctor's office about unemployment
2   benefits. Did I hear that right?
3       A.   It was his secretary. Yes.
4       Q.   Can you tell me everything you remember about
5   that conversation with your doctor's secretary?
6       A.   She, basically, told me to start looking into
7   unemployment benefits, that I would probably be
8   eligible. She didn't tell me the gist of the
9   conversation that she even had with Chris Collins. I
10  don't know what happened between them, if they even
11  talked. But she just told me to start looking into
12  unemployment.
13      Q.   Did she tell you why?
14      A.   No, she did not.
15      Q.   Did you discuss with her your restrictions and
16  whether or not you were able to return back to work at
17  that point?
18      A.   Well, she had told me that I was able to return
19  back to work initially when I brought the note back
20  in. She said, "You can come pick up your note,
21  everything is good; you know, you can go ahead and go
22  back."
23      Q.   No. I'm focusing on this later conversation.
24      A.   Yeah. There was no, no conversation, except to

**A-5**

Villanueva
Nicole Villanueva

v.
C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

Page 14

1 apply for unemployment.
2  Q.  What's your date of birth?
3  A.  7/31/74.
4  Q.  Could you, please, just briefly describe your
5 educational background starting with high school?
6  A.  Graduated from Mt. Pleasant in '93, high
7 school, and went to Cecil County Community College
8 '95. I have a phlebotomy certification, also a
9 certified nursing assistant. That was from '94. EKG
10 technician in '98. That's, basically, it.
11  Q.  Okay. All right. I am going to put in front
12 of you what's -- I have previously marked the
13 exhibits, and so I am going to put in front of you
14 what's been previously marked as Villanueva 1. Can you
15 just confirm for me that's a copy of your resume?
16  A.  Yes, it is.
17  Q.  Does this look to you like the resume that you
18 submitted to Christiana Care when you applied for a
19 position there?
20  A.  Yes.
21  Q.  Can you describe -- I mean other than what's
22 written on this sheet -- well, can you tell me, first,
23 why you left Cokesbury Village in '96?
24  A.  I had gotten my C -- gotten my phlebotomy

Page 15

1 certification and started working with a reproductive
2 endocrinologist. I initially was hired as a
3 receptionist. Then once he figured out that I could
4 draw blood and I was also a tech, I actually became
5 his medical assistant, and I worked for him for almost
6 four years till he filed for bankruptcy and then I
7 left.
8  Q.  That's CHR?
9  A.  Yes. Center For Human Reproduction.
10  Q.  What was your salary when you were working at
11 CHR?
12  A.  I might have been making $10 an hour, roughly.
13  Q.  And I take it that before the pregnancy that
14 you had in 2003 while you were working at Christiana
15 Care, you had had a previous pregnancy?
16  A.  Yes. With my son.
17  Q.  And during what year were you pregnant with
18 your son?
19  A.  I had him in October of 2000. So it was '99
20 into 2000.
21  Q.  Am I correct you were working at Cardiology
22 Consultants when you were pregnant?
23  A.  That's right. Yes.
24  Q.  Can you describe for me what you did when you

Page 16

1 were working at Cardiology Consultants between '99 and
2 2001?
3  A.  I was an EKG technician, ordered supplies,
4 brought patients back, did their EKGs, blood
5 pressures, recorded them in the charts at the time.
6 Now we're all computerized. Stocked the medicine
7 cabinets. Charged the defibrillator. We moved from
8 office to office, depending on doctors' needs.
9  Q.  Am I correct that your cardiologist is a doctor
10 at Cardiology Consultants?
11  A.  Yes.
12  Q.  So you are being treated by a doctor who is
13 also -- and you work in his practice?
14  A.  Yes.
15  Q.  Or did?
16  A.  Mm-hmm.
17  Q.  Do you recall what your salary was at
18 Cardiology Consultants between '99 and 2001?
19  A.  I want to say, roughly, 12, maybe $12 an hour.
20  Q.  And why did you eventually leave Cardiology
21 Consultants in January 2001?
22  A.  Because I had had my son, and I wanted to stay
23 home with him. I did not want to put him in daycare.
24  Q.  So from January 2001, for how long were you out

Page 17

1 of work?
2  A.  I technically was not out of work. I opened a
3 home daycare so that I could be with him. Got my
4 certification for daycare licensing and watched a
5 couple other children along with him. And then when
6 he turned 2, I applied for the position at Christiana
7 and put him in daycare. But the position that I
8 applied for at Christiana was alternating, some days
9 were 7:00 to 3:00, some would be 3:00 to 11:00, so he
10 would not be at daycare all the time. And my goal was
11 to actually go into a permanent 3:00 to 11:00, which I
12 had switched with another girl because she needed a
13 permanent 7:00 to 3:00. I needed a permanent 3:00 to
14 11:00 to keep my son out of daycare. So we had
15 switched. That was just getting ready to go into
16 place when all this started.
17  Q.  Okay. So when you say "all this started," you
18 are referring to April 2003?
19  A.  Mm-hmm.
20  Q.  What was your scheduled shift in April 2003?
21  A.  At that time, I was alternating, some days were
22 7:00 to 3:00, some days were 3:00 to 11:00.
23  Q.  Okay. And so when you were on 7:00 to 3:00,
24 that's when you put your son in daycare?

**A-6**

Villanueva
Nicole Villanueva

v.
C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

Page 18

1  A.  Mm-hmm, yes.  It was minimal.
2  Q.  And did Christiana Care reimburse you for
3  daycare expenses?
4  A.  No.
5  Q.  Can you tell me what, in your own words, what
6  is the medical condition that was exacerbated during
7  your pregnancy?
8  A.  It's cardiac arrhythmia.
9  Q.  What were the symptoms of that during your
10  first pregnancy?
11  A.  Basically, just I could feel my heart rate was
12  higher.  Sometimes you feel in your throat a little
13  bit.  You might get a little short of breath.
14  Q.  Anything else?
15  A.  No.
16  Q.  Did the condition affect your ability to do
17  physical tasks?
18  A.  When I was pregnant with my son?
19  Q.  Yes.  Your first pregnancy.
20  A.  Yes.  Is that what we're talking about?
21  Q.  Mm-hmm.
22  A.  Okay.  No.  I continued to work.  I continued
23  to work as an EKG technician.  In fact, I had a halter
24  monitor put on just to  make sure that everything was

Page 19

1  okay.  Everything was fine.  Eventually, it just
2  passed.  I went on, delivered, did not have heart
3  problems.
4  Q.  When -- while you were working at Cardiology
5  Consultants, did your employer make any alterations to
6  your work requirements in order to accommodate the
7  arrhythmia you were having?
8  A.  It wasn't to accommodate the arrhthmia.  I had
9  developed kidney stones during my pregnancy with my
10  son and they had placed a stint in, and I was very
11  uncomfortable.  They put me in a secretarial position
12  for the following -- maybe it was a month to six weeks
13  until I had him.  I delivered four weeks early, so.
14  Q.  So if I am understanding this right, the
15  arrhthymia that exacerbated your pregnancy while you
16  were at Christiana Care did not really manifest itself
17  in that way when you were working at Cardiology
18  Consultants.  Do I have that right?
19  A.  No.  I am not understanding that question.
20  Q.  Okay.  When you were working at Christiana Care
21  and you had your second pregnancy in 2003, I take it
22  that the arrhthymia limited you in some way from doing
23  the physical aspects of your job at Christiana Care?
24  A.  I don't know that it limited me any.

Page 20

1  Q.  Okay.
2  A.  I still went about my home life and my work
3  life just as if, you know -- I knew it was happening.
4  As soon as I started to feel it, I called the
5  cardiologist.  Actually I called his secretary.  And I
6  said, "Linda, you know, I'm pregnant again.  My heart
7  rate is a little high.  Can you, you know, talk to
8  Dr. Goldenberg?"  She said, "Well, can you come in for
9  an EKG?"  I said, "Yeah, that's fine.  I'll stop by."
10  I went for an EKG.  Of course, it showed cardiac
11  arrhthmia, the same with my son.  And went in the
12  following day for my appointment with Dr. Goldenberg.
13  He said, "Things have changed now.  He said we can put
14  you on Lopressor.  We know that doesn't decrease the
15  baby's heart rate.  So we can go ahead and do that and
16  let's kind of have you hang out for a month."  And he
17  asked me what I did.  I said, "I'm unit a clerk/
18  patient care tech."  He said, "Let's have you do the
19  unit clerk part of the job for a month.  I'll see you
20  back and we'll go from there."
21      So who is to say in a month I didn't feel
22  better and didn't need the medicine anymore and I
23  didn't resolve?
24  Q.  From your perspective, was there any part of

Page 21

1  the patient care aspects of your job that you could no
2  longer -- that you could not perform because of the
3  arrhthymia?
4  A.  No.
5  Q.  So what did you say to Dr. Goldenberg when he
6  told you that he thought you shouldn't -- that you
7  should limit yourself to the unit clerk tasks?
8  A.  I didn't -- I said, that was fine; that if
9  that's what he felt, you know, was fine.  I was going
10  to follow what he said.
11      I didn't think -- at that point, I didn't
12  think it would be an issue.  I had been around the
13  barn once before, and I didn't think that it would be
14  that big of a deal.
15  Q.  And so am I right that in terms of the symptoms
16  of the arrhthymia, you described before shortness of
17  breath sometimes?
18  A.  Occasionally.
19  Q.  Okay.  Anything else?
20  A.  You just feel heavy -- like almost
21  palpitations.
22  Q.  Other than your first pregnancy and the
23  pregnancy that you had while you were at Christiana
24  Care, do you have any other children?

**A-7**

6 (Pages 18 to 21)

Villanueva
Nicole Villanueva

v.
C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

**Page 22**

1 A. No.
2 Q. And when was -- I think you had a daughter the
3 second time?
4 A. Yes.
5 Q. Okay. When did you deliver your daughter?
6 A. I delivered her August 15th of 2003. She was
7 two weeks early. I developed kidney stones again.
8 They ended up putting a PIC-line in and buying her two
9 more weeks, and then I delivered. But I worked up
10 until I developed the kidney stones.
11 Q. You were working at the daycare center?
12 A. Yes.
13 Q. Is that Little Caboose?
14 A. Yes.
15 Q. Can you describe what your job functions were
16 at Little Caboose?
17 A. I was head teacher for 12 one-year olds.
18 Basically, I took care of the curriculum and changed
19 diapers, and just the basic outside stuff, took them
20 outside, stories.
21 Q. How old were the kids again?
22 A. They were one.
23 Q. How many -- were there any other adults working
24 with you with the one-year olds?

**Page 23**

1 A. I had an aide.
2 Q. Did the symptoms of the arrhythmia that you had
3 had, did they resolve themselves after you gave birth?
4 A. Oh. They resolved way before then.
5 Q. When did they resolve?
6 A. I know I was feeling better by the time I
7 started working at the daycare. Within a couple
8 weeks, because I had already taken the medicine, I
9 felt fine.
10 Q. Okay. And at that point, did you call anybody
11 at Christiana Care about going back to your old job?
12 A. No.
13 Q. Why not?
14 A. Because I was pretty bitter by the time I left.
15 I felt that, you know, I wasn't treated the way I
16 should have been treated, and ... I don't know. I was
17 very bitter about the whole thing.
18 Q. Okay. You can put that aside. Thanks.
19 Ms. Villanueva, I am going to put in front
20 of you what's been marked as Villanueva 2. And could
21 you just confirm for me this is, I think the
22 employment application that you -- or part of the
23 employment application you filled out when you applied
24 for a job at Christiana Care.

**Page 24**

1 A. Correct.
2 Q. Is all of the handwriting on the top page of
3 Villanueva 2 your handwriting?
4 A. Where it says "position applying for," that is
5 not my handwriting.
6 Q. At the very top?
7 A. Yes. It looks like Kealey Barnes initialed it
8 so that it may be her initials or her handwriting.
9 The rest of it is my handwriting.
10 Q. All right. Is that your signature on the
11 second page?
12 A. Yes.
13 Q. Thanks. You can put that exhibit aside.
14 When you started at Christiana Care -- you
15 have used two phrases, you have referred to unit clerk
16 position and unit tech technician -- did you have both
17 positions?
18 A. I was initially hired as a unit clerk. When I
19 interviewed with Carol Dye, it became a split position
20 because they did not need, I guess, a unit clerk to
21 sit there because there was only six patients on the
22 floor. So they needed somebody to split the position.
23 Q. Okay. And when did that happen?
24 A. It was right when I was hired.

**Page 25**

1 Q. Okay.
2 A. I knew that when I was being interviewed by
3 Carol Dye.
4 Q. At that point, am I understanding you
5 correctly, that there was not a person who worked
6 full-time as a unit clerk?
7 A. No. Not that I'm aware of.
8 Q. So there was not such a person?
9 A. No. It was a split. There was three of us,
10 and we all -- between the three of us, we took care of
11 the patients and entered any records that had come in
12 from the doctors through the computer.
13 Q. All right. And as part of your -- so I take it
14 you had patient care responsibilities?
15 A. Yes, yes.
16 Q. Did that involve helping patients to move
17 around physically?
18 A. Turning. Once in awhile, you'd get a patient
19 that needed to get out of bed and maybe go on a
20 commode if they were a little more able to move
21 around. But these patients were pretty sick.
22 Q. Well, can you describe for me in your words
23 what the demands were, the patient care demands of
24 your position?

**A-8**

Villanueva
Nicole Villanueva

v.

C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

Page 26

1  A.  We would change the position, roll them every
2  two hours, reposition them; feed them if they needed
3  help to be fed; assist the nurses if they needed help
4  with dressing changes, you know, anything they needed
5  help with; bathing.  Then, you know, put the records
6  in the computer when the doctors are writing the
7  orders.
8  Q.  All right.  Now, during your pregnancy, while
9  you were working at Christiana Care, did your
10  arrhythmia make it more difficult for you to do any of
11  those physical tasks, like moving patients around or
12  lifting?
13  A.  No.  Because you are not lifting by yourself.
14  You are lifting with another person.  You always have
15  someone else.  If it's somebody very heavy, then you
16  need three or four people, then -- because we saw a
17  lot of gastric bypass patients, and, of course, two
18  people are not going to lift somebody that's three or
19  400 pounds by themselves.  At times, there could be
20  four of us in a room with a nurse to roll a patient
21  over.
22  Q.  Did there -- before you got the first note from
23  your doctor putting you -- suggesting that you be
24  assigned to sedentary work, before you got that note,

Page 27

1  was there a point at which you restricted your own
2  activities while working at Christiana Care?
3  A.  No.  The nurses would help me.  I guess just
4  knowing that I was pregnant, they didn't want me to
5  lift by myself.  But that was on them.  I didn't ask
6  them to help me.  We never lifted by ourselves.
7  Q.  Did you have --
8  A.  I mean, that's just, you know, smart.
9  Q.  Again, prior to getting the first note from
10  your cardiologist, did you have any conversations with
11  any of your coworkers or supervisors about restricting
12  your -- the physical demands of your job?
13  A.  No, no.
14  Q.  Ms. Villanueva, I am going to put in front of
15  you what's been marked as Villanueva 3.  And
16  Villanueva 3 is a note from your cardiologist, dated
17  April 8th, 2003?
18  A.  Mm-hmm.
19  Q.  Could you read the note, please aloud?
20  A.  "Nicole Villanueva has pregnancy induced
21  cardiac arrhythmia.  Physical" -- I don't know what
22  that other word is.  Maybe "physical activity
23  precipitates her arrhythmia.  At this time I have
24  suggested a sedentary position."

Page 28

1  Q.  When you --
2  A.  This was his initial note.
3  Q.  And when you got this note from Dr. Goldenberg,
4  you had an appointment in the office with him?
5  A.  Yes.  I saw him that day.
6  Q.  Was that a previously scheduled appointment you
7  had with him?
8  A.  Yes.  After I had gone in to have the EKG done,
9  they had set me up for the appointment for the
10  following day.
11  Q.  And you brought this note eventually to
12  somebody at Christiana Care?
13  A.  Yes.  This note went to Carol Dye initially.
14  She was the first one to get it.
15  Q.  Did you hand it to Carol Dye?
16  A.  Yes, I did.
17  Q.  What did you say when you were giving the note
18  to Carol Dye?
19  A.  I just said, "I have a note from my doctor.
20  He's putting me on light-duty."
21  Q.  What did Carol Dye say?
22  A.  She said she didn't know if she could use me on
23  that floor, but they might be able to use me on other
24  floors.  She would have to talk to Karen McCloud, and

Page 29

1  it would have to be cleared by Employee Health.
2  Q.  And what happened next?
3  A.  So then I had gone down to Employee Health.
4  They basically handed me the note back and said to
5  give it back to her.  I gave it back to her.  And she
6  went up to Karen McCloud.  And the next thing I know,
7  she came down, said -- she said she couldn't do it.
8  If they did it for me, they would have to do it for
9  everyone else.
10  Q.  She couldn't do what?
11  A.  She couldn't put me in a light-duty position.
12  That's when I kind of got a little irritated.  I said,
13  "Wait a minute.  This is a note from my doctor.
14  Aren't you legally obligated to follow doctor's
15  orders?"
16  Q.  So was it your view that Christiana Care was
17  required to create a light-duty position for you?
18  A.  Not create a light-duty position.  The idea of
19  the note was that I would do a unit clerk position
20  since I was trained as a unit clerk.
21  Q.  Okay.  And at the time, in April 2003, I think
22  you said earlier, there was not a full-time unit clerk
23  position in your unit.  Is that true?
24  A.  No, there never was a full-time unit clerk

A-9

8 (Pages 26 to 29)

Villanueva
Nicole Villanueva

v.
C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

Page 30

1  position, but I am sure there was unit clerk positions
2  in the hospital.
3  Q.  Okay.
4  A.  And just by her suggesting that they could
5  probably use me on other floors, put in my mind that
6  there wasn't going to be a question about it, that it
7  wasn't going to be a problem. I thought that she was
8  going to go up there, talk to Karen McCloud about
9  where to put me.
10  Q.  So what was -- to your understanding, if
11  Christiana Care had followed this note, what would
12  your job function have been?
13        MS. BREWINGTON: Objection. Calls for
14  speculation.
15  Q.  You can answer the question.
16        MS. BREWINGTON: You can answer the
17  question.
18  A.  Repeat the question.
19  Q.  I'll just give you an instruction that I should
20  have given at the beginning. During the course of the
21  deposition, your lawyer will object to certain
22  questions, which is certainly fine and appropriate,
23  and the court will rule on those objections later.
24  But for today, unless your lawyer instructs you not to

Page 31

1  answer a question, you have to answer it even though
2  she has objected. Will you follow that instruction?
3  A.  Mm-hmm.
4        MS. BREWINGTON: And to the best of your
5  ability.
6  A.  Okay. Well. ...
7  BY MR. BLOOM:
8  Q.  To rephrase the question: What was your
9  understanding of how Christiana Care should have
10  modified your job responsibilities after getting this
11  note?
12  A.  That I would be put in a light - a unit clerk
13  position. Since I was already -- since I was already
14  trained to be a unit clerk, they're not really doing
15  anything special. I would be filling a unit clerk
16  position. They're not going to have to retrain me.
17  Q.  And what would that entail, working solely as a
18  unit clerk?
19  A.  It would be a desk position, a sitting position
20  where you enter records into the computer.
21  Q.  Okay. Would there be significant walking in
22  that position?
23  A.  No.
24  Q.  Okay.

Page 32

1  A.  It would be limited.
2  Q.  All right. So your understanding is that if
3  you had been put into a full-time unit clerk position
4  that the job would have been sedentary?
5  A.  Right.
6  Q.  Okay. You can put Exhibit 3 aside. Let me ask
7  you actually: What was -- I know your doctor
8  eventually issued a note after Villanueva 3, and you
9  referred earlier to a meeting that you had with Kerry
10  Delgado.
11  A.  Mm-hmm.
12  Q.  Did that happen before you got the new note?
13  A.  No. Yes. It was before I had gotten cleared,
14  yes.
15  Q.  Who was present during that meeting?
16  A.  It was Kerry Delgado, myself and Carol Dye.
17  Q.  And I think you said before that you told Kerry
18  and Carol that you would be able to go to your doctor
19  and get a new note lifting your restrictions. Did I
20  hear that right?
21  A.  No. What I said was that they were putting me
22  in a position where I would need to go get a note
23  telling them to clear me -- having him clear me for --
24  you know, to go back full-duty.

Page 33

1  Q.  Okay.
2  A.  Because I couldn't afford to lose my job. I
3  was four-and-a-half-months pregnant. I had a toddler
4  at home that I needed to feed.
5  Q.  Was there something that led you to believe
6  that Dr. Goldenberg would write you a new note?
7  A.  I think initially his idea was this was going
8  to be optimal, to have me sit for a month, and then
9  return me back to full-duty. But when that couldn't
10  be accommodated, then, you know, he would let me go
11  back full-duty rather than lose my job.
12  Q.  Well, let me ask the question a different way.
13  When you were sitting in the office with Kerry Delgado
14  and Carol Dye and you said that they were putting you
15  in a position where you would have to go and get a new
16  note from your doctor, was there anything at that
17  point that led you to believe that you'd be able to
18  get a new note from your doctor?
19  A.  I knew I would. I knew I could do the job.
20  Q.  Okay.
21  A.  I think his was -- this is just speculating on
22  his part. I think it was just precautionary for him.
23  And if I was able to do the position, then, you know,
24  it wasn't a big issue. But they were putting me in a

A-10

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Villanueva                              v.                 Christiana Care Health Services
Nicole Villanueva            C.A. # 04-258-JJF                          March 22, 2006

Page 34

1  position where they knew the note was written for a
2  month. And when they're telling me if I didn't return
3  to work full-duty in 12 days, you're fired, well,
4  that's a Catch-22.
5      Q.  Incidentally, did anybody at Christiana Care
6  ever make any comments to you or in your presence that
7  you thought reflected discrimination because of your
8  pregnancy?
9      A.  Chris Collins told me I picked a poor time to
10  get pregnant.
11     Q.  Okay. Anything else?
12     A.  Kerry had said, "We can fire you. Delaware is
13  an employment at-will state, and we can fire you for
14  any reason."
15     Q.  That was during the meeting we were just --
16     A.  That was during the meeting with her. I only
17  met with her one time.
18     Q.  Any other comments?
19     A.  Not that I am aware of.
20     Q.  And the comment by Chris Collins about you
21  picked a poor time to be pregnant --
22     A.  Mm-hmm.
23     Q.  -- when did that conversation occur?
24     A.  I started to get a little agitated with her

Page 35

1  when she was talking about calling Dr. Colmorgen. And
2  I said to her -- I said, "What am I supposed to do?"
3  I said, "I have a note clearing me for work, but you
4  won't let me go back. At this point, you are putting
5  me in a bad position." She said, "I don't know what
6  to tell you. You picked a poor time to get pregnant."
7      Q.  What did you say in response to that?
8      A.  I said, "Well, that wasn't really our call."
9  I said, "I think that's pretty discriminatory."
10     Q.  Did you ever have any conversations with
11  anybody at Christiana Care -- and I mean coworkers or
12  supervisors -- about whether keeping your full-duty as
13  a patient care technician presented any health risk to
14  you or to your child?
15     A.  The only issue that we had was there was a
16  patient on the floor that had -- I'm trying to
17  remember -- shingles. I went in there, and nobody let
18  me know that the patient had shingles. And I was a
19  little perturbed by that. But I ended up calling my
20  OB and told him, you know, that I was possibly exposed
21  to shingles, and he said that it wouldn't be a problem
22  because I had had chicken pox and the baby would pick
23  up my immunity. So that was the only issue.
24     Q.  What about any conversations with coworkers or

Page 36

1  supervisors about whether moving patients around
2  presented any risks to you or your child?
3      A.  No.
4      Q.  All right. Ms. Villanueva, I am going to put
5  in front of you what's been marked as Villanueva 4. This
6  is an April 10th, 2003 note from your cardiologist?
7      A.  Yes.
8      Q.  And this is the note that we have been talking
9  about --
10     A.  Right.
11     Q.  -- that lifts the restrictions?
12     A.  Right.
13     Q.  Who at Christiana Care did you give this note
14  to?
15     A.  Initially, it went to Carol Dye, and I had
16  taken it -- then I had taken it down to Employee
17  Health. That was the day they were closed. I don't
18  know if they were having a meeting or what was going
19  on. So I went back up to the floor. And she said
20  since I couldn't be cleared, I would have to go back
21  home. And that's when I spent the week at home. And
22  then I returned with this note again during the day.
23  And that's when I had to call Chris Collins from home.
24     Q.  Okay. And tell me about the conversation you

Page 37

1  had over the phone with Chris Collins.
2      A.  I asked her why wasn't I being cleared to
3  return to work. I said, "You have never given me a
4  physical. You have checked my heart rate. You never
5  checked my blood pressure. How do you know I'm not
6  ready to be cleared for work?" And she said -- that's
7  when she said she was going to talk to -- she asked me
8  what my heart rate was. I said, "Well, you have to
9  bear in mind, one, I am pregnant; two, I have a
10  two-year old running around; and three, I have all
11  this anxiety from possibly losing my job." She said
12  that she was going to talk to Dr. Colmorgen. I said,
13  "You shouldn't talk to him. You need to talk to
14  Dr. Goldenberg. He is my cardiologist."
15          And, I guess -- I don't know if she talked
16  to Dr. Colmorgen. I don't know whatever happened with
17  that. Alls I know is after that conversation I got
18  the call to start looking into unemployment by
19  Dr. Goldenberg's secretary.
20     Q.  Did you discuss unemployment benefits with
21  anybody at Christiana Care?
22     A.  No.
23     Q.  Now, you mentioned before that you felt -- I
24  think you said that you felt that you were being put

Villanueva
Nicole Villanueva

v.
C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

Page 38

1  in a bad position because your job was in jeopardy.
2  A. Mm-hmm.
3  Q. Did I get that right?
4  A. That's correct.
5  Q. Did you feel that you were being forced to go
6  against your doctor's orders in order to keep your job
7  at Christiana Care?
8  A. I don't know that I felt that I was going
9  against his orders. I think that, looking back on it,
10  I could have done the job if I needed to. I didn't
11  need a light-duty note. But I was following his
12  orders. I mean, I had worked the previous pregnancy.
13  I worked through the whole time my cardiac arrhythmias
14  with my son. Nothing happened. I did not fall over
15  dead. I was fine. So nothing made me think this
16  would be any different.
17  Q. Well, you just said, looking back on it now,
18  you think you could have done the job fine.
19  A. Mm-hmm.
20  Q. Did you look at it differently at the time in
21  April 2003?
22  A. No. I mean, my responsibilities were the same.
23  I was still -- you know, I was going to work. I was
24  caring for my son. Nothing changed. I went along

Page 39

1  about my business. I took my medicine like I was
2  supposed to, and it resolved.
3  Q. Did you tell anybody at Christiana Care that
4  you thought you were being forced to go against your
5  doctor's recommendations in order to keep your job?
6  A. I told Kerry that, that they were, basically,
7  putting me in that position.
8  Q. What did you tell Kerry?
9  A. I told they are that, you know, they're putting
10  me in a bad position because you are telling me here
11  that -- you know the note is written for a month -- I
12  have to return in 12 days. So I have no other choice.
13  Q. No other choice but what?
14  A. But to see if the doctor could write me a note
15  to return. She said, "Well, wouldn't that be lying?"
16  I said, "Well, I need to feed my family." Who is
17  going to hire somebody five months pregnant? Nobody.
18  Q. What was in your mind the -- what was in your
19  mind wrong with having to go back and get a new note
20  from your doctor?
21  A. I don't think there was anything wrong with it.
22  I knew I could do the job, and that was obvious when I
23  went to work the next week caring for 12, you know,
24  one-year olds. That was a lot harder than any job at

Page 40

1  Christiana.
2  Q. Other than what you just described about your
3  conversation with Kerry Delgado, did you tell anybody
4  else at Christiana Care that you thought you were
5  being put in a difficult position by having to get a
6  new note from your doctor?
7  A. No.
8  Q. And what was it in your opinion that was --
9  that put you in the bad position, as you described it?
10  A. What do you mean?
11  Q. Well, I think you said before that you thought
12  Christiana Care was putting you in a difficult
13  position.
14  A. Mm-hmm.
15  MS. BREWINGTON: Yes?
16  A. Yes.
17  Q. What was the difficult position or the
18  difficult choice that you were being put to in your
19  opinion?
20  A. Because they wouldn't accommodate the note.
21  They weren't accepting the note. And I kind of didn't
22  understand the problem with it. You are talking about
23  a big company. You are not talking about a little
24  mom-and-pop operation where there is not a position

Page 41

1  available. I mean, 8,000 employees. I think there is
2  a unit clerk position available somewhere. Obviously,
3  Carol Dye had that opinion, too, when she told me we
4  could probably use you on other floors, which told me,
5  eh, you might have done it before.
6  Q. Done what before?
7  A. Put somebody in a light-duty position.
8  Q. Okay. And --
9  A. Otherwise, she would have said we can't do the
10  this from the initial. It wasn't till they went
11  upstairs and discussed it that it wasn't going to be
12  able to happen.
13  Q. Okay. Why were you told that it wasn't going
14  to be able to happen?
15  A. She said because if she did it for me, she
16  would have to do it for everyone else.
17  Q. Who told you that?
18  A. Well, she said that Karen McCloud said that.
19  Carol Dye said that Karen McCloud said that.
20  Q. So Carol Dye was relaying to you what she
21  learned relaying to you what she learned from Karen
22  McCloud?
23  A. Mm-hmm.
24  Q. Yes?

Villanueva                                    v.                    Christiana Care Health Services
Nicole Villanueva                     C.A. # 04-258-JJF                        March 22, 2006

Page 42

1   A. Yes.
2   Q. Did you have any conversations with Carol Dye
3   about possibly moving to a unit clerk position?
4   A. No. She told me to sit down. I was working as
5   a unit clerk right at that point. She said she was
6   going to go talk to someone in Employee Relations. So
7   I sat down. I was doing desk work. I got the call to
8   go down to Employee Relations.
9   Q. And you referred a second ago to there possibly
10  being other people who were moved to unit clerk
11  positions. Did I hear that right?
12  A. Correct.
13  Q. As you sit here today, do you know whether or
14  not that actually happened with any of your coworkers?
15  A. I do know it did happen with Kathryn Ross.
16  Q. What is your understanding of what happened
17  with Kathryn Ross?
18  A. That she was in a car accident, and that --
19  she was initially a patient care tech. She came back.
20  There was restrictions. She couldn't lift. And she
21  was trained as a unit clerk and became a unit clerk.
22  Q. Okay. Did you have any conversations with
23  Kathryn Ross about that?
24  A. No. I had heard her story when I was working

Page 43

1   up on 5D.
2   Q. Who did you hear her story from?
3   A. Well, I heard her talking with another patient
4   care tech or unit clerk.
5   Q. Okay. So if I have this right, your knowledge
6   of what happened with Kathryn Ross is based upon your
7   overhearing --
8   A. Mm-hmm.
9   Q. -- Kathryn Ross talking to somebody else?
10  A. Mm-hmm.
11  Q. Is that a yes?
12  A. Yes.
13  Q. What did you overhear Kathryn Ross say?
14  A. Just that she was in a car accident. She had
15  hurt her back. She wasn't able to lift anymore, and
16  that she was going to be trained to be as a unit
17  clerk.
18  Q. Okay. Other than what you overheard from
19  Kathryn Ross that day, is there anything else you
20  learned? Is there anything else you learned about her
21  transfer to a unit clerk position?
22  A. No. Because I was only up there the one day.
23  I don't know if I was covering. I don't know why I
24  was up there actually. I don't know if I was in

Page 44

1   training. I might have been in training.
2   Q. You referred to up --
3   A. And she was just coming back. 5D, which is a
4   couple floors up.
5   Q. Which unit did you work at?
6   A. TSU, which is transitional surgical unit.
7   Q. Okay.
8   A. They were sister floors.
9   Q. Did Kathryn Ross, to your knowledge, ever work
10  on your floor?
11  A. I don't recall. I really can't say. Because
12  we did -- we shared -- if we were short with techs,
13  maybe one of -- somebody had called out, we would
14  share and bring somebody down, or if they were short,
15  somebody would go up. Why I was there, I don't
16  recall, working with her.
17  Q. Okay. Other than Kathryn, Ross, is there
18  anybody else who you believe was transferred to a unit
19  clerk position to accommodate a medical condition?
20  A. I knew about Dianna Stewart. I had talked with
21  her. She -- I am not real sure what she did. She --
22  I saw her as a tech on TSU. She had come down and
23  helped, complaining about back -- she had had back
24  problems. She was hurt in an accident. And I didn't

Page 45

1   really talk to her much. I knew she was having issues
2   with doctor's notes. And I kind of dismissed the
3   whole thing.
4   Q. Well, do you have any knowledge about whether
5   or not Christiana Care transferred her to a new
6   position to accommodate a medical condition?
7   A. I have no idea what they were doing with her
8   because she is bouncing back and forth between TSU and
9   5D.
10  Q. Do you contend in this case that Ms. Stewart
11  was treated more favorably than you?
12  A. Possibly, but I don't -- you know, I don't have
13  the records. I believe Kathryn Ross was.
14  Q. Okay. Do you know with respect to Kathryn Ross
15  whether she was moved into a vacant position or
16  whether a position was created for her?
17  A. I have no idea. But just the simple fact that,
18  you know, it was done. You are going to go ahead and
19  train somebody, whereas, I was already trained as a
20  unit clerk, you know.
21  Q. How do you know she -- Kathryn Ross needed to
22  be trained as a unit clerk?
23  A. Because I know she was only a patient care
24  tech. She was hired as a patient care tech. She was

A-13

12 (Pages 42 to 45)

Villanueva                                  v.              Christiana Care Health Services
Nicole Villanueva                    C.A. # 04-258-JJF                        March 22, 2006

Page 46

1  not a unit clerk. Because I know she had to be
2  trained as a unit clerk.
3      Q.  That's my question. How do you know she had to
4  be trained as a unit clerk?
5      A.  Because she was training when I was up there.
6      Q.  Training as a unit clerk?
7      A.  Mm-hmm.
8      Q.  When was that?
9      A.  It had to have been early December because I
10  was still going through my training.
11      Q.  December of --
12      A.  Early to mid December.
13      Q.  Of 2002?
14      A.  Of 2 -- yes, 2002.
15      Q.  Ms. Villanueva, I am going to put in front of
16  you what's been marked as Villanueva 5. Can you tell
17  me what Villanueva 5 is?
18      A.  That's my documentation.
19      Q.  You created this document?
20      A.  Yes.
21      Q.  All this handwriting is yours?
22      A.  It's all mine.
23      Q.  Okay. When did you create this document that's
24  Villanueva 5?

Page 47

1      A.  As things were happening, as things were
2  happening with Christiana Care, I started documenting.
3      Q.  Okay. Will you just -- first, will you read --
4  there are some terms at the top that have asterisks
5  next to them. Can you just read what the terms with
6  asterisks are, starting in the upper left-hand corner?
7      A.  One was the swiping in, was the time clock.
8      Q.  Okay. What is -- we'll do this piece by piece.
9  I am going to interrupt you there and ask you: What
10  does that refer to when it says, "Swiping in (time
11  clock)"?
12      A.  Because Carol Dye, I had seen her several times
13  with people, other employees, that had not clocked in
14  or forgot their time clock, and it was okay. And
15  she -- I forgot to swipe in one morning because I came
16  in and started getting right to work, forgot to swipe
17  in, and she was going to write me up for it. So
18  that's probably why I documented that.
19      Q.  Does that have anything to do with your claims
20  in this case?
21      A.  No. But I was writing things down. I was
22  making sure that I documented everything. And it kind
23  of does because then it kind of shows, eh, I wasn't
24  too favorable in her mind to begin with. And I knew

Page 48

1  that.
2      Q.  How did you know that?
3      A.  I knew that because she treated me different
4  than she treated everybody else. It was obvious --
5      Q.  Since the beginning?
6      A.  Yes.
7      Q.  I'm sorry. Did you finish your answer?
8      A.  It was obvious from the beginning.
9      Q.  From when you first start working there?
10      A.  Mm-hmm, mm-hmm.
11      Q.  Okay. Did you ever get a sense of why?
12      A.  Don't know why. Maybe she just didn't like me.
13  I don't know.
14      Q.  And the second term with an asterisk, what's
15  that?
16      A.  She was -- I was on a 72-hour bi-weekly --
17      Q.  I'm sorry to interrupt you. First just tell me
18  what the word is.
19      A.  "Occurrences."
20      Q.  Okay.
21      A.  I worked 72 hours bi-weekly. My son had
22  gotten -- I thought he had had pneumonia. I had to
23  call out one day. She was going to give me an
24  occurrence and write me up for it. I said, "Well, I

Page 49

1  think I am allowed one day off." Because I wasn't
2  going to get paid for it. Because you get higher pay
3  if you don't get -- take personal time. Come to find
4  out, she, I guess, doublechecked her books and
5  couldn't write me up for it, so.
6      Q.  Okay. Is there anything else you want to say
7  about that?
8      A.  No.
9      Q.  What's the third term with an asterisk, says
10  "double backs." What does that refer to?
11      A.  That was -- gosh, I am trying to remember. You
12  know, I am not real sure. I can't remember.
13      Q.  Okay. If during the course of today's
14  deposition, if it comes back to you and you remember
15  what it is, let me know.
16      A.  Okay.
17      Q.  Okay? Then to the right there is an asterisk
18  with that it says, "light duty" and it says "Diana
19  Stewart" and "Kathryn." Does that refer to what we
20  were just talking about?
21      A.  Yes, yes.
22      Q.  Is there anything else you want to add about
23  Kathryn Ross or Dianna Stewart?
24      A.  No.

**A-14**

13 (Pages 46 to 49)

Villanueva
Nicole Villanueva

v.

C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

Page 50

1  Q.  The last term with an asterisk says,
2  "unemployment."
3  A.  Right.
4  Q.  I think you said before that your doctor's
5  office had suggested that you could apply for
6  unemployment benefits.
7  A.  Right.
8  Q.  Is that right?
9  A.  Right.  But I was not eligible because I was
10  terminated two weeks prior to when I would have been
11  eligible.
12  Q.  Could you, please, now read the rest of this
13  document.  So read the date and then read the note
14  that you wrote next to the date?
15  A.  "4/8/03 - Appointment with Dr. Goldenberg.
16  Letter written for light-duty.
17      "4/9/03 - Letter given to work (refusal for
18  light duty).  Told to clock out early by HR."
19      ""3/10/03 - Letter written and given to
20  work for full duty.  Health Center closed early, so I
21  was told to go home by Carol Dye.
22      "4/15/03 - Took one week off from work per
23  Carol Dye.  Then took note for full duty to Health
24  Center.  Still refused to except me to come back to

Page 51

1  work at all.  Told me if I didn't return in 12 working
2  days, job would be terminated."
3  Q.  Now, who was it from your -- to your
4  understanding, who made the decision that you would
5  not be cleared to return to work even after getting
6  the second note from Dr. Goldenberg?
7  A.  I would assume it was Chris Collins because she
8  was the last one I talked to, and that was -- she was
9  the reason why they wouldn't accept the note.  And I
10  don't know what the reasoning was.  She never gave me
11  a reason.  They never did a physical, so I don't know
12  what they were going by.  She just handed me -- you
13  know, the nurse in there just handed me the note back
14  said, "We're not accepting this.  You need to call
15  her."  That's when I said, "Well, where is she?"  She
16  said, "She is in her office."  I said, "Well, then I
17  want to speak to her."  She said, "No, you can't speak
18  to her.  Let me give you her number, and you can call
19  her from home."
20  Q.  What's Chris Collins' position?
21  A.  I don't know if she's the manager down in
22  Employee Health.  I am not real sure.
23  Q.  But she's a manager in Employee Health
24  Services?

Page 52

1  A.  Possibly.  I don't know.  I don't know what her
2  position is.
3  Q.  Let me put it this way.  She works in Employee
4  Health Services?
5  A.  Yes, yes.
6  Q.  She doesn't supervise you?
7  A.  No.
8  Q.  So if I am hearing you right, you are not
9  positive if it was Chris Collins personally, but
10  somebody in Employee Health services made the decision
11  that --
12  A.  Well, it was obviously her because that's the
13  one I talked to.  Chris Collins is the one I talked
14  to.
15  Q.  So from your perspective, Chris Collins made
16  the decision that she would not clear you to return to
17  work --
18  A.  Mm-hmm.
19  Q.  -- because there were two conflicting notes?
20  A.  Mm-hmm.
21  Q.  Is that a yes?
22  A.  Yes.
23  Q.  You can put Villanueva 5 aside.
24      Incidentally, did you ever have a

Page 53

1  discussion with anyone at Christiana Care about
2  whether you'd be able to return to your position at
3  Christiana Care after your pregnancy?
4  A.  I spoke with Karen McCloud.  She called me and
5  told me once I had the baby, I was more than welcome
6  to come back.
7  Q.  When did that conversation happen?
8  A.  That happened after I received the letter
9  stating that I was being terminated because I wasn't
10  eligible for FMLA.  And that wasn't the reason why I
11  was being terminated because I never asked for FMLA.
12  That's what I had talked to Kerry Delgado about it.  I
13  said, "Why would I take time away from my baby when I
14  can work?"  It doesn't make any sense.
15  Q.  You just said you weren't being terminated
16  because of your ineligibility for FMLA.  Right?
17  A.  That wasn't the reason I was being
18  terminated, but that's the way they wrote the letter,
19  because I was asking for FMLA.  And I never asked for
20  FMLA.
21  Q.  What's your view of why you were terminated?
22  A.  I think I was just too much of a headache,
23  basically.  They knew I was going to go out on
24  maternity leave.  It's quite a chance to take because

**A-15**

14 (Pages 50 to 53)

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Villanueva
Nicole Villanueva

v.

C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

Page 54

1   you don't know if she's going to come back. And then
2   you are going to have to accommodate her. Too much of
3   a headache.
4      Q.   Were you eligible for maternity leave?
5      A.   I would have been, yes.
6      Q.   How long after you received the termination
7   letter did Karen McCloud call you?
8      A.   I don't recall how — what the date was. But I
9   know it was shortly after.
10     Q.   Okay. And what was the first thing she said to
11  you when she called you?
12     A.   She just said, "Hello." I was like, "Hello."
13  She said, "Nicole." I said, "Yes." She said, you
14  know, she said, "Did you receive the letter?" I said,
15  "Yes, I did." She said, "I just want to let you know
16  that you are more than welcome to come back after you
17  have the baby."
18     Q.   And I think you said earlier that you decided
19  that even after you had the baby, you had no desire to
20  go back to Christiana Care?
21     A.   Right. Because, obviously, it's not a
22  family-oriented place, so. And having two children
23  and a lot of demands, I can't, you know, work there.
24     Q.   So that was your choice not to seek to go back

Page 55

1   to Christiana Care?
2      A.   Mm-hmm.
3      Q.   Yes?
4      A.   Well, at that point I had also gone through the
5   Department of Labor and started legal proceedings.
6      Q.   I am going to put in front of you what's been
7   marked as Villanueva 6. And this looks to be like a
8   doctor's note from December 12th, 2002. Is that
9   right?
10     A.   Yes.
11     Q.   Can you tell me what this note relates to?
12     A.   It's actually a note from my doctor.
13     Q.   About what?
14     A.   I was placed on light-duty for lifting from a
15  procedure I had done.
16     Q.   Okay. Was that —
17     A.   Which they were well aware that I was going to
18  have done. I told Carol Dye in my interview that I
19  was going to need time off.
20     Q.   And what was the procedure?
21     A.   I had invitro.
22     Q.   So what did Christiana Care do after receiving
23  this note?
24     A.   They sent me home for a week.

Page 56

1      Q.   What were you told about that?
2      A.   That — to go home, clock out, that they
3   couldn't accommodate you.
4      Q.   That they couldn't put you on light-duty?
5      A.   No. But I was still in orientation at this
6   point. And I kind of debated it with her a little bit
7   because I said, you know, "I am not supposed to be
8   lifting anyway; I am still in orientation." I said,
9   "And I still haven't finished the unit clerk portion
10  of my orientation, so why can't I finish that during
11  this time?" And they told me to clock out. So I went
12  home.
13     Q.   Who is the "they" you are referring to?
14     A.   Carol Dye.
15     Q.   Carol Dye. Okay. Did Carol Dye tell you why
16  she couldn't put you on light-duty?
17     A.   She told me now they were going to put me as a
18  patient care tech. They were going to have me do the
19  orientation for patient care tech. I said, "Well, I
20  have only had two days of unit clerk orientation."
21  You were supposed to have a week of unit clerk and a
22  week of patient care tech. Then all of a sudden we
23  were supposed to do orientation for patient care tech.
24     Q.   Were you going through orientation with anybody

Page 57

1   else?
2      A.   What do you mean?
3      Q.   Was there anybody else along with you who was
4   going through orientation at the same time you were?
5      A.   There was a group of us, but not in that unit.
6      Q.   Is there anything you want to add about this
7   note from December 2002 or how Christiana Care
8   responded to it?
9      A.   No.
10     Q.   You can put that aside.
11     A.   Except that it was discussed in front of all
12  the other nurses at the nurse's station and the
13  patients.
14     Q.   What was discussed?
15     A.   My health at that point when I handed her the
16  note. Instead of taking me into the office, she
17  decided she was going to discuss it in front of the
18  other nurses at the nurse's station.
19     Q.   This is immediately after you handed the note
20  to Carol Dye?
21     A.   Mm-hmm, mm-hmm. Instead of saying come into my
22  office, you know, let's talk, or whatever, you know,
23  she decided she was going to discuss it there at the
24  nurse's station in front of everyone.

**A-16**

Villanueva                                v.                    Christiana Care Health Services
Nicole Villanueva                  C.A. # 04-258-JJF                        March 22, 2006

Page 58

1   Q.  So what was discussed?
2   A.  What my procedure was and why I needed to be on
3   not lifting anything more than five pounds, which is
4   really no one's business at that point. And I had
5   stated to her when I was going through the interview
6   process that that just what was going to be happening
7   and that I would need time off.
8   Q.  So the restriction was that you couldn't lift
9   five pounds or more?
10  A.  Right. For a week.
11  Q.  And correct me if I'm wrong, I think what I
12  heard you say is that the reason Carol Dye didn't put
13  you on light-duty was because the orientation was
14  shifting to the patient care aspect of the job?
15  A.  All of a sudden, yes, when I had only had two
16  days of unit clerk and it was supposed to be a week of
17  unit clerk and a week of patient care tech. Then all
18  of a sudden it was supposed to be, you know, she had
19  switched it to be a patient care tech.
20  Q.  Did she tell you why?
21  A.  No.
22  Q.  Did you ask?
23  A.  I didn't debate it with her. She told me to
24  clock out, and I went home.

Page 59

1   Q.  Did you have any understanding as to whether --
2   well, first let me back up. What's the basis for your
3   belief that there was going to be one week of training
4   as unit clerk and then another week as patient care
5   tech?
6   A.  That's what we were told in orientation.
7   Q.  Who told you that?
8   A.  Whoever headed the orientation, who I think was
9   Kerry Delgado.
10  Q.  Okay. And so are you distinguishing between an
11  orientation period that's separate and apart from the
12  two weeks of training that you were just talking
13  about?
14  A.  What they do is they have an orientation
15  session for three days. They go over the policy, the
16  handbook, everything, and then you start your --
17  actual orientation where you go and train as a unit
18  clerk. I went to computer classes. And then you do
19  your patient care part of the orientation.
20  Q.  Okay. So when -- so your basis for believing
21  that there would be one week of unit clerk training
22  and one week of patient care tech training was based
23  upon something that was said during your initial --
24  A.  Yeah. What I was told.

Page 60

1   Q.  If I can just finish -- - what you were told
2   during the human resources orientation?
3   A.  Yes.
4   Q.  Just to clarify, what I am trying to do is I am
5   trying to separate this initial part of general HR
6   employment orientation that you had and then after
7   that, sort of more substantive orientation with your
8   unit.
9   A.  Mm-hmm.
10  Q.  Is that accurate to break it down into those
11  two components?
12  A.  Yes.
13  Q.  So if I have got this straight, during the
14  initial human resources-type orientation where you got
15  the handbook and things like that you learned during
16  that orientation that you would have one week of unit
17  clerk training and one week of patient care tech
18  training. Do I have that right?
19  A.  Correct. And then we were also told that on
20  the floor. I was told by Carol Dye on the floor.
21  Q.  What were you told by Carol Dye?
22  A.  That it would be one week of patient tech and
23  one week of unit clerk because I had to go up to 5D to
24  do the unit clerk part of the orientation.

Page 61

1   Q.  Okay.
2   A.  And the schedule was written out also of where
3   you would be.
4   Q.  Were any of your coworkers at Christiana
5   Care -- did any of your coworkers at Christiana Care
6   have pregnancies that you were aware of while you were
7   there?
8   A.  Not that I know of.
9   Q.  And I think you said this before, but when did
10  you actually give birth in 2003?
11  A.  August 15th, 2003.
12  Q.  Were there any complications with the delivery?
13  A.  No. I had a C-section.
14  Q.  And after giving birth, when were you first
15  medically able to return to work?
16  A.  I went back to work 12 weeks because I had a
17  C-section.
18  Q.  So you actually went back to work 12 weeks
19  after giving birth?
20  A.  Mm-hmm.
21  Q.  Was that the first point at which you were able
22  to return to work?
23  A.  Yes.
24  Q.  And when you returned to work, did you go back

A-17

16 (Pages 58 to 61)

Villanueva                                    v.                    Christiana Care Health Services
Nicole Villanueva                   C.A. # 04-258-JJF                              March 22, 2006

Page 62

1   to Little Caboose?
2   A. Yes.
3   Q.  Were you full-time at Little Caboose?
4   A. Yes.
5   Q.  Okay.  So is that 40 hours a week?
6   A. Yes.
7   Q.  What about when you were -- just to shift back
8   quickly to Christiana Care -- when you were first
9   hired, were you hired as a full-time employee?
10  A. 72 hours bi-weekly.  I guess they consider that
11  part-time.  I don't know if they consider it part-time
12  or full-time.  But I worked 72 hours bi-weekly.
13  Q.  Was it your understanding you were required to
14  required to work 72 hours every two weeks?
15  A. Mm-hmm.
16      MS. BREWINGTON: Yes?
17  A. Yes.
18  Q.  When you went back to work at Little Caboose,
19  did you get any -- did you get a discount for your
20  kids that were in daycare at Little Caboose?
21  A. I paid full price for my son and they gave
22  me -- they did give me a discount for my daughter, if
23  I remember correctly.  I don't remember.  I would have
24  to look at the notes, look at my records.

Page 63

1   Q.  But you have records --
2   A. Yes.
3   Q.  -- of that sort?
4   A. Oh, yes.
5   Q.  All right.  So I am going to ask you to help me
6   with the time-line a little bit.  You left Christiana
7   Care in April of '03.  Right?
8   A. Right.
9   Q.  And you were working at Little Caboose within a
10  couple weeks after that.  Is that correct?
11  A. It was within a week.
12  Q.  Within a week?
13  A. Yes.
14  Q.  Okay.  And then at what point did you need to
15  stop working because you were getting very late in
16  your pregnancy?
17  A. I stopped working August 2nd.  I went in the
18  hospital.  I had kidney stones.  They put a PIC-line
19  in to buy the baby two more weeks, and then I
20  delivered.
21  Q.  Okay.  And then so you went back to Little
22  Caboose in what month?
23  A. October.
24  Q.  Other than that time period during --

Page 64

1   immediately before and the 12 weeks after you gave
2   birth in 2003, have there been any other periods of
3   time where you have been unable to work since leaving
4   Christiana Care?
5   A. No.
6   Q.  How long did you remain employed at Little
7   Caboose?
8   A. April 2003 to -- when did I start at
9   cardiology?  I want to say March or April of 2004.  So
10  it was about a year.
11  Q.  In March or April of 2004 is when you went back
12  to work at Cardiology Consultants?
13  A. Right, right.  We were waiting for a position
14  to open up.  I had called how Ann Bellman, who was a
15  director there.  She had told me when I left there
16  initially, you know, if I ever wanted to come back,
17  there would always be a position for me.  So I gave
18  her a call back and said I was looking for an EKG
19  position.  She said, "I have a few girls that are
20  getting ready to go out on pregnancy or maternity
21  leave." She said, "I am sure one of them is not going
22  to come back." She said, "As soon as I know," she
23  said, "I'll call you," so.
24  Q.  And was there a period of time where you were

Page 65

1   working at both Little Caboose and Cardiology
2   Consultants at the same time?
3   A. No, no.
4   Q.  So as soon as you found out that you were going
5   to have a position at Cardiology Consultants --
6   A. I left.
7   Q.  -- you left Little Caboose?
8   A. Right.  That was, basically, just to keep some
9   income coming in.
10  Q.  And you are currently employed at Cardiology
11  Consultants?
12  A. Yes.
13  Q.  And you have been continuously since the spring
14  of '04?
15  A. Yes.
16  Q.  And what's your title?
17  A. EKG technician.
18  Q.  How many EKG technicians are at Cardiology
19  Consultants?
20  A. It's hard to say because we have -- we're at 16
21  offices, and we're 31 doctors.  So I couldn't even
22  tell you.
23  Q.  How about in the office where you work?
24  A. In my office, there is 10 of us.

A-18

17 (Pages 62 to 65)

Page 66

1   Q.  Since leaving Christiana Care, have you been
2   employed anywhere else other than Little Caboose and
3   Cardiology Consultants?
4   A.  No.
5   Q.  All right.  Ms. Villanueva, I am just going to
6   go through a little housekeeping with documents with
7   you.  And I am going put in front of you what's been
8   marked Villanueva Exhibit 9.
9   A.  Okay.
10  Q.  Can you just confirm for me that this is your
11  2003 W-2 form from Christiana Care?
12  A.  Mm-hmm. Yes.
13  Q.  Okay.  You can put that aside.
14      And I am going to show you Villanueva 10.
15  A.  Little Caboose, yes.
16  Q.  This is your 2003 W-2 from the Little Caboose?
17  A.  Yes.
18  Q.  Okay.  You can put that aside.
19      I am going to show you Villanueva 11.
20      MR. BLOOM:  Can we take a break?
21      (Recess taken.)
22  BY MR. BLOOM:
23  Q.  Ms. Villanueva, I had put in front of you
24  Villanueva 11.

Page 67

1   A.  Mm-hmm.
2   Q.  Can you confirm for me that this is your 2004
3   W-2 form from Little Caboose?
4   A.  Yes.
5   Q.  All right.  You can put that aside.
6       And I am going to show you Villanueva 12.
7   And can you confirm for me this is your 2004 W-2 from
8   Cardiology Consultants?
9   A.  Yes.
10  Q.  All right.  Were you full-time at Cardiology
11  Consultants throughout 2004?
12  A.  Yes.
13  Q.  And in 2004 how many hours per week did you
14  work at Cardiology Consultants?
15  A.  40 hours, give or take overtime.  Occasionally
16  you get a couple hours here, there for overtime.
17  Q.  All right.  You can put that exhibit aside.
18      I am going to show you what's been marked
19  Villanueva 13.
20  A.  Okay.
21  Q.  And these are payroll earnings statements from
22  when you were employed with Little Caboose?
23  A.  Yes.
24  Q.  All right.  And if you flip through Exhibit

Page 68

1   Villanueva 13, the format of the payroll statements
2   changes.  Do you see that?
3   A.  Yes.  Because she changed who she went through.
4   Q.  When you say she, you mean --
5   A.  The owner changed who she did her payroll
6   through.
7   Q.  That was my question.
8   A.  That's why.
9   Q.  If you will turn to the very last page of
10  Exhibit Villanueva 13, on the left-hand side, it says
11  that it covers the pay period of April 24th 2004
12  through May 7th, 2004.
13  A.  Mm-hmm. Yes.
14  Q.  Is that consistent with your recollection that
15  that's the last period during which you were working
16  at Little Caboose?
17  A.  Yes.
18  Q.  If you will just look to the front page of this
19  exhibit, the first page of Villanueva 13 is an
20  earnings statement that covers the period April 26th,
21  2003 through May 9, 2003.  Right?
22  A.  Yes.
23  Q.  Is that consistent with your memory, that you
24  started working at Little Caboose sometime around

Page 69

1   April 26th, 2003?
2   A.  Yes.
3   Q.  I think you said before the reason you left
4   Little Caboose is because you finally got an open
5   position at Cardiology Consultants?
6   A.  Correct.
7   Q.  You can put that exhibit aside.
8   Ms. Villanueva.
9       I am going to put in front of you
10  Villanueva 14.  And Villanueva 14 is a series of
11  earnings statements from your employment with
12  Cardiology Consultants.  Right?
13  A.  Correct.
14  Q.  Okay.  Were you full-time at Cardiology
15  Consultants throughout 2005 also?
16  A.  Yes.
17  Q.  And what about in 2006?
18  A.  Yes.
19  Q.  You can put that exhibit aside.
20      I am going to show you Villanueva 15.  And
21  Villanueva 15 is three separate pages.  So I want you
22  to look at those three pages and tell me when you're
23  done.
24  A.  Okay.

**A-19**

Villanueva                                    v.                    Christiana Care Health Services
Nicole Villanueva                      C.A. # 04-258-JJF                            March 22, 2006

Page 70

1  Q.  What are the three pages that are in Villanueva
2  15?
3  A.  It is the tax portion of the childcare expenses
4  for my W-2s, my taxes for all three years.
5  Q.  So there is a Form 2441 for the years 2003,
6  2004, and 2005?
7  A.  Correct.
8  Q.  And these reflect childcare expenses that you
9  had during those years?
10  A.  Correct.
11  Q.  Do you have any understanding as to why these
12  particular documents were produced by you or your
13  lawyers to me in this case?
14  A.  I guess to calculate damages.
15  Q.  Why is it -- do you believe that Christiana
16  Care is responsible for paying your childcare expenses
17  as a result of this case?
18  A.  Yes, I do.
19  Q.  What's that belief based on?
20  A.  Because I was starting to take a permanent 3:00
21  to 11:00 position. My children wouldn't be in daycare
22  because my husband worked 7:00 to 3:00, so.
23  Q.  At the time your employment was terminated, you
24  were still working what shift?

Page 71

1  A.  I was working alternating 7:00 to 3:00 and 3:00
2  to 11:00. It hadn't gone into effect yet.
3  Q.  All right. I am going to show you Villanueva
4  8. And read Villanueva 8 and let me know when you're
5  done.
6  A.  Okay.
7  Q.  Have you seen Villanueva 8 before?
8  A.  Yes. I have a copy.
9  Q.  This is a letter from your lawyer to me
10  explaining the damages that you're seeking in this
11  case. Do I have that right?
12  A.  Correct, correct.
13  Q.  Are there any money damages other than what's
14  described in this letter that you're seeking in this
15  case?
16  A.  Pain and suffering and attorney fees.
17  Q.  And in this letter it says that you're seeking
18  lost wages in the amount of $43,600. Did I read that
19  right?
20  A.  Correct.
21  Q.  Can you explain to me how you calculated that
22  amount?
23  A.  My lost wages -- well, considering I didn't
24  work. I started working at the Little Caboose. I was

Page 72

1  making maybe $8 an hour, if that. Then I had to pay
2  childcare on top of that. So I walked home with maybe
3  a hundred dollars every week. Two hundred bi-weekly,
4  maybe. And now I am still not making what I was
5  making at Christiana Care. I don't have the benefits
6  of overtime. Because when you worked at weekends at
7  Christiana Care, there was incentive. So I lost that.
8  I lost holiday pay. And it's probably going to take
9  me close to six years to get back to where I was.
10  Q.  Did you calculate this amount, this $43,600
11  amount?
12  A.  The attorney did on top of everything that I
13  have given her.
14  Q.  Okay. To your understanding, does that amount
15  cover a particular period of time?
16  A.  I believe from the time I left Christiana up to
17  present.
18  Q.  And you referred a second ago to having to pay
19  for childcare coming out of your pay at Little
20  Caboose?
21  A.  Right.
22  Q.  Did I hear you say that right?
23  A.  Correct.
24  Q.  So is it your view that -- let me rephrase

Page 73

1  that. There is a separate entry in Villanueva 8 that
2  refers to daycare expenses. Right?
3  A.  Correct.
4  Q.  Okay. The daycare expenses, did that also
5  factor into the lost wages that are in the $43,000
6  figure?
7  A.  No.
8  Q.  Do you have any understanding as to how the
9  $43,600 was actually calculated?
10  A.  I am assuming through my pay stubs, my W-2s,
11  they calculated it.
12  Q.  And is it your understanding that that reflects
13  the difference in pay from what you were getting at
14  Christiana Care --
15  A.  Correct.
16  Q.  -- and what you were getting at Little Caboose?
17  A.  Correct. And the difference from cardiology
18  also.
19  Q.  And the figure that's in Villanueva 8 for
20  daycare expenses, is that just the sum of the numbers
21  that were in the tax forms that were in Villanueva 15?
22  A.  I believe so. That's probably correct. Yes.
23  Q.  These forms that are in Villanueva 15, these
24  reflect tax credits that you got for childcare

**A-20**

Villanueva                                    v.              Christiana Care Health Services
Nicole Villanueva              C.A. # 04-258-JJF                       March 22, 2006

Page 74

1   expenses. Is that right?
2   A. That's just what I paid out in childcare
3   expenses. Everything that's listed is what I paid out
4   for the year in childcare expenses.
5   Q. Okay. Is it your understanding, though, that
6   part of the purpose of this form was for you to get a
7   credit on your taxes for a portion of those expenses?
8   A. Very little credit.
9   Q. Is that a yes?
10  A. Yes.
11  Q. How much did Little Caboose charge per day?
12  A. I am not sure. I paid weekly.
13  Q. What did you pay weekly? Let's start with
14  2003.
15  A. Initially, when my son started going there, I
16  paid 147 a week.
17  Q. Okay. Did it change at some point after that?
18  A. When I was hired there, when I was hired there,
19  I continued to pay the 147 a week. And then when my
20  daughter was born, she started going there. They gave
21  me the discount. And I believe I paid $80 a week for
22  her. I can't remember. I'd have to look at home.
23  Q. And in 2004, what Exhibit 15 shows is that your
24  kids were then going to a place called Learning

Page 75

1   Express?
2   A. My son was. My son is currently there.
3   Q. What's the difference between Learning Express
4   and Little Caboose?
5   A. Learning Express is a preschool. They're
6   degree teachers. It's actually a preschool
7   kindergarten, and they're actually going to go up to
8   third grade.
9   Q. So Learning Express is pre-school?
10  A. Exactly. They cannot go there until they turn
11  3.
12  Q. And is it your position that Christiana Care
13  should be paying for your son's preschool?
14  A. Exactly. Because he would still be home with
15  me until he started kindergarten. He hasn't started
16  kindergarten yet.
17  Q. What's the basis for your belief that
18  Christiana Care should pay for your son's preschool?
19  A. Because he wouldn't be there if I was home
20  during the day. There was no need to have preschool.
21  Q. Is Learning Express more expensive than Little
22  Caboose?
23  A. I am currently paying 155 for him. I am paying
24  170 for my daughter a week now.

Page 76

1   Q. So about 325 a week all together?
2   A. Mm-hmm. It's about 1300 a month in daycare.
3   Q. What's great new beginnings?
4   A. That's where my daughter is.
5   Q. Currently?
6   A. Yes. She cannot go to my son's school until
7   she turns 3. And she has to be potty-trained.
8   Q. What's the difference between Great New
9   Beginnings and Little Caboose?
10  A. Nothing. It's the same basic idea.
11  Q. Why did you switch from Little Caboose?
12  A. My son was at the Little Caboose. My daughter
13  was home. We had an elderly woman come in and take
14  care of her while she was an infant. And then when
15  she turned 2, we put her in Great New Beginnings until
16  she turns 3. Then she will go over with my son.
17  Q. And I think you said this before. But even
18  while you were working at Christiana Care, your son
19  was in daycare at Little Caboose. Right?
20  A. Only the days that I worked during the day, he
21  was there. So it may be -- it alternated. Some days,
22  it was two days a week; some days, three days a week.
23  Q. When you say some days, sometimes two,
24  sometimes three days a week, that's the number of days

Page 77

1   that your son would be at Little Caboose?
2   A. Yes. Depending on when my -- when the 7:00 to
3   3:00 position was. I may have -- two days a week I
4   may work 7:00 to 3:00. The other days were 3:00 to
5   11:00. So those two days, he would be at daycare.
6   Q. And that, what you just described as sometimes
7   being two, sometimes three --
8   A. Right.
9   Q. -- that was true throughout the time you were
10  employed at Christiana Care?
11  A. Correct.
12  Q. All right. You can put Villanueva 8 aside.
13      I am going to show you Villanueva 7. Just
14  take a moment to review that document and let me know
15  when you're done.
16  A. Okay.
17  Q. And so you have seen this document before?
18  A. Yes.
19  Q. And I'll just note for the record Villanueva 7
20  is Plaintiff's Answers to Defendant's First Set of
21  Interrogatories.
22      Ms. Villanueva, would you turn to the
23  second-to-the-last page of this exhibit and just
24  confirm for me that's your signature on the

A-21

20 (Pages 74 to 77)

Villanueva                              v.                    Christiana Care Health Services
Nicole Villanueva              C.A. # 04-258-JJF                          March 22, 2006

Page 78

1  verification page?
2  **A. Correct.**
3  Q. If you would turn to page number 6 of
4  Villanueva 7. And on page 6 are your answers to
5  interrogatory 7, which asks a series of question about
6  your search for new employment after you left
7  Christiana Care. Right?
8  **A. Correct.**
9  Q. There is a reference here to Concentra Medical
10 and that you were interviewed for a sales position?
11 **A. Correct.**
12 Q. And where is Concentra Medical located?
13 **A. They have several different offices. One of**
14 **them up on Harmony Road, in Newark, Delaware. I**
15 **actually interviewed in Marlton, New Jersey. I guess**
16 **it was their main corporate headquarters.**
17 Q. Do you recall when that was, when that
18 interview was?
19 **A. February -- January or February 2004.**
20 Q. And do you remember what the salary of that
21 position was?
22 **A. It was based on commission. They gave a base**
23 **salary, but then, you know, there was commission,**
24 **depending on how many customers you brought in.**

Page 79

1  Q. What were you -- what would you have been
2  selling if you had worked at Concentra Medical?
3  **A. It's, basically, to employers -- when their**
4  **employees get like work-related injuries, they clear**
5  **them to go back to work. Or the initial hiring**
6  **process, they do the clearance for that, drug screens.**
7  Q. Did you ever hear back from Concentra about
8  whether or not they were going to offer you a job?
9  **A. No, I did not hear back.**
10 Q. And what about Panzer Dermatology, what was
11 that position you applied for?
12 **A. I actually sent my resume in. I didn't know it**
13 **was Panzer Dermatology -- sent my resume in from the**
14 **newspaper, and they actually called me back. I had**
15 **already accepted the position with Cardiology**
16 **Consultants, so I just didn't even bother calling them**
17 **back because I had already started.**
18 Q. If you will turn the page. On page 7 of
19 Villanueva 7, there is a reference here to a profit
20 sharing plan at Cardiology Consultants. Do you see
21 that?
22 **A. Correct.**
23 Q. Can you describe for me what that profit
24 sharing plan is?

Page 80

1  **A. The doctors contribute money into the profit**
2  **sharing. Depending on how well the company does in a**
3  **year, depends how much they contribute into your**
4  **profit-sharing. So it's, basically, my retirement.**
5  Q. Is that money, I guess, put into an account in
6  your name?
7  **A. They -- I believe they invest it in different**
8  **types of investments, and then, you know, when you**
9  **retire, I guess you withdraw.**
10 Q. Let me ask it this way. Do you receive a
11 statement periodically?
12 **A. Yes, yes.**
13 Q. You do.
14 **A. Yes.**
15 Q. How frequently do you receive a statement of
16 your share in the profit-sharing plan?
17 **A. About every three to four months. We just got**
18 **another one.**
19 Q. Have you kept the records that you received
20 from your -- the statements you get about your
21 profit-sharing plan?
22 **A. Yes.**
23 Q. And can you estimate for me what you received
24 from the profit-sharing plan for the whole year of

Page 81

1  2005?
2  **A. I wouldn't even be able to tell you without**
3  **looking at the records.**
4      MR. BLOOM: I am going to request
5  production of Ms. Villanueva's statements from the
6  profit-sharing plan.
7      MS. BREWINGTON: Can you send me a letter?
8      MR. BLOOM: I will.
9      MS. BREWINGTON: Okay. Good.
10     MR. BLOOM: But we're talking about the
11 from the time period when Ms. Villanueva went back to
12 Cardiology Consultants in spring 2004 until present.
13     THE WITNESS: It wasn't much. I can tell
14 you that much.
15 BY MR. BLOOM:
16 Q. In the profit sharing plan, do you also, apart
17 from what the business contributes, do you also
18 contribute to a retirement account there?
19 **A. No.**
20 Q. If you would turn ahead -- and we're still in
21 Exhibit Villanueva 7 -- to page 9. There is a
22 reference to a debt action filed by Wilmington Trust
23 Company. Can you tell me what that was about?
24 **A. Well, when I lost my job at Christiana Care, I**

A-22

21 (Pages 78 to 81)

Page 82

1    couldn't afford to pay them. So making $8 an, hour I
2    either had to feed my family or pay my creditors, and
3    my family came first. So they sent it to court.
4    Q.  What was the debt that was being enforced?
5    A.  I owed on a loan.
6    Q.  Okay. What was the loan for?
7    A.  Medical expenses.
8    Q.  Okay. I don't -- we don't need to get into
9    excruciating detail, but were those expenses related
10   in any way to your pregnancy?
11   A.  Yes.
12   Q.  How so?
13        MS. BREWINGTON: I am going to object in
14   terms of relevance.
15   A.  I don't see where it matters. It's just
16   medical stuff. It's a loan.
17   Q.  But --
18   A.  What I used the money for, I don't see what it
19   matters.
20   Q.  I understand that you don't.
21   A.  Or if it's anybody's business, really, at this
22   point. There was a loan that I defaulted on. Because
23   I lost my job at Christiana, I could not pay it, so
24   instead of paying creditors, I fed my family, which

Page 83

1    was more important.
2    Q.  I understand that, Ms. Villanueva. And I don't
3    want to make you feel uncomfortable. But this is a
4    lawsuit about pregnancy discrimination.
5    A.  Right. From the time I was pregnant, not
6    before. So my medical things before do not have
7    anything to do with this.
8    Q.  Then let me ask you a different way. The
9    expenses that gave rise to this debt that's referred
10   to in your response to interrogatory 11, when in time
11   did you incur those expenses?
12   A.  Prior to when I worked at Christiana Care and
13   during.
14   Q.  And during?
15   A.  And during.
16   Q.  Okay. Did these expenses that relate to
17   Wilmington Trust Company's action, did they relate to
18   invitro fertilization?
19   A.  I don't understand what it matters.
20        MS. BREWINGTON: I have the same objection.
21   A.  No. I think that's ridiculous because it
22   doesn't have anything to do with this. I am not going
23   to discuss my -- the way -- the method my children got
24   here. I think that it's not relevant.

Page 84

1    Q.  That's fine. The court --
2    A.  I can prove to you I have debt. So, I mean,
3    what I used the money for is really nobody's business,
4    so. So I am going to leave it at that.
5    Q.  Well, that's fine, Ms. Villanueva, but you
6    still need to answer the question.
7    A.  I am not answering the question. It was used
8    for medical reasons.
9    Q.  All right. I'll just let you know we may be
10   back here again to do this over again. I don't know
11   if that's going to happen. But the deposition will
12   remain open to do that.
13        MS. BREWINGTON: Can we take a five-minute
14   break off the record?
15        MR. BLOOM: Sure.
16        MS. BREWINGTON: Can we step outside?
17        MR. BLOOM: Sure.
18        MS. BREWINGTON: Thank you.
19        (Recess taken.)
20        MS. BREWINGTON: I think you can re-ask
21   that question if you'd like to.
22        MR. BLOOM: Could you read back the last
23   question, please?
24        (The reporter read as follows:

Page 85

1        "Question: Did these expenses that relate
2    to Wilmington Trust Company's action, did they relate
3    to invitro fertilization?")
4        MS. BREWINGTON: For the record, I am just
5    going to object.
6        THE WITNESS: Correct.
7    BY MR. BLOOM:
8    Q.  Can you tell me what the amount of the loan is
9    that Wilmington Trust Company had?
10   A.  Currently what the amount is or what it was
11   initially taken out for?
12   Q.  Initially.
13   A.  10,000.
14   Q.  And what is it at now?
15   A.  8900. Give or take.
16   Q.  I take it that the lawsuit that's referred to
17   in this interrogatory response was resolved in some
18   way?
19   A.  No. It is currently still ongoing.
20   Q.  Has your husband been employed -- let's start
21   with 2003, in April, when you left Christiana Care.
22   Was your husband employed at that time?
23   A.  Yes.
24   Q.  What does he do?

A-23

22 (Pages 82 to 85)

Villanueva                                      v.                    Christiana Care Health Services
Nicole Villanueva                    C.A. # 04-258-JJF                          March 22, 2006

Page 86

1   A. He works at W. L. Gore.
2   Q. What's that?
3   A. Well, their division actually makes filters for
4   the Wet/Dry Vac. Now he's actually a mechanic for
5   them, machinist, mechanic.
6   Q. Could you spell the name of his employer?
7   A. W. L. G-O-R-E & Associates.
8   Q. Is he being continuously employed by W. L. Gore
9   & Associates from April 2003 to the present?
10  A. Correct.
11  Q. And can you tell me approximately what your
12  husband's yearly salary was in 2003?
13       MS. BREWINGTON: I'll object.
14  A. Yeah. I am kind of having a problem with that.
15  Q. You still need to answer the question.
16  A. I am having a real problem with that because
17  that's nobody's business.
18  Q. Ma'am --
19  A. I couldn't even tell you if I wanted to.
20  Q. Ma'am, you need to answer the question.
21  A. Well, my reasoning is what does he have to do
22  with this ?
23  Q. I am not here answering questions today, but.
24  A. I mean, it's irrelevant. What he makes is

Page 87

1   nobody's business. What does that have to do with
2   this case? Nothing.
3   Q. You may not view it as relevant. And, frankly,
4   it's not --
5   A. It's not relevant.
6   Q. -- Ms. Villanueva, for you to decide. You need
7   to answer the question.
8   A. It doesn't matter. He kept a roof over our
9   heads when I got fired from Christiana Care. That's
10  what matters.
11  Q. Ms. Villanueva, give me an approximation of
12  what your husband earned in 2003.
13  A. I have no idea. I would have to look at the
14  W-2s.
15  Q. Do you know what he makes right now?
16  A. Yes, I know what he makes right now.
17  Q. What does he make right now?
18  A. About $50,000 a year. Not including overtime.
19  Q. Okay. And that's for 2006?
20  A. For 2005, when we did our W-2s, that's what he
21  made.
22  Q. So he made about $50,000 give or take for all
23  of 2005?
24  A. Correct.

Page 88

1   Q. Was he making more in 2005 or less than 2005?
2        MS. BREWINGTON: I am going to object to
3   the same line of questioning in terms of relevance.
4   She can answer if she's able.
5   A. What was the question?
6        MR. BLOOM: I didn't finish it.
7        MS. BREWINGTON: I'm sorry.
8   BY MR. BLOOM:
9   Q. The question is what you just referred to was
10  $50,000 in 2005. To your recollection, is that more
11  than or less than he made in 2004?
12  A. It's more because he got a promotion.
13  Q. Okay. What was the promotion?
14  A. He was doing a apprenticeship --
15       MS. BREWINGTON: Object.
16  A. -- through Gore --
17       MS. BREWINGTON: I objected. You can
18  answer the question.
19  A. He's doing a apprenticeship through Gore as a
20  mechanic/machinist.
21  Q. When did your husband first start working for
22  W. L. Gore & Associates?
23       MS. BREWINGTON: The same objection.
24  A. 1997. No, '96.

Page 89

1   Q. And you just referred a minute ago to
2   approximately $50,000 in earnings in 2005.
3   A. Mm-hmm.
4   Q. Can you approximate for me how that compares
5   with what he earned in 2003?
6        MS. BREWINGTON: I am going to object on
7   the grounds of relevance and the fact that it's been
8   asked and answered.
9   Q. That's fine. Can you answer that question?
10  A. I have no idea without having my W-2 -- his
11  W-2s in front of me. I have no idea.
12  Q. But those are documents that you possess at
13  home?
14  A. Yes. We did pay taxes.
15       MR. BLOOM: Okay. Ms. Villanueva, I have
16  no further questions today. As I mentioned, I am
17  holding the deposition open. I don't know if we'll
18  continue or not, but it is -- is there anything else
19  we need to deal with on the record?
20       MS. BREWINGTON: I object to holding the
21  deposition open. We certainly have time here to
22  answer any questions you may have.
23       THE WITNESS: Yeah. And I am not taking
24  another day off from work. I have lost enough time.

A-24

23 (Pages 86 to 89)



Villanueva
Nicole Villanueva

v.
C.A. # 04-258-JJF

Christiana Care Health Services
March 22, 2006

Page 90

1    MR. BLOOM: We'll deal with that if we need
2  to down the road. We're off the record.
3         (Deposition concluded at 12:39 p.m.)
4         -- -- -- --
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 91

1            I N D E X
2  WITNESS: NICOLE VILLANUEVA          PAGE
   EXAMINATION BY MR. BLOOM            2
3
          E X H I B I T S
4  NO.                     MARKED
5  1  Resume of N. Villanueva, stamped    14
      D0169 - 170
6
   2  Employment application, stamped     23
7     D0173 - 74
8  3  4/8/03 handwritten note of          27
      Dr. Goldenberg, stamped D0202
9
   4  Typewritten note of                 36
10    Dr. Goldenberg, stamped D0206
11 5  Handwritten note, stamped 0003      46
12 6  12/12/02 handwritten note,          55
      stamped D0350
13
   7  Plaintiff's Answers to Defendant's  77
14    First Set of Interrogatories
15 8  2/28/06 letter from L. Brewington   71
      to T. Bloom
16
   9  Copy of W-2 forms, stamped 0005     66
17
   10 Copy of W-2 form, stamped 0004      66
18
   11 Copy of W-2 form, stamped 0026      66
19
   12 Copy of W-2 form, stamped 0025      67
20
   13 Copies of earnings statements,      67
21    stamped 0043 - 0062
22 14 Copies of earnings statements,      69
      stamped 0063 - 0116
23
   15 Copy of Form 2441, stamped 91,      69
24    90 and 0117

A-25

Page 92

1
2
        REPLACE THIS PAGE
3
        WITH THE ERRATA SHEET
4
        AFTER IT HAS BEEN
5
        COMPLETED AND SIGNED
6
        BY THE DEPONENT.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 93

1  State of Delaware   )
                       )
2  New Castle County   )
3
4       CERTIFICATE OF REPORTER
5
6       I, Lucinda M. Reeder, Registered Diplomate
   Reporter and Notary Public, do hereby certify that
7  there came before me on the 22nd day of March 2006,
   the witness herein, NICOLE VILLANUEVA, who was duly
8  sworn by me and thereafter examined by counsel for the
   respective parties; that the questions asked of said
9  witness and the answers given were taken down by me in
   Stenotype notes and thereafter transcribed by use of
10 computer-aided transcription and computer printer
   under my direction.
11      I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12 examination of said witness.
13      I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16
17          Lucinda M. Reeder, RDR, CRR
            Certification No. 132-RPR
18          (Expires January 31, 2008)
19
20 DATED:    3-31-06
21
22
23
24

24 (Pages 90 to 93)



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Villanueva

## v.

# Christiana Care Health Services, Inc.

### C.A. # 04-258-JJF

---

### Transcript of:

### Christine M. Collins

### April 26, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A-26

Villanueva
Christine M. Collins

v.
C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NICOLE VILLANUEVA,            )
                              )
              Plaintiff,      )
                              )    Civil Action
    v.                        )    No. 04-258-JJF
                              )
CHRISTIANA CARE HEALTH        )
SERVICES, INC.               )
                              )
              Defendant.      )

              Deposition of CHRISTINE M. COLLINS taken
pursuant to notice at the law offices of Morris, James,
Hitchens & Williams, 222 Delaware Avenue, Tenth Floor,
Wilmington, Delaware, beginning at 11:50 a.m. on
Wednesday, April 26, 2006, before Kathleen White Palmer,
RMR, CSR-DE, CLR and Notary Public.

APPEARANCES:

        LORI A. BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19806
          for the Plaintiff

        THOMAS S. BLOOM, ESQUIRE
        MORGAN LEWIS & BOCKIUS LLP
          1701 Market Street
          Philadelphia, Pennsylvania   19103-2921
          for the Defendant

ALSO PRESENT:

        NICOLE VILLANUEVA
        KERRY DELGADO

------------------------------------------------------
              WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477

Villanueva
Christine M. Collins

v.
C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 2

1        CHRISTINE MARION COLLINS,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MS. BREWINGTON:
6        Q.   Hi, Miss Collins.  My name is Lori Brewington
7    and I represent Nicole Villanueva in a discrimination
8    action against Christiana Care.  I'm going to ask you a
9    series of questions.
10       Have you ever been in a deposition before?
11       **A.   Once.**
12       Q.   The reason why I ask is because I just want to
13   explain to you, I'll be asking you a series of questions
14   and I'll ask you to give me the answer.  If you answer
15   the question, then I'll assume that you understand the
16   question that was asked.
17       If at any time you need a break, just let
18   me know and we'll go off the record and take a break.
19       If you could begin by stating your name and
20   professional title.
21       **A.   Christine M. Collins.  My professional title,**
22   **I'm a family nurse practitioner, certified in**
23   **occupational health and director of Employee Health at**
24   **Christiana Care.**

Page 3

1        Q.   Were you the director of Employee Health when
2    Miss Villanueva was employed at Christiana Care?
3        **A.   Yes.**
4        Q.   Could you tell me a little bit about your
5    educational background?
6        **A.   I am a -- I completed a bachelor's degree in**
7    **nursing and a certificate program as a family nurse**
8    **practitioner.  And then I completed a master's in**
9    **occupational health, nursing and administration at the**
10   **University of Pennsylvania.**
11       Q.   When did you begin working at Christiana Care?
12       **A.   April 11th, 1988.**
13       Q.   Could you tell me generally the function of
14   Employee Health Services?
15       **A.   Our primary -- our primary function is to**
16   **promote the health and well-being of employees.  We do**
17   **occupational health for injuries or illnesses that occur**
18   **on the job.  We also do some limited primary care.**
19       Q.   Is that it?
20       **A.   Yes.**
21       Q.   Are there any doctors that work in Employee
22   Health?
23       **A.   We have a medical director.**
24       Q.   Who is your medical director?

Page 4

1        **A.   It's Dr. James Newman.  Actually, his official**
2    **title would be -- he's our collaborative -- collaborating**
3    **physician.**
4        Q.   What exactly does that mean?
5        **A.   As a nurse practitioner in Delaware, you have to**
6    **function with a collaborative agreement with a physician,**
7    **and so he is our physician collaborative that we function**
8    **under.**
9        Q.   Correct me if I'm not asking the questions in
10   the right way, but I'm just trying to understand.
11       Does he oversee your operation?
12       **A.   No.**
13       Q.   Is he involved in any way in the determinations
14   that you make in Employee Health Services?
15       **A.   Occasionally.**
16       Q.   In what way?
17       **A.   If we need medical advice, we might consult him.**
18       Q.   Could you tell me about Christiana Care's policy
19   with respect to employees who cannot do the regular
20   duties of their position because of physical limitations?
21       **A.   Say it one more time.**
22       Q.   It's a difficult question.  I'll try to talk
23   slowly.
24       I'd like to know about Christiana Care's

Page 5

1    policy or what your understanding is of their policy with
2    respect to employees who cannot do the regular duties of
3    their job because of physical limitations.
4        MR. BLOOM:  Object to the form of the
5    question.
6        If you understand it, you can answer it.
7        **A.   I guess -- can you be more specific?  Because it**
8    **can vary.**
9        Q.   Okay.  Well, tell me how it can vary.
10       **A.   Well, if a person can't do their physical -- if**
11   **they can't perform their job duties because of physical**
12   **reasons, generally that they would be -- they would go**
13   **out on a medical leave of absence.**
14       Q.   When you say "generally," what do you mean?
15       **A.   Well, if they are unable to perform their job**
16   **duties or if they have medical conditions that require**
17   **them to take medications or whatever, that they can't do**
18   **their job duties, you know, they would -- they would be**
19   **placed on a medical leave of absence.**
20       Q.   Is that what Christiana Care does in every
21   situation where an employee can't do their regular job
22   duties?
23       **A.   If it's temporary, yes.  And if they need**
24   **medical treatment that will resolve their problem, then**

2 (Pages 2 to 5)

Villanueva
Christine M. Collins

v.

C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 6

1 they would be out until such time that they could come
2 back and do their job.
3    Q.  Okay.
4    A.  If it's a permanent situation and they can't do
5 their physical job, then they would have to go through
6 our -- the process of bidding into a position or for a
7 position that they could physically perform or qualify
8 for.
9    Q.  Who makes the determination whether it's a
10 temporary condition or a permanent condition?
11    A.  If their treating physician -- depending on the
12 documentation that they have or the condition, you know,
13 the employee themselves might say that this is not -- so
14 most of the time we would get medical document that would
15 support -- first of all, they have to have medical
16 documentation to support a leave of absence, so -- and
17 if -- if they are going to exceed a maximum leave of
18 absence, you know, they might want to pursue another
19 opportunity.  But that would be between them and their
20 doctor.
21    Q.  So what role does Employee Health play in
22 determining whether a medical condition is permanent or
23 temporary?
24    A.  We don't.  We would assist the employee once we

Page 7

1 know what direction they are going, but we wouldn't make
2 that determination.
3    Q.  Does Employee Health make a determination
4 whether an employee can do their job?
5    A.  Yes, we do.  Employees are seen in Employee
6 Health if there's any question about their ability to do
7 their job, and, you know, we would make an assessment
8 based on the history that they have, what's going on with
9 them, acquiring medical information and information from
10 their doctor.  You know, whether or not it would be safe
11 for them to continue working in that position.  As well
12 as safe for patients.  We have to consider patient
13 safety, as well.
14    Q.  In considering patient safety and the safety of
15 the employee, do you examine the employee?
16    A.  It would depend.
17    Q.  What does that depend on?
18    A.  Well, an evaluation, a medical evaluation
19 actually has several components to it.
20    Q.  Okay.
21    A.  Probably one of the most important components is
22 the medical history.  People, by medical history, may
23 have a problem that is not currently being manifested,
24 but you wouldn't want to put a person in a situation

Page 8

1 where that would make them symptomatic.
2    Q.  So when would you examine an employee?
3    A.  If they come in and they're ill with symptoms.
4    Q.  Who would examine them?
5    A.  One of the nurse practitioners.
6    Q.  Would you complete some type of form indicating
7 that an exam was done?
8    A.  We would document our visit.  An examination is
9 not always done, but we would document the visit.
10    Q.  Does Christiana Care have a written policy with
11 respect to the rules that are followed when an employee
12 can't do the regular duties of their job?
13    A.  I'm thinking through the policies to see if
14 there's one that would address that.  Not a specific
15 policy for that, no.
16    Q.  Miss Villanueva began working at Christiana Care
17 around December of 2002; is that correct?
18    A.  I would -- I don't know her exact hire date.
19 Somewhere around that time.  I don't know the exact hire
20 date.
21    Q.  When did you first learn that she was pregnant?
22    A.  I was contacted by one of the nurse
23 practitioners that works for me that she had come in
24 because of problems related to her pregnancy and was put

Page 9

1 on -- was given light-duty restrictions.  My
2 understanding it was basically for a sedentary-type of
3 position.
4    Q.  Who was the nurse practitioner that contacted
5 you?
6    A.  That was Rebecca Goldstein.
7    Q.  What did you say in response to Rebecca
8 Goldstein?
9    A.  Can you be more specific?
10    Q.  You indicated to me that Rebecca spoke to you
11 about Miss Villanueva being pregnant; correct?  And
12 problems that she was having related to her pregnancy;
13 correct?
14    A.  Correct.
15    Q.  Did you respond to her in any way?
16    A.  My recollection is that she came in one day with
17 a sedentary note, and the next day she had a note that
18 said she was cleared without restrictions.  And Rebecca
19 had called me and was concerned that her status had not
20 changed -- nothing had changed between the day before and
21 the day that she came in with the new note.  And she was
22 uncomfortable clearing her without any restrictions.  And
23 I supported her in her assessment and decision that, you
24 know, that she should continue to have restrictions.

3 (Pages 6 to 9)

Villanueva
Christine M. Collins

v.
C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 10

1　Q.　I'll ask you more about that later. Okay?
2　　　　I want to show you a document and ask you
3　to tell me what it is.
4　　　　MS. BREWINGTON:  This will be Collins 1.
5　　　　(Collins Exhibit 1 was marked for
6　identification.)
7　BY MS. BREWINGTON:
8　Q.　Could you tell me what this document is?
9　A.　**This is the Employee Health Service Referral**
10　**form that is completed as a result of a visit to Employee**
11　**Health.**
12　Q.　What is the date of this document?
13　A.　April 9th, 2003.
14　Q.　Who signed it?
15　A.　**That is Rebecca Goldstein's signature.**
16　Q.　Is she the person that completed this document?
17　A.　Yes.
18　Q.　What job title does it indicate?
19　A.　Unit clerk/PCT.
20　Q.　And "PCT" stands for what?
21　A.　Patient care technician.
22　Q.　What medication was Miss Villanueva taking?
23　A.　Lopressor.
24　Q.　What is the purpose of this medication?

Page 11

1　A.　**Lopressor is a beta blocker that is used to**
2　**treat cardiac arrhythmias and tachycardia.**
3　Q.　Does this document indicate how long she was
4　taking Lopressor?
5　A.　No.
6　Q.　Could you tell me what the writing in this
7　document says, the handwriting in the document?
8　A.　**"5 months pregnant. Saw Dr. Goldenberg on 4/8**
9　**and he wants to place her on sedentary duty with cardiac**
10　**arrhythmias."**
11　Q.　So as of April 9th, 2003, according to this
12　document, she was five months' pregnant; is that correct?
13　A.　**That's the way I would interpret it.**
14　Q.　According to this document from Employee Health,
15　Miss Villanueva was not to be sent home; is that correct?
16　A.　**It was noted that she could remain on duty**
17　**working in a sedentary capacity.**
18　Q.　I'm going to ask you this question:  Why did
19　Employee Health clear her to return to work in a
20　sedentary duty if her job title was unit clerk/patient
21　care tech?
22　A.　**I can clear them for whatever the restrictions**
23　**their doctors identify.  Whether or not there is**
24　**sedentary duty or light duty available is dependent on,**

Page 12

1　**one, the person's job, and two, the department, whether**
2　**or not they have -- they can accommodate light duty.  So**
3　**that would be, you know, a department's determination**
4　**based on their job, et cetera.  So I cleared them.  I**
5　**basically clear them with what their doctor says, and**
6　**then it would be working with the manager to see if they**
7　**were going to be able to work or not.**
8　Q.　Now, I want to understand what you said earlier,
9　and correct me if I'm wrong.
10　　　　Earlier you mentioned that if an employee
11　can't perform their job duties, they take a medical leave
12　of absence; is that correct?
13　A.　**If they can't be -- if there are restrictions**
14　**that cannot be accommodated, then, yes, they would be**
15　**placed on a medical leave.**
16　Q.　So in your experience, have there been
17　accommodations made for certain employees depending on
18　their department and their job responsibilities?
19　A.　**We have -- the only mandatory light-duty program**
20　**that we have is for our occupational injuries.  Outside**
21　**of that, it's really dependent on the job they have and,**
22　**you know, if you are -- if you fracture your foot and**
23　**you're a roofer, you're not going to be able to get up on**
24　**the roof.  So they would not be able to continue.**

Page 13

1　　　　**If you fracture your foot and you have**
2　**sedentary duty and your job is a telephone operator, it's**
3　**not -- it probably is not going to be an issue.**
4　　　　**So it is dependent upon the department, the**
5　**job, and the restrictions that they have.**
6　Q.　So it's dependent upon the job and the
7　restrictions that they have.  So your statement earlier
8　that if a person can't perform the job duties, they'll
9　take a medical leave of absence isn't necessarily true in
10　all cases; correct?
11　A.　**The majority of them.**
12　Q.　Is it fair to say that there are some
13　circumstances where an employee who can't perform the
14　regular duties will serve in some other function?
15　A.　**Only if there's work available on that unit and**
16　**it's within their job descriptions.**
17　Q.　Now, you mentioned that only if there's work
18　available on that unit.  Is that Christiana Care's
19　policy?
20　A.　**Policy?  I'm not sure if that's written in a**
21　**policy.  It's definitely practice.  If they have a**
22　**vacancy within the department or a hole in the department**
23　**where they have work available, you know, a lot of times**
24　**they can try to help them.  They can transition them**

4 (Pages 10 to 13)

Villanueva                              v.                    Christiana Care Health Services, Inc.
Christine M. Collins              C.A. # 04-258-JJF                              April 26, 2006

Page 14

1  into -- if there's a vacancy -- I mean a hole in the
2  department's needs. But I don't know whether it's
3  policy, per se.
4      Q. Is it fair to say there's no written policy that
5  the work available has to be on that same unit?
6      A. I don't know if it's policy, but if it's not
7  available on their unit, there's no way to assign them
8  outside of their department.
9      Q. I just took the deposition of Carole Dye and we
10  were talking about the transitional surgical unit and 5D,
11  and in that situation Karen McCloud, I guess she
12  departments reported to her. In a situation -- you seem
13  confused. Are you confused?
14      A. I'm not sure. I haven't heard what you are
15  saying.
16      Q. Okay. She testified that the transitional unit
17  and 5D, that Karen McCloud was the supervisor of both the
18  transitional unit and 5D. Okay?
19      A. Okay.
20      Q. You indicated that if there's work available on
21  that unit, then perhaps they would be placed on that
22  floor; is that correct?
23      A. Yes.
24      Q. In a situation where you have someone that's

Page 15

1  injured in the transitional surgical unit, would they be
2  placed in 5D?
3          MR. BLOOM: Object to the form of the
4  question.
5          If you can answer it, you can.
6      Q. Go ahead.
7          MR. BLOOM: I think there are too many
8  hypothetical variables built into that question. That's
9  why I objected.
10          If you can answer, you can.
11      A. Well, not -- I would have to say no. They are
12  different cost centers. They would probably have to bid
13  into the positions. I mean, her position is within a
14  certain cost center, so they just don't pull them and put
15  them in another cost center that I'm aware of. But not
16  that I'm aware of.
17      Q. Going back to Collins 1, after Miss Villanueva
18  saw Rebecca -- I forget her last name.
19      A. Goldstein.
20      Q. -- did she remain on duty in a sedentary
21  capacity?
22      A. I don't believe so.
23      Q. Why not?
24      A. I don't believe that they had light duty

Page 16

1  available on the unit.
2      Q. Okay.
3      A. Or a sedentary position for her to function in.
4      Q. Was Miss Villanueva eligible for any medical
5  benefits during the time that she worked for
6  Christiana Care that you are aware of?
7      A. Insurance?
8      Q. Anything, any medical benefits with respect to
9  FMLA or -- I'm not sure if Christiana Care has a
10  disability program.
11          MR. BLOOM: Do you understand the question?
12      A. Any benefits? Well, as far as medical
13  insurance, I can't remember what -- at what point in time
14  there was a three-month -- where you had to wait three
15  months until you get insurance.
16      Q. Okay.
17      A. Currently you are eligible for health insurance
18  the month -- I think the first of the month after you
19  start employment. So I don't know if she would have had
20  medical insurance at this point or not. I'm not sure --
21  I'm pretty certain she was not eligible for a leave of
22  absence.
23      Q. How long do you have to be at Christiana Care?
24      A. Six months.

Page 17

1      Q. Would that be FMLA?
2      A. Was FMLA in '03? You have to have the hours for
3  FMLA and I believe that it's like 1,000 hours. But at
4  Christiana Care I know that, you know, we have to be
5  there six months. And FMLA it's a certain number of
6  hours or 12 months or something. I don't believe she was
7  eligible for FMLA, but I'm not positive. I do know she
8  was not eligible for leave of absence.
9      Q. Okay.
10      A. As far as FMLA, my primary responsibility in
11  FMLA is only if it's a medically qualifying condition. I
12  don't get involved with whether or not they meet the
13  other criteria for FMLA. I simply do the medical certs.
14      Q. You mentioned before a mandatory light-duty
15  program; is that correct?
16      A. Correct.
17      Q. Is there a policy concerning the mandatory
18  light-duty program?
19      A. We have a workers' compensation policy.
20  Light-duty policy has been written and has been followed,
21  but I just found out it was never promoted to the web, so
22  I'm actually in the process of promoting it. But we do
23  have a light-duty policy for workers' compensation.
24      Q. That was written by the Employee Health

Villanueva                                    v.              Christiana Care Health Services, Inc.
Christine M. Collins                   C.A. # 04-258-JJF                          April 26, 2006

Page 18

1  department?
2      A.  Employee Health, employee relations, and driven
3  by also our safety department.
4      Q.  Let me show you another document.
5          (Collins Exhibit 2 was marked for
6  identification.)
7  BY MS. BREWINGTON:
8      Q.  Could you tell me what this document is?
9      A.  It's a note from Dr. Goldenberg that "Nicole has
10  been under my care and from a cardiac standpoint may
11  return to work with no restrictions."
12     Q.  It's signed by Dr. Goldenberg?
13     A.  I'm assuming that's his signature.
14     Q.  The date of this --
15     A.  The date of service is 4/10/2003.
16     Q.  Did Miss Villanueva present this note to
17  Employee Health Services?
18     A.  Yes.
19     Q.  Do you know when that was?
20     A.  I believe it was the next day.
21     Q.  Was she allowed to return to work after she
22  presented her return-to-work note?
23     A.  No.
24     Q.  Do you know who told Miss Villanueva that she

Page 19

1  wasn't allowed to work and to call you on the phone?
2      A.  I think she saw Rebecca again the next day. I
3  believe that was when Rebecca contacted me.
4      Q.  Do you know whether Rebecca did an examination
5  of Miss Villanueva?
6      A.  No.
7      Q.  Did you do an examination of Miss Villanueva?
8      A.  No.
9      Q.  Have you ever met Miss Villanueva?
10     A.  I don't remember. I'm not sure if I ever met
11  her in person or not.
12     Q.  Did you talk with Miss Villanueva over the
13  phone?
14     A.  Yes, I did.
15     Q.  What did you say to her?
16     A.  I recall talking to her about the problems that
17  she was having with her pregnancy with regard to rapid
18  heartbeat and that I was not comfortable, you know,
19  returning her to work without any restrictions given the
20  history of the tachycardia that she had. And in my
21  conversation with her by her own admission that she
22  limited her activity at home, she would only go up and
23  down the stairs once a day to avoid exertion that would
24  trigger these heart rates, and that she had had a similar

Page 20

1  problem with her previous pregnancy and had worked in a
2  light duty or in a sedentary capacity during that
3  pregnancy.
4      Q.  Okay. Is there anything else?
5      A.  No.
6      Q.  So you received her doctor's note indicating
7  that she could return to work regular duty from her
8  treating physician; correct?
9      A.  Correct.
10     Q.  You did not feel comfortable returning her to
11  work; correct?
12     A.  Correct.
13     Q.  Did you consult with Dr. Newman, the
14  collaborating physician?
15     A.  No, no.
16     Q.  Did you consult with anyone?
17     A.  Dr. Colmorgen.
18     Q.  Who is Dr. Colmorgen?
19     A.  He is Christiana Care's physician who is the
20  director of the maternal/fetal medicine and high-risk
21  pregnancy.
22     Q.  What did Dr. Colmorgen advise you to do?
23     A.  He supported my recommendation that she not be
24  cleared without restrictions based on the history that

Page 21

1  she had provided.
2      Q.  Did he advise you to call her doctor, her
3  treating physician?
4      A.  I can't remember if it was him that recommended
5  it or not. I wrote a memo. Did he tell me to call him
6  or not? I did speak with him, but I can't remember. I
7  think -- I know I wrote a memo and I don't know who
8  directed me to, but I know I spoke with him.
9      Q.  I do not want to enter this as an exhibit
10  because I don't have a copy, but maybe this will refresh
11  your recollection.
12         If you could read for me this paragraph
13  right here.
14         MR. BLOOM:  Before you do that, have you
15  seen that document before or is any of the handwriting
16  yours?
17         THE WITNESS:  It's not my handwriting.
18         MR. BLOOM:  Okay. All right. I'm sorry.
19  Go ahead.
20  BY MS. BREWINGTON:
21     Q.  Okay.
22     A.  I can read it.
23         MR. BLOOM:  You are going to ask the
24  question to read somebody else's handwriting?

6 (Pages 18 to 21)

Villanueva                           v.        Christiana Care Health Services, Inc.
Christine M. Collins          C.A. # 04-258-JJF                        April 26, 2006

Page 22

1        MS. BREWINGTON:  Right.  To help her
2   refresh her recollection.
3   BY MS. BREWINGTON:
4        Q.  Do you see where I pointed to?
5        A.  "Chris contacted Dr. Colmorgen as consult -- he
6   suggested contacting cardiologist."
7        Q.  Hold on right there.
8            Is it fair to say that based on this note,
9   does this refresh your recollection at all?
10       A.  Yeah.
11       Q.  Did Dr. Colmorgen suggest that you contact --
12       A.  I'm assuming based on this, yes, that he did.
13       Q.  Did you then contact her treating --
14       A.  Yes, I did.
15       Q.  If you could keep reading.
16           MR. BLOOM:  To herself or aloud?
17           MS. BREWINGTON:  Out loud, please.
18   BY MS. BREWINGTON:
19       Q.  You can start it all over if you like.
20       A.  That's all right.  "Chris called cardiologist
21   Goldenberg -- awaiting return call."
22       Q.  No.  I'm sorry.  This sentence where it says "He
23   suggested."
24       A.  I did.  "He suggested contacting cardiologist

Page 23

1   based on we know arrhythmias, if they were intermittent,
2   was work a trigger or could sitting at home be a
3   trigger."
4        .Q.  Do you know whose handwriting that is?
5        A.  I think it's Kerry's.
6        Q.  Kerry Delgado?
7        A.  Yes.
8        Q.  For the record, that "we" -- I think we might
9   need to enter this as an exhibit.  But do you know what
10  that symbol is?
11       A.  I think it's -- I think it's a like an empty --
12  I forget.  It's called a nulset.
13       Q.  Do you know what it indicates?
14       A.  I'm not -- I'm not sure.
15           MS. BREWINGTON:  Can we make copies of this
16  document?  I would like to enter it as an exhibit.
17           MR. BLOOM:  Sure.
18           MS. BREWINGTON:  I only have this one copy.
19           This will be Collins 3.
20           (Collins Exhibit 3 was marked for
21  identification.)
22  BY MS. BREWINGTON:
23       Q.  Are you trained in arrhythmia patients?
24       A.  I'd have to answer that yes.

Page 24

1        Q.  How so?
2        A.  I was an ICU nurse and interpret EKGs and deal
3   with patients who have arrhythmias.
4        Q.  Are you aware that this document says we know,
5   zero, arrhythmias?
6            MR. BLOOM:  Object to the form of the
7   question.
8        Q.  I'll read it to you.  Are you aware this
9   document says:  "Chris contacted Dr. Colmorgen as
10  consult - he suggested contacting cardiologist based on
11  we [zero] know arrhythmias."
12           MR. BLOOM:  Object to the form of the
13  question.  That mischaracterizes the document and neither
14  the witness nor counsel handwrote that document.
15           If you can answer it, you can answer it.
16       Q.  My question is:  Are you aware that it says
17  that?
18       A.  It's what it -- that's what -- that is not my
19  note.  I don't know what the shorthand implies to the
20  person who wrote it.
21       Q.  Did Dr. Colmorgen examine Miss Villanueva?
22       A.  No.
23       Q.  Did he even meet Ms. Villanueva?
24       A.  No.

Page 25

1        Q.  Did he talk with Miss Villanueva?
2        A.  No.
3        Q.  You discussed her medical condition with
4   Dr. Colmorgen; is that correct?
5        A.  Briefly, yes.
6        Q.  Did you advise Ms. Villanueva that you were
7   going to discuss her medical condition with
8   Dr. Colmorgen?
9        A.  No.
10       Q.  Did you get Miss Villanueva's permission before
11  discussing her medical condition with Dr. Colmorgen?
12       A.  I did not disclose Ms. Villanueva's identity at
13  all.  I described a five-month-pregnant woman with
14  tachycardia.  So I in no way violated her privacy at all.
15       Q.  So he doesn't even know who Miss Villanueva is?
16       A.  No, no.
17       Q.  Is it your normal practice to consult
18  Dr. Colmorgen when you're not in agreement with the
19  treating physician?
20       A.  Only for maternal/fetal medicine problems.
21       Q.  Why is that?
22       A.  Because he's a maternal/fetal specialist.
23       Q.  I'm sorry.  So you only consult Dr. Colmorgen
24  for those situations.  Do you consult other doctors?

A-33

Villanueva                           v.              Christiana Care Health Services, Inc.
Christine M. Collins            C.A. # 04-258-JJF                        April 26, 2006

Page 26

1    A. Yes.
2    Q. Is it Employee Health Services' policy to have
3    an employee examined by another doctor if there's a
4    dispute, if there's a difference of opinion between the
5    treating physician and yourself?
6    A. Can you repeat that?
7    Q. My question is: Is it Christiana Care's policy
8    to have the employee examined by another physician if
9    Employee Health Services doesn't agree with a treating
10   physician's opinion?
11   A. No. We do have a policy that we reserve the
12   right to have them examined if there's a question, but we
13   do not -- we do not have a policy that states that if
14   there's a disagreement, then they will be seen by a
15   specialist.
16   Q. Would it have been beneficial for Employee
17   Health to have her see a physician from Christiana Care?
18   A. Not necessarily.
19   Q. Why not?
20   A. Because the history that she provides itself,
21   her medical history is sufficient to be concerned about
22   her status.
23   Q. What was your understanding of her medical
24   history?

Page 27

1    A. Her medical history is that she has cardiac
2    arrhythmia, specifically tachycardia on exertion.
3    Q. Are you aware you Miss Villanueva had that same
4    condition with her first pregnancy?
5    A. Yes, I know.
6    Q. Are you aware that Miss Villanueva worked with
7    this condition after she left Christiana Care --
8    A. No, I'm not.
9    Q. -- with no restrictions?
10   A. No, I'm not.
11   Q. Are you aware at the time while working with
12   Christiana Care where an employee was able to work in a
13   different capacity due to their physical limitations?
14   MR. BLOOM: Object to the form of the
15   question.
16   You can answer it if you understand it.
17   A. Of a specific situation? No.
18   Q. So you can't recall any names?
19   A. No.
20   Q. Can you recall generally?
21   A. I had an ICU nurse who had had surgery, was
22   cleared to come back with -- in a sedentary capacity and
23   there was administrative policy review preparation for a
24   survey that the employee was capable of doing and they

Page 28

1    were allowed to come back and do the administrative work
2    while they recovered from their surgery.
3    Q. You don't remember her name?
4    A. No.
5    Q. How long ago was that?
6    A. I don't remember a specific situation. I know
7    that that occasionally occurs.
8    Q. That occasionally occurs, what you just talked
9    about?
10   A. In that department.
11   Q. What department is that?
12   A. It would have been on a nursing unit.
13   Q. Okay.
14   A. That you have a nurse who could come in, review
15   policies, update them, do some administrative work when
16   they could not do the patient care.
17   Q. Okay.
18   A. But that was a specific task and it may be
19   limited to a period of time if they only have two or
20   three days or whatever, but I know that -- I can't think
21   of a person's name, but I know of some to come in and do
22   policy review until they were able to go back or for a
23   limited period of time when they couldn't go back. But
24   that would have been a specific task, a specific

Page 29

1    position, a specific thing on that unit that that person
2    could do.
3    Q. I didn't hear in what you just said whether
4    there was a distinction between whether the employee was
5    injured at work or not injured at work. Did you make a
6    distinction?
7    A. No.
8    Q. So there's no distinction there.
9    MR. BLOOM: Is that a question or a comment
10   by you?
11   MS. BREWINGTON: I said: Did you make a
12   distinction? And she said, "No."
13   MR. BLOOM: Fine. I'm just going to
14   object. I think the record is going to show a comment
15   that will show a question on the transcript, so I'm just
16   going to object to that.
17   MS. BREWINGTON: Okay.
18   BY MS. BREWINGTON:
19   Q. Do you know who Kathryn Ross is?
20   A. No.
21   Q. Do you know who Diana Stewart is?
22   A. No.
23   Q. Do you know who Nicole Markel is?
24   A. No.

A-34

8 (Pages 26 to 29)

Villanueva                                    v.                    Christiana Care Health Services, Inc.
Christine M. Collins                   C.A. # 04-258-JJF                                 April 26, 2006

Page 30

1    Q.  I'm just going to ask you if you recognize this
2    handwriting.
3        A.  No.
4            MS. BREWINGTON:  If I could have one
5    minute.
6            MR. BLOOM:  Sure.
7            (Discussion off the record.)
8    BY MS. BREWINGTON:
9        Q.  Did you say that you contacted Dr. Goldenberg --
10       A.  Yes.
11       Q.  -- Miss Villanueva's treating physician?
12           Did he change his opinion at all in terms
13   of whether she can return to work regular duty?
14           MR. BLOOM:  I object to the form of the
15   question just in the sense that in this case
16   Dr. Goldenberg issued two contradicting opinions.  So
17   which --
18           MS. BREWINGTON:  Let me clarify.
19   BY MS. BREWINGTON:
20       Q.  He issued a return-to-work note and I entered it
21   as an exhibit and it was a return-to-work note, regular
22   duty.  Do you recall that?
23       A.  Yes.
24       Q.  Then you indicated that you called him on the

Page 31

1    phone; is that correct?
2        A.  Yes.
3        Q.  My question is:  Did he change his opinion after
4    speaking with you from regular duty to some other
5    restriction?
6        A.  He -- he did not issue a new note saying that he
7    would reimpose restrictions.  When I expressed my
8    concerns to him about him clearing her without
9    restrictions based, one, on the note from the day before,
10   and two, based on Nicole's own comment that she was going
11   against medical advice, and when I spoke with him he told
12   me that he thought that she might be able to pay herself
13   at work.  And he understood my concerns and did not offer
14   any objections to my concerns.
15           I indicated to him that unfortunately in a
16   hospital environment, you cannot pace yourself.  The
17   climate in the hospital paces your activity and the
18   notion that somebody can sit down and rest is not a
19   realistic one.  These are very physically demanding jobs.
20       Q.  The unit clerk job is very physically demanding?
21       A.  The PCT job is very physically demanding.
22       Q.  Is it fair to say that the unit clerk job is not
23   physically demanding?
24       A.  Not as physical as the PCT.

Page 32

1        Q.  Did he say to you that she should not return to
2    work regular duty?
3        A.  I don't recall him saying that, specifically.
4        Q.  Did he say to you that she could not do the
5    position or the duties of a patient care tech?
6        A.  I don't recall his specific comment.
7            MS. BREWINGTON:  I think that's all I have.
8    No further questions.
9            MR. BLOOM:  I just have two quick
10   follow-ups.
11   BY MR. BLOOM:
12       Q.  Ms. Collins, I'm just going to direct your
13   attention to what has previously been marked as
14   Collins 1, which is the form that I think is right in
15   front of you.  In the lower left-hand corner in the
16   "Disposition" box there's an indication that
17   Miss Villanueva was cleared to return to work "sedentary
18   duty."  Do I have that right?
19       A.  Correct.
20       Q.  Does that notation on this form indicate one way
21   or the other whether such sedentary duty exists in
22   Miss Villanueva's unit?
23       A.  No.
24       Q.  Is it your experience that whether or not the

Page 33

1    employee can actually return to work consistent with
2    their restrictions depends upon the actual work needs of
3    the unit that they work in?
4        A.  That's correct.
5        Q.  The last thing I want to clear up is there's
6    been some testimony in a variety of contexts today about
7    whether or not the work relatedness of an employee's
8    injury is relevant to how Christiana Care or Employee
9    Health responds to that employee's injury.  Do you recall
10   that testimony, generally?
11       A.  Yes.
12       Q.  Does whether or not an employee's injury or
13   impairment is a work-related injury, how does that affect
14   the way Christiana Care responds to that?
15       A.  We have -- for our occupational injuries, we
16   have a light-duty program, so we will find work for a
17   person who has limitations based on a work-related
18   injury, yes.
19       Q.  Does that have anything to do with the fact that
20   Christiana Care is sort of paying for that employee
21   regardless of whether they are working or not, if it's a
22   work-related injury?
23       A.  Correct.  And should that person be totally -- I
24   mean, unable to go back to their regular job, they still

A-35

Villanueva
Christine M. Collins

v.

C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 34

1  have to go and go through a bid process to find an
2  alternative position.
3  Q.  Thank you.
4         MR. BLOOM:  I have nothing else.
5         MS. BREWINGTON:  I have nothing further.
6         MR. BLOOM:  She is going to read and sign.
7         (The deposition was then concluded at
8  12:40 p.m.)
9         - - - - -
10            INDEX TO TESTIMONY
11
12  CHRISTINE M. COLLINS              PAGE
13
     Examination by Ms. Brewington         2
14   Examination by Mr. Bloom             32
15
         - - - - -
16
17          INDEX TO EXHIBITS
18
     COLLINS EXHIBIT NO.:              PAGE
19
20  1  A one-page copy of an Employee Health Service
        Referral              10
21
    2  A one-page copy of a memo signed by Edward M.
22     Goldenberg, M.D.          18
23  3  A one-page copy of a handwritten document
        beginning "Chris Collins"     23
24

Page 35

1
2
3
4
5
6
7
8         REPLACE THIS PAGE
9
10        WITH THE ERRATA SHEET
11
12        AFTER IT HAS BEEN
13
14        COMPLETED AND SIGNED
15
16        BY THE DEPONENT.
17
18
19
20
21
22
23
24

Page 36

1  State of Delaware )
2            )
3  New Castle County )
4
5       CERTIFICATE OF REPORTER
6
7       I, Kathleen White Palmer, Registered Merit
   Reporter and Notary Public, do hereby certify that there
8  came before me on the 26th day of April, 2006, the
   deponent herein, CHRISTINE M. COLLINS, who was duly sworn
9  by me and thereafter examined by counsel for the
   respective parties; that the questions asked of said
10 deponent and the answers given were taken down by me in
   Stenotype notes and thereafter transcribed into
11 typewriting under my direction.
12      I further certify that the foregoing is a
   true and correct transcript of the testimony given at
13 said examination of said witness.
14      I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
15 interested in the event of this suit.
16
17
18
19         Kathleen White Palmer, RPR, RMR
           Certification No. 149-RPR
20         (Expires January 31, 2008)
21
   DATED:  April 28, 2006
22
23
24

A-36

10 (Pages 34 to 36)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Villanueva

## v.

# Christiana Care Health Services, Inc.

### C.A. # 04-258-JJF

---

## Transcript of:

## Karen E. McCloud, R.N.

## April 26, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Villanueva                           v.              Christiana Care Health Services, Inc.
Karen E. McCloud, R.N.          C.A. # 04-258-JJF                      April 26, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NICOLE VILLANUEVA,              )
                                )
            Plaintiff,          )
                                )       Civil Action
v.                              )   No. 04-258-JJF
                                )
CHRISTIANA CARE HEALTH          )
SERVICES, INC.                  )
                                )
            Defendant.          )

            Deposition of KAREN E. McCLOUD, RN, taken
pursuant to notice at the law offices of Morris, James,
Hitchens & Williams, 222 Delaware Avenue, Tenth Floor,
Wilmington, Delaware, beginning at 12:50 p.m. on
Wednesday, April 26, 2006, before Kathleen White Palmer,
RMR, CSR-DE, CLR and Notary Public.

APPEARANCES:

            LORI A. BREWINGTON, ESQUIRE
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware  19806
              for the Plaintiff

            THOMAS S. BLOOM, ESQUIRE
            MORGAN LEWIS & BOCKIUS LLP
              1701 Market Street
              Philadelphia, Pennsylvania   19103-2921
              for the Defendant

ALSO PRESENT:

            NICOLE VILLANUEVA
            KERRY DELGADO          A-38
------------------------------------------------------
                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Villanueva
Karen E. McCloud, R.N.

v.
C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

**Page 2**

1    KAREN E. McCLOUD, RN,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MS. BREWINGTON:
6    Q.  Good morning, Miss McCloud.
7    A.  Good morning.
8    Q.  My name is Lori Brewington and I represent
9  Nicole Villanueva in a discrimination action against
10  Christiana Care. I have the pleasure of taking your
11  deposition today.
12        I'm going to ask you a series of questions.
13  I'll make every effort to ask them one at a time. If for
14  some reason you do not understand the question, just let
15  me know and I will explain it. If you answer the
16  question, we'll assume that you understand the question.
17        If at any time you need to take a break,
18  just let me know and we'll take a break.
19        We have a court reporter here and she will
20  be recording your statements. Please make sure that your
21  statements aren't un-huhs or mm-hmms because they are
22  difficult to understand on the record.
23        I would like to begin today by asking you
24  to state your name and professional title for the record.

**Page 3**

1    A.  My name is Karen McCloud. I'm an RN and nurse
2  manager.
3    Q.  How long have you been a nurse manager?
4    A.  A little over six years.
5    Q.  Were you a nurse manager at the time that Nicole
6  Villanueva was employed with Christiana Care?
7    A.  Yes.
8    Q.  What floor did you work on? What unit were you
9  in?
10    A.  At that time I was a nurse manager for both 5D
11  and the transitional surgical unit, or TSU.
12    Q.  Did Carole Dye report directly to you?
13    A.  Yes, she did.
14    Q.  Carole Dye was Miss Villanueva's supervisor; is
15  that correct?
16    A.  That's correct.
17    Q.  Carole Dye and Miss Villanueva worked in the
18  transitional surgical unit?
19    A.  That's correct.
20    Q.  Did employees that worked in the transitional
21  surgical unit also work in 5D?
22    A.  I'm not sure -- I'm not sure what you're asking.
23    Q.  There's employees that work in the transitional
24  surgical unit; correct?

**Page 4**

1    A.  Correct.
2    Q.  Did any of them ever work in 5D?
3    A.  By if ever you mean if they were sometimes
4  pulled to other areas, but we had a TSU staff that were
5  assigned primarily to TSU.
6    Q.  So sometimes the staff of TSU would be pulled to
7  other areas; is that correct?
8    A.  Correct.
9    Q.  What areas would they be pulled to?
10    A.  They could be pulled to any area in the
11  hospital.
12    Q.  What are some of the areas that they could be
13  pulled to?
14    A.  Medical/surgical units.
15    Q.  Anything else?
16    A.  Primarily medical/surgical units. I was
17  thinking maybe critical care units, but that would be
18  very unusual, very infrequent.
19    Q.  Mainly the medical and surgical units; is that
20  correct?
21    A.  Medical/surgical units.
22    Q.  You mentioned employees would be pulled. You
23  said staff. Excuse me.
24        What positions are you talking about when

**Page 5**

1  you say "staff" would be pulled to other areas?
2    A.  Registered nurses, patient care techs, patient
3  care tech II's.
4    Q.  Are there any other positions that would be
5  pulled?
6    A.  No.
7    Q.  Are unit clerks ever pulled to other areas?
8    A.  I didn't have any -- just unit clerks in TSU.
9    Q.  So when you say patient care tech II's, you're
10  indicating those employees that are trained as unit
11  clerks and patient care techs; is that correct?
12    A.  That's correct.
13    Q.  How many employees reported directly to you at
14  the time that Miss Villanueva worked there?
15    A.  I'm going to estimate about 14 in the TSU and
16  about 80 to 85 on 5D.
17    Q.  Did Kathryn Ross report to you?
18    A.  Yes.
19    Q.  Did Diana Stewart report to you?
20    A.  Yes.
21    Q.  Did Nicole Markel report to you?
22    A.  Yes.
23    Q.  Am I saying her name right?
24    A.  Yes.

**A-39**

2 (Pages 2 to 5)

Villanueva                                    v.              Christiana Care Health Services, Inc.
Karen E. McCloud, R.N.                  C.A. # 04-258-JJF                            April 26, 2006

Page 6

1    Q.  We'll go back to those people a little later.
2         Now, when I ask you about a unit clerk, I
3    am speaking of only a unit clerk.  Okay?
4    A.  Mm-hmm.
5    Q.  When I ask you about a patient care tech II,
6    then you can give me the roles and responsibilities of a
7    patient care tech II.  Okay?
8    A.  Okay.
9    Q.  My question to you is:  What are some of the
10   responsibilities generally of a unit clerk?
11   A.  The primary responsibility for a unit clerk II
12   is chart maintenance, entering doctors' orders,
13   transcribing doctors' orders, requisition labs,
14   requisition tests.
15   Q.  Hold on.  I don't understand.  Requisition labs?
16   A.  Requesting labs.  Sorry.  We call it
17   requisitioning.
18   Q.  That's over the phone?
19   A.  Through the computer.
20   Q.  Oh, through the computer.  Okay.
21   A.  Labs and other tests.
22   Q.  Okay.
23   A.  Answering the phone, filing.  Mostly unit
24   papers.

Page 7

1    Q.  Not like --
2    A.  Not like HR papers.  It would be unit papers for
3    patient care.
4    Q.  Is it fair to say that the unit clerk is
5    generally sitting in her job?
6    A.  Not exclusively.  They stand and walk around the
7    unit quite a bit gathering charts, putting orders on
8    charts, putting test results on charts.
9    Q.  What percentage of their time is sitting versus
10   doing other things?
11   A.  I would estimate about half and half.
12   Q.  Half and half?
13   A.  Yes.
14   Q.  When you say walking, are they walking on
15   different floors or are they walking in that same area?
16   A.  Within the same unit, although they do sometimes
17   have to run errands, go down to other floors in the
18   hospital to pick up things, charts, that kind of thing.
19   Q.  Is that a large part of their job, running
20   errands?
21   A.  It's less frequent.
22   Q.  We talked about earlier that sometimes your
23   staff may be pulled to other areas; correct?
24   A.  Correct.

Page 8

1    Q.  Are there occasions when you're short-staffed?
2    A.  On -- you are talking about 5D or TSU?
3    Q.  Either.
4    A.  There are times when we are short-staffed, yes.
5    Q.  What do you do in those situations?
6    A.  We will ask for overtime -- ask for assignment
7    from the per diem pool.  There are per diem nurses and
8    unit clerks, as well.  Nurses or techs to be pulled from
9    other units.
10   Q.  Other units like where?
11   A.  Other medical/surgical units.
12   Q.  Okay.
13   A.  We will request overtime or time changes from
14   our own staff.
15   Q.  Now, when employees are pulled to assist you in
16   the transitional and 5D from the medical and surgical
17   units, do they need to be trained for what you guys do?
18   A.  When you are asking about staff, do you mean --
19   are you talk about nursing staff, unit clerk or --
20   Q.  Well, let's go one by one.  How about that?
21        A unit clerk, would they have to be trained
22   in medical?  If an employee is coming over from the
23   medical and surgical unit when you are understaffed, do
24   you guys then train them, the unit clerk?

Page 9

1    A.  If a unit clerk is pulled from another unit to
2    work in a TSU, that very rarely happens because we prefer
3    to have a cross-training or somebody --
4    Q.  The patient care tech?
5    A.  Somebody who is oriented to both functions.
6    Q.  All right.
7    A.  But on occasion when we cannot meet that need,
8    we have had a unit clerk pulled into the area that could
9    at least take off the orders and answer the phone and
10   that kind of thing.  In that case, it usually was a per
11   diem unit clerk or a clerk from another unit that they
12   already know the computer system, they know the doctors'
13   order sheets, they know the chart maintenance, that kind
14   of thing so they can function for most of the job -- they
15   can do most of the job without additional orientation.
16        Somebody on the unit, one of the nurses
17   usually would show them where different things were kept
18   and that kind of thing.  So they give them an
19   introduction to the unit, but didn't have to train them
20   how to do the job.
21   Q.  Are the computer systems the same on each unit
22   or in each unit?
23   A.  The computer systems are the same within the
24   medical/surgical units, and TSU would be included in

A-40