Villanueva                                          v.                Christiana Care Health Services, Inc.
Karen E. McCloud, R.N.                       C.A. # 04-258-JJF                         April 26, 2006

Page 10

1  that. There are some areas in the hospital that have
2  different computer systems.
3      Q.  What about the chart orders, are they generally
4  the same?
5      A.  Yes.
6      Q.  You mentioned sheets. I didn't get --
7      A.  I probably said order sheets.
8      Q.  Are they generally the same?
9      A.  Yes.
10     Q.  When I say the same, I mean in terms of like
11 different units.
12     A.  Yes.
13     Q.  Were you aware that Miss Villanueva was
14 pregnant?
15     A.  Yes.
16     Q.  Do you remember when you became aware that she
17 was pregnant?
18     A.  I believe it was early in her employment.
19     Q.  Do you recall that she started her employment
20 with Christiana Care in December of 2002?
21     A.  Yes.
22     Q.  So is it fair to say that it was around December
23 of 2002 that you learned that she was pregnant?
24     A.  Yes.

Page 11

1      Q.  Did Miss Villanueva present a note to someone at
2  Christiana Care requesting limited duty?
3      A.  Yes. She submitted that note to Carole, Carole
4  Dye.
5      Q.  Did you ever see a copy of that note?
6      A.  I don't recall.
7      Q.  Did Carole discuss this request for sedentary
8  duty with you?
9      A.  Are you referring to the time in April? Or are
10 you talking about in January?
11     Q.  Yes. I'm sorry. April. It was April 9th.
12 I'll represent to you the doctor's note was dated
13 April 9th. So that's the time I'm talking about.
14          Did you discuss this with Carole?
15     A.  Yes.
16     Q.  What can you tell me about that conversation?
17     A.  I remember Carole asking me if -- or telling me
18 that Nicole had a note for sedentary duty. And I
19 discussed our policy with Carole, the Christiana Care
20 policy about light duty availability, that we don't have
21 light duty available for nonoccupational injuries. So I
22 advised Carole to refer Nicole to Employee Health
23 Services for evaluation.
24     Q.  Does Christiana Care have a written policy that

Page 12

1  indicates that you don't have any positions available for
2  nonoccupational injuries?
3      A.  I am not sure of that.
4      Q.  But it's your opinion that that's the policy?
5      A.  I was advised of that by both Employee Health
6  and human resources.
7      Q.  Who advised you of that?
8      A.  I can't recall at this time. I've had different
9  HR advisors.
10     Q.  So it wasn't at this time, April 9th, 2003? Was
11 it prior to this time that they advised you of that?
12     A.  Prior to that.
13     Q.  Did you discuss this with Carole Dye? Did you
14 talk with Carole Dye about this?
15     A.  Yes.
16     Q.  What was her response to you?
17     A.  I don't remember what she said.
18     Q.  Did you involve Kerry Delgado from human
19 resources?
20     A.  I don't recall having a conversation with Kerry.
21 I know that Carole did that same day.
22     Q.  Do you recall what occurred during that
23 conversation?
24     A.  I wasn't present at that conversation.

Page 13

1      Q.  Did Carole tell you what happened at that
2  conversation?
3      A.  I believe she did.
4      Q.  Do you remember what she told you?
5      A.  As far as I can recall, she informed me of what
6  the outcome was, that Nicole was sent home.
7      Q.  Did she say why?
8      A.  She was sent home because we could not
9  accommodate her sedentary duty.
10     Q.  I'm trying to get an understanding of your
11 understanding of Christiana Care's policy. Actually,
12 could you tell me about it again?
13          What is your understanding of their policy
14 with respect to no light duty for --
15     A.  We cannot accommodate light duty for a
16 nonoccupational injury.
17     Q.  So you cannot accommodate --
18     A.  Correct.
19     Q.  So are you aware of any time where
20 Christiana Care has accommodated an employee for a
21 nonoccupational injury?
22     A.  I can't answer --
23          MR. BLOOM: Object to the form of the
24 question.

A-41

4 (Pages 10 to 13)

Villanueva                          v.              Christiana Care Health Services, Inc.
Karen E. McCloud, R.N.         C.A. # 04-258-JJF                        April 26, 2006

Page 14

1    Can you read that back, the last question?
2    (The reporter read from the record as
3    requested.)
4    MR. BLOOM: Just to clarify, contrary to
5    the policy that Ms. McCloud just articulated. Subject to
6    that clarification, you can answer.
7    THE WITNESS: Okay.
8    A. I cannot answer for whether Christiana Care has
9    ever accommodated that. I can only answer for what I
10   have done myself.
11   BY MS. BREWINGTON:
12   Q. My question is: Are you aware of any time? So
13   it doesn't necessarily have to be whether you've done it,
14   but are you aware of Christiana Care ever doing that?
15   A. I'm not aware of any.
16   Q. Do you, yourself, know of any instance where you
17   have allowed an employee to work in a different position
18   who was not injured at work?
19   MR. BLOOM: Object to the form of the
20   question.
21   You can answer it.
22   A. I'm not clear what you are saying. Are you
23   asking me if I've accommodated someone in a light-duty
24   restriction?

Page 15

1    Q. I guess what I'm asking you is: In your role as
2    a supervisor, have you, in your experience, allowed one
3    of your employees who was injured and had restrictions to
4    work in a different capacity?
5    A. I have not allowed someone to work in a
6    different capacity within their same job description.
7    Q. Outside of their job description.
8    A. I have had employees who have transferred into
9    other positions that they were able to do with their
10   light-duty restrictions.
11   Q. How did they go about transferring to other
12   positions?
13   A. Through arrangements with recruitment, a
14   position was available, they bid for it, they were
15   eligible, and they accepted the position.
16   Q. Do you recall any of those employees' names who
17   bid for positions and they transferred into it?
18   A. Kathryn Ross would be one and Laura Crosby would
19   be the other.
20   Q. Tell me about this bidding process.
21   A. When an employee is looking for another job,
22   they contact recruitment. We usually have one recruiter
23   assigned to us. And they -- they can either call over to
24   recruitment and ask what positions are available, work

Page 16

1    with recruitment directly, or they can bid online. We
2    have online availability, job postings. They can look
3    for the job and post it that way.
4    Q. Would these documents concerning their bidding
5    process be in their employee file?
6    A. I would not have them in my file. If they were
7    online, that would be entered through HR's or
8    recruitment's computer system. If they talked to someone
9    on the telephone, then I wouldn't have documentation of
10   that.
11   Q. Were you involved in their bidding process in
12   any way?
13   A. In -- let me answer in Laura's because that's
14   more recent.
15   Laura was unable to return to work in her
16   patient care tech position. Actually, hers was a
17   work-related injury. And she -- I had an open unit clerk
18   position available. She contacted Kealey Barnes, our
19   recruiter, and bid for the position that way. We
20   oriented her in the position and she's still employed as
21   a unit clerk.
22   Q. Did Laura Crosby have to bid for the position?
23   A. Yes.
24   Q. I don't understand that. Is it true that when

Page 17

1    you have a work-related injury, the employee is
2    automatically placed in a position?
3    A. No, that's not true.
4    Q. Okay.
5    A. The position -- if they are injured in a
6    work-related injury and they need a light-duty
7    accommodation, ordinarily something is usually worked out
8    through Employee Health Services --
9    Q. So they don't have --
10   A. -- to light duty.
11   Q. I'm sorry. I cut you off. I'm sorry.
12   A. That's okay.
13   Q. So they don't have to bid for that?
14   A. For a temporary light-duty accommodation, no.
15   Q. So the distinction here is if it's a temporary
16   light duty, Christiana Care will place them in that
17   position without them having to bid?
18   MR. BLOOM: Object to the form of the
19   question. That mischaracterizes the testimony.
20   You can answer.
21   MS. BREWINGTON: I'm asking. I'm sorry.
22   A. If it's a work-related injury, if it's an
23   occupational injury, there can be a temporary light-duty
24   assignment.

A-42

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Villanueva
Karen E. McCloud, R.N.

v.

C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 18

1   Q. Without bidding; is that correct?
2   A. Without bidding.
3   Q. I asked you about Laura Crosby. Now let's get
4   to Kathryn Ross.
5       What was Kathryn Ross' role or job?
6   A. Kathryn was originally hired as a patient care
7   technician.
8   Q. Patient care technician I? II?
9   A. No number. Just patient care technician.
10  Q. Was she qualified to be a unit clerk?
11  A. When she was hired as a patient care technician?
12  Q. Yes.
13  A. She met the basic qualifications of the job,
14  which is a high school diploma. She was not trained as a
15  unit clerk.
16  Q. She was not trained. Okay.
17      So is it fair to say that prior to her
18  leave of absence, she wasn't aware of the duties of a
19  unit clerk? Like she didn't know how to perform those
20  duties?
21  A. Prior to her injury, she was not trained as a
22  unit clerk, that's correct.
23  Q. She went out on leave of absence; correct?
24  A. That's correct.

Page 19

1   Q. Do you know why she went out on a leave of
2   absence?
3   A. She was in a serious motor vehicle accident.
4   Q. That wasn't related to the job; correct?
5   A. That's correct.
6   Q. Did she have any physical restrictions when she
7   returned to work?
8   A. When -- she did not return to work for almost
9   six months. She was restricted to no patient care when
10  she returned, but she did not return as a patient care
11  tech. She accepted an open unit clerk position that I
12  had available.
13  Q. When she returned to work with restrictions, did
14  you send her to Employee Health?
15  A. Yes. She was cleared by Employee Health.
16  Q. To work with those restrictions; is that
17  correct?
18  A. To work as a unit clerk.
19  Q. I'm sorry. Did she have physical restrictions
20  placed on her?
21  A. Yes.
22  Q. What were those physical restrictions?
23  A. There were definitely lifting restrictions. I
24  don't remember the exact weight limit that she was able

Page 20

1   to lift.
2   Q. Were there any other restrictions that you can
3   remember?
4   A. I know she had a restriction for how long she
5   could stand and sit.
6   Q. You indicated that you sent her to Employee
7   Health; correct?
8   A. Correct.
9   Q. They cleared her to return to work as a unit
10  clerk?
11  A. Correct.
12  Q. Did they clear her to return to work with those
13  restrictions?
14  A. The restrictions were still there.
15  Q. Okay.
16  A. But as a unit clerk, they could be -- she could
17  work with those restrictions as a unit clerk.
18  Q. Did someone train her as a unit clerk when she
19  got into that position?
20  A. Yes.
21  Q. To your knowledge, was Kathryn Ross pregnant?
22  A. No.
23  Q. Kathryn Ross, prior to her leave of absence, did
24  she work in that transitional unit or 5D?

Page 21

1   A. 5D.
2   Q. After her leave of absence when she returned as
3   a unit clerk, did she work in the transitional unit or
4   5D?
5   A. 5D.
6   Q. Now, you mentioned before that Kathryn bid for
7   the position; is that correct?
8   A. That's correct.
9   Q. Explain to me again how she bid for the
10  position. She was out on a leave of absence; correct?
11  A. That's correct.
12  Q. She came back as a unit clerk?
13  A. Mm-hmm.
14  Q. Did she bid for the position while she was out
15  of work?
16  A. She -- I guess she did. She had contacted the
17  recruiter.
18  Q. What recruiter did she call?
19  A. I'm not -- I'm not 100 percent sure who my
20  recruiter was at that time. I think it was Kealey
21  Barnes, but I'm not sure.
22  Q. How do you know that she contacted a recruiter?
23  A. I'm sure I told her to call, to call Kealey.
24  Q. Then what happened?

**A-43**

Villanueva
Karen E. McCloud, R.N.

v.
C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 22

1    A. She accepted the position and we started her
2  on -- somewhere in October.
3    Q. Did other people bid for this position?
4    A. No.
5    Q. Why not?
6    A. I don't know.
7    Q. I might need to stay on this topic.
8       The position of unit clerk that Kathryn
9  Ross ended up receiving, was that a posted position for
10 Christiana Care?
11   A. I don't recall that it was.
12   Q. So she bid for a position that wasn't posted; is
13 that correct?
14   A. I don't recall if it was posted.
15   Q. In order to bid for a position, does the
16 position have to be posted?
17   A. The position would have had to have been posted
18 at some point. It may have been posted and then taken
19 down, that kind of thing.
20   Q. So is it your testimony that the position
21 doesn't have to be posted, then, at that exact time the
22 bidding is taking place?
23   A. That's correct.
24   Q. So Kathryn Ross didn't have to reapply for the

Page 23

1  position; is that correct?
2    A. That's correct. She transferred.
3    Q. Is bidding for the position a form of transfer?
4    A. It can be or it can be a reemployment or an
5  employment opportunity.
6    Q. How so?
7    A. If a position is not filled internally, it's
8  posted externally so someone could bid for it from
9  externally, from outside the hospital.
10   Q. But if it's someone bidding and they receive a
11 position inside the hospital, is that considered a
12 transfer?
13   A. I'm sorry. Could you repeat that?
14   Q. If a person is bidding -- like, for example,
15 Kathryn Ross, she bid for this position, is that
16 considered a transfer into a unit clerk position?
17   A. Yes.
18   Q. Could you tell me who Diana Stewart is?
19   A. Diana Stewart was employed as a student nurse
20 extern on 5D.
21   Q. What are some of the roles and responsibilities
22 of a student nurse extern?
23   A. A student nurse extern has basically the same
24 job description as a patient care tech.

Page 24

1    Q. Oh, okay. Which is -- tell me.
2    A. Okay. A.m. care, bathing patients, dressing
3  patients, doing vital signs, accuchecks, performing eyes,
4  nose, ambulating patients, assisting them with using an
5  incentive spirometer.
6    Q. Using a what?
7    A. It is a breathing exerciser machine.
8    Q. Diana was in one of your units or your unit?
9  Which unit?
10   A. Diana was on 5D.
11   Q. She was on 5D. Okay.
12      Was she also involved in a car accident?
13   A. Yes, she was.
14   Q. Did she also go out on a leave of absence?
15   A. No, she did not.
16   Q. Are you sure?
17   A. I'm positive.
18   Q. Did she at some point present a doctor's note
19 with restrictions to Christiana Care?
20   A. Yes, she did.
21   Q. Who did she present it to?
22   A. That would be to me.
23   Q. What did the doctor's note indicate?
24   A. The doctor's note indicated no patient care for

Page 25

1  a week.
2    Q. Did Diana Stewart work in the patient care
3  capacity for that week that she wasn't allowed to in
4  accordance with her doctor?
5    A. Yes, she did, but that was my mistake.
6    Q. When she returned to work with those
7  restrictions, with restrictions, I don't really know what
8  the restrictions are, but do you know what the
9  restrictions were?
10   A. There was no patient care for a week.
11   Q. But you don't know like arm, neck, or anything
12 like that? She was just not supposed to do the patient
13 care job for one week; is that correct?
14   A. It wasn't specified on the note. She had told
15 me verbally that she was having neck pain and shoulder
16 pain after physical therapy.
17   Q. Instead of doing the patient care tech duties,
18 what did she do?
19   A. I'm sorry. I don't understand what you are
20 asking.
21   Q. Did Miss Stewart do the patient care duties for
22 that week that she was instructed not to by her doctor?
23   A. She did.
24   Q. She did do the patient care duties.

A-44

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Villanueva                                    v.              Christiana Care Health Services, Inc.
Karen E. McCloud, R.N.              C.A. # 04-258-JJF                         April 26, 2006

Page 26

1        You sent her down to Employee Health when
2  she came in with those restrictions?
3        A.  It's actually a little backwards.  She notified
4  me that she had the neck and shoulder pain.  I sent her
5  to Employee Health for clearance because she was
6  complaining of a musculoskeletal injury.  Employee Health
7  sent her home.
8        When she came back up and said she was
9  being sent home, she told me she was going to go see her
10 doctor, who was right across the street.  So she went to
11 her doctor, came back, handed me a note that said that
12 she was cleared for work.  I didn't read the note.  I put
13 the note on my desk.
14     Q.  So the note said she was cleared for work?
15     A.  No, the note did not say she was cleared for
16 work.  She told me verbally she was cleared for work, so
17 I allowed her to continue to work.
18     Q.  You received a doctor's note, though?
19     A.  But I put the doctor's note on my desk because
20 she told me verbally she was cleared.  So I allowed her
21 to go ahead and work.
22     Then when she was working in TSU as a
23 PCT II role, she was evidently telling staff that she
24 couldn't lift because of her back and her neck and her

Page 27

1  having been in a car accident.
2        Carole asked me about that, if she was
3  approved for light duty and I said, "Absolutely not."
4  And I went up and checked that note that she had handed
5  me and that's where I saw it said no patient care for a
6  week.
7        So I instructed Diana to report to Employee
8  Health Service for clearance again.  When she went to
9  Employee Health, they said no patient care for a week and
10 I saw that restriction on her Employee Health slip.  And
11 to my knowledge, she did not work as -- in the patient
12 care tech II capacity during that time.
13     Q.  Why not?
14     A.  Because she was restricted.
15     Q.  Why didn't she work in the patient care tech?
16     A.  Because she couldn't do any lifting.  Her note
17 said no patient care.
18     Q.  So what did she do instead?
19     A.  If she worked during that week at all, and I'm
20 not sure that she did, she would have worked as a unit
21 clerk on 5D.
22     Q.  I'm confused.  Did Christiana Care allow her to
23 work as a unit clerk because she had restrictions, she
24 could not do the patient care tech job?

Page 28

1        A.  As a unit -- Diana was cross-trained as a unit
2  clerk.  She had been oriented to that role when we
3  created the TSU or moved the TSU down to the second
4  floor.  Because she was able to function fully as a unit
5  clerk, I did use her sometimes on 5D as a unit clerk when
6  I had needs.
7        Q.  Just so it's clear, Christiana Care allowed her
8  to work as a unit clerk; is that correct?
9        A.  Yes.
10     Q.  Diana Stewart was hired as a nurse extern;
11 correct?
12     A.  That's correct.
13     Q.  You mentioned that the nurse extern is similar
14 to the patient care tech duties.  Is that also correct?
15     A.  That's correct.
16     Q.  Who is Nicole Marble?
17     A.  I don't know Nicole Marble.
18     Q.  Markel.  I have it written here wrong.  I'm
19 sorry.
20     Nicole Markel, who is she?
21     A.  Nicole Markel is a registered nurse at
22 Christiana Hospital.  She was a nurse in TSU and then
23 transferred to 3C.  And I'm not sure where she is now.
24     Q.  Was she transferred to 3C as a result of

Page 29

1  physical restrictions?
2        A.  I don't believe so.  I believe she transferred
3  from TSU to 3C.
4        Q.  I'm sorry.  I didn't hear that last part.
5        A.  She transferred from TSU to 3C.
6        Q.  To 3C?
7        A.  Yes.
8        Q.  But you are not aware of that being as a result
9  of an injury?
10     A.  No.
11     Q.  Are you aware of any time where Christiana Care
12 allowed her to work in a different capacity due to
13 physical restrictions?
14     A.  When you mean "capacity," what do you mean?  She
15 still worked as an RN.
16     Q.  Still working as an RN, I guess, but just
17 doing -- I guess doing different jobs.  Like, for
18 example, not fully doing regular duty.  So whatever --
19 let's talk about this.
20     Whatever a nurse does regularly, which I'm
21 not sure, maybe you can tell me, was she allowed to work
22 doing different duties to accommodate the fact that she
23 had a physical restriction?
24     A.  Nicole continued to work as a registered nurse

**A-45**

8 (Pages 26 to 29)

Villanueva     v.     Christiana Care Health Services, Inc.
Karen E. McCloud, R.N.     C.A. # 04-258-JJF     April 26, 2006

**Page 30**

1 in the TSU, continued to take patient care assignment.
2 We did limit her lifting because she had a work-related
3 injury, an occupational injury.
4    Q. So is it fair to say that Christiana Care
5 limited her duties, job duties?
6    A. I'm confused by "duties" versus physical
7 demands. She was still performing her RN duties with
8 additional assistance with the physical demands of the
9 job.
10    Q. Are you saying that she was able to do
11 everything and did everything that a person without
12 restrictions was doing?
13    A. I wouldn't say that. She was -- she needed
14 additional assistance to turn her patients, get her
15 patients out of bed, that kind of thing. She wasn't to
16 lift on her own.
17    Q. Do other nurses lift on their own?
18    A. No. We have a no solo lifting policy. Sorry
19 about that. I mean that a nurse may be able to go into a
20 room and turn somebody to do an assessment. She might
21 need the tech to go into the room to help her turn the
22 patient to listen to their lungs, but she was still able
23 to take the assignment.
24    Q. Was her employment limited in any other way

**Page 31**

1 physically? You mentioned the patients. Was it limited
2 in any other way as a result of her restrictions?
3    A. Do you mean like in hours or shifts or anything
4 like that?
5    Q. I mean anything. I mean hours, shifts, lifting,
6 bending, walking. Any other restrictions placed on her?
7    A. I don't recall that. I remember there was a
8 time when she was light duty, meaning like doing filing
9 and answering the phone. She was not on the unit at all.
10    Q. To your knowledge, was Nicole pregnant?
11    A. No.
12    Q. Going back to Diana Stewart, to your knowledge,
13 was Diana Stewart pregnant?
14    A. No.
15      (McCloud Exhibit 1 was marked for
16 identification.)
17 BY MS. BREWINGTON:
18    Q. What is this document?
19    A. This is a letter that I sent to Nicole
20 indicating that she was being terminated because she was
21 not eligible for a leave of absence and she wasn't able
22 to return to work.
23    Q. Is it true that she was not able to return to
24 work or that she wasn't allowed to return to work?

**Page 32**

1    A. I don't understand what you are asking.
2    Q. You indicated that she wasn't able to return to
3 work. Why wasn't she able to return to work?
4    A. She was not cleared to return to work by
5 Employee Health.
6    Q. But you are aware that she was released to
7 return to work regular duty by her regular physician;
8 correct?
9    A. Yes.
10    Q. Whose decision was it to terminate
11 Miss Villanueva?
12    A. It was ultimately my decision.
13    Q. What was the basis for your termination
14 decision?
15    A. Nicole had been out of work for a period of time
16 that indicated she would have needed to be placed on
17 leave to continue to be out of work, a leave of absence.
18 However, she was not eligible for a leave of absence
19 because she had not been employed for six months. So
20 consistent with policy, the decision was made to
21 terminate her employment.
22    Q. Why wasn't Miss Villanueva allowed to return to
23 work once she was cleared to return to regular duty by
24 her regular physician, Dr. Goldenberg?

**Page 33**

1    A. That decision was -- she went to Employee Health
2 for evaluation.
3    Q. Yes.
4    A. And under their experience, they determined that
5 she was not eligible or she was not able to work. They
6 would not clear her to return to work.
7    Q. Do you know whether they examined
8 Miss Villanueva?
9    A. I wouldn't know that.
10    Q. Do you know whether Ms. Collins met with
11 Miss Villanueva? Chris Collins, Christine Collins.
12    A. I don't know that.
13    Q. Do you know whether Christiana Care consulted
14 any physician that indicated that she could not return to
15 work regular duty?
16      MR. BLOOM: Object to the form of the
17 question.
18      You can answer if you understand.
19    A. Could you repeat the question?
20    Q. My question is: Do you know whether
21 Christiana Care, anyone from Christiana Care consulted
22 anyone, any doctor that indicated that she could not
23 return to work regular duty?
24    A. I don't recall.

**A-46**

9 (Pages 30 to 33)

Villanueva
Karen E. McCloud, R.N.

v.

C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 34

1  Q.  Was Miss Villanueva ever disciplined for
2  performance?
3  A.  I don't recall anything above initial coaching.
4  Q.  Is that discipline, "initial coaching"?
5  A.  No.  Coaching is a conversation.
6  Q.  Okay.  So is your answer no, she --
7  A.  My answer is no, she was not disciplined to my
8  knowledge.
9  Q.  Was she ever disciplined for absenteeism?
10  A.  No, I don't believe so.
11      MS. BREWINGTON:  I need a minute.
12      MR. BLOOM:  Sure.
13      (A recess was taken at this time.)
14  BY MS. BREWINGTON:
15  Q.  If you could just have a look at that document
16  for me.
17      MR. BLOOM:  This is D233 Bates number.
18  A.  (The witness reviews the document.)
19  Q.  What is that document?
20  A.  It appears to be a doctor's note from
21  Dr. Goldenberg.
22  Q.  What does it say?
23  A.  Dr. Goldenberg has never been known for clear
24  writing.

Page 35

1  Q.  To the best of your ability.
2  A.  It is dated 4/8/03.  "Nicole Villanueva has
3  pregnancy induced cardiac arrythmia.  Physical" -- and I
4  can't make out the next word -- "precipitates her
5  arrythmia.  At this time I have suggested a sedentary
6  position.  Ed Goldenberg."
7  Q.  Are you aware that Dr. Goldenberg placed her on
8  medication when he saw her that day?
9  A.  I was not aware of that.
10  Q.  Were you aware that Miss Villanueva had been on
11  that medication for at least one week before she returned
12  to work requesting regular duty?
13  A.  I didn't know that she was -- I didn't know the
14  details of her medication regimen.  I did not know that.
15  Q.  Yet you made the final decision to terminate
16  her; is that correct?
17  A.  The decision to terminate her was because she
18  was -- she was not cleared by Employee Health to return
19  to work, and she was out -- extending her time out would
20  have needed to be a leave of absence which she was not
21  eligible for.
22      MS. BREWINGTON:  I don't have anything
23  further.
24      MR. BLOOM:  I have a little follow-up.

Page 36

1  BY MR. BLOOM:
2  Q.  Miss McCloud, you testified earlier about
3  Kathryn Ross bidding for a unit clerk position and
4  working in that position after she sustained an injury.
5  Do you remember that?
6  A.  Yes.
7  Q.  At that time, did you have a vacant unit clerk
8  position?
9  A.  Yes, I did.
10  Q.  I take it you did not create the unit clerk
11  position or unit clerk work for her to do?
12  A.  That's correct.
13  Q.  Diana Stewart, I think you testified that she
14  also may have worked in a unit clerk capacity following
15  an injury.  Is that true?
16  A.  Yes.
17  Q.  At that time did you have a vacant unit clerk
18  position available for Miss Stewart to work in?
19  A.  No, I did not.
20  Q.  Why was Miss Stewart able to fill in in the unit
21  clerk role?
22  A.  I had a need at that time because I had two
23  full-time unit clerks out on surgical leave of absence,
24  out or going out on a surgical leave of absence.  I had

Page 37

1  holes in my schedule.  Since Diana was trained as a unit
2  clerk, I could use her to fill in those holes.
3  Q.  Was Miss Stewart a casual employee?
4  A.  Yes, she was.
5  Q.  What does that mean?
6  A.  That means she has no committed hours and I have
7  no commitment to give her a certain number of hours.  She
8  works when she is available.  She tells me when she is
9  available.  And if I have a need that I can match up her
10  availability with, I have her work.
11  Q.  Did you create any unit clerk work for
12  Miss Stewart to do?
13  A.  No.
14  Q.  You also testified about Linda Crosby.  Do I
15  have that name correct?
16  A.  Laura.
17  Q.  Laura Crosby.  Thank you.
18      Did she have an injury that limited her
19  physical abilities?
20  A.  Yes.
21  Q.  Was that a work-related injury?
22  A.  Yes, it was.
23  Q.  Did you also at that time have an open unit
24  clerk position?

**A-47**

10 (Pages 34 to 37)

Villanueva                              v.              Christiana Care Health Services, Inc.
Karen E. McCloud, R.N.          C.A. # 04-258-JJF                        April 26, 2006

Page 38

1   A. I had an open unit clerk position when she
2   was -- after several months after she was injured, yes.
3       Q. Do you have an understanding as to why
4   Christiana Care may go to greater lengths to provide
5   restrictive work for employees who have a work-related
6   injury?
7       A. Yes, I do. It's my understanding that the
8   hospital has to pay their wages whether they are working
9   or not. So since we are paying them, it's -- it behooves
10  us to have -- to create some light-duty assignment for
11  them.
12      Q. In April 2003, did you have an open unit clerk
13  position within your authority that Miss Villanueva could
14  have been transferred to or bid for?
15      A. No, I did not.
16      Q. Apart from an open position, did you have any
17  unit clerk work needs that were going unfilled that
18  Miss Villanueva could fill?
19      A. No.
20      Q. I'm going to put in front of you D464. It's
21  been used earlier today. This is a list of unit clerk
22  positions.
23      A. Yes.
24      Q. Are any of the unit clerk positions listed in

Page 39

1   this document positions where you would have the
2   authority to transfer Miss Villanueva to?
3       A. No.
4       Q. Are you the hiring manager for any of the unit
5   clerk positions listed on this document?
6       A. No, I'm not.
7       Q. If somebody at Christiana Care were interested
8   in obtaining one of the positions that are listed on
9   D464, what is your understanding of the process to do
10  that?
11      A. They would have to contact recruitment either by
12  bidding on an online form or calling recruitment and
13  asking how to go about bidding.
14          MR. BLOOM: I'm done.
15          MS. BREWINGTON: If I could do a follow-up.
16  BY MS. BREWINGTON:
17      Q. If you could review this document for me.
18          MR. BLOOM: We are going back to D464.
19      Q. How many open unit clerk positions are there?
20      A. Nine.
21      Q. Out of those nine, those nine open positions,
22  were they available or were they open during the time
23  that Miss Villanueva worked at Christiana Care?
24      A. May I take a look at it for a second?

Page 40

1       Q. Sure.
2       A. I need to see the dates. (The witness reviews
3   the document.) Yes, it appears that they were all were.
4       Q. With respect to Diana Stewart, you indicated
5   that she was a patient care tech; correct?
6       A. She was a student nurse extern.
7       Q. Student nurse extern?
8       A. Yes.
9       Q. She did a similar role as the patient care tech;
10  is that correct?
11      A. Yes.
12      Q. You did not have an open unit clerk position
13  available?
14      A. When?
15      Q. When she needed -- I guess I don't want to say
16  that word. When she couldn't do the position of a nurse
17  extern.
18      A. I did not have a clerk position at that time,
19  that's correct.
20      Q. But it's true that Diana worked as a clerk?
21      A. On a couple of occasions, yes.
22      Q. When she needed those restrictions, she didn't
23  work as a nurse extern; correct?
24      A. When -- are you talking about when she gave me

Page 41

1   the note or when I saw the note?
2       Q. When you saw the note.
3       A. When I read the note?
4       Q. Yes.
5       A. When I read the note and sent it down to
6   Employee Health and they said no patient care for a week,
7   I do not recall what she worked during that week. I
8   don't remember what she worked that week.
9       Q. Did she ever work in a unit clerk position
10  during that week?
11      A. During the week after Employee Health said no
12  patient care?
13      Q. It's getting confusing.
14      A. It is confusing.
15      Q. I guess I'm confused. I thought you indicated
16  before, and correct me if I'm wrong, that you did not
17  create a unit clerk position for her; correct?
18      A. Correct.
19      Q. Yet she did the role of a unit clerk.
20      A. Sporadically, yes.
21      Q. When did she do that?
22      A. If you're asking during the time when she was
23  injured? There were some -- there were a few days
24  between the time that she went to her doctor and he

**A-48**

11 (Pages 38 to 41)

Villanueva                              v.              Christiana Care Health Services, Inc.
Karen E. McCloud, R.N.          C.A. # 04-258-JJF                    April 26, 2006

Page 42

1   said -- Employee Health first sent her home and she went
2   to Employee Health -- or she went to her doctor and he
3   said she was cleared or she told me that she was cleared,
4   there were some times during that week that she worked as
5   a unit clerk.
6        Q.   Did she work as a patient care tech?
7        A.   Not on 5D. She worked as -- down in TSU, I
8   believe, as both patient care tech and as the unit clerk,
9   similar to the PCT II2 function. It was after she was
10  working down there that she notified Carole or notified
11  the other nurses that she couldn't lift and Carole
12  notified me that she was essentially putting herself on
13  restrictions.
14       When Carole notified me she was saying that
15  she couldn't lift, I informed Carole she was not
16  restricted because at that point I hadn't seen that note
17  from her doctor saying that there was no patient care. I
18  thought she was cleared to work.
19       Q.   Then what happened after that?
20       A.   I sent her down to Employee Health and they
21  restricted her to no patient care at all.
22       Q.   Then what happened?
23       A.   I don't remember. I don't remember. I don't
24  recall if she worked during that week. If she did work

Page 43

1   in that week, I would have only had her working as a unit
2   clerk.
3        Q.   Thank you.
4        MS. BREWINGTON:  Nothing further.
5        MR. BLOOM:  One last follow-up.
6   BY MR. BLOOM:
7        Q.   Ms. McCloud, if you had had any need for unit
8   clerk work during April 2003, would you have permitted
9   Miss Villanueva to do that work?
10       A.   Yes, I would have.
11       Q.   Thank you.
12       MR. BLOOM:  Nothing else.
13       MS. BREWINGTON:  No further questions.
14       (The deposition was then concluded at
15  1:50 p.m.)
16            - - - - -
17
18
19
20
21
22
23
24

Page 44

1                INDEX TO TESTIMONY
2
3
   KAREN E. McCLOUD, R.N.                    PAGE
4
5   Examination by Ms. Brewington              2
    Examination by Mr. Bloom                  36
6   Examination by Ms. Brewington             39
    Examination by Mr. Bloom                  43
7
8            - - - - -
9
            INDEX TO EXHIBITS
10
11  McCLOUD EXHIBIT NO.:                     PAGE
12
    1   A one-page copy of a letter dated April 24,
13      2003, to Nicole Villanueva from Karen
        McCloud, RN                           31
14
15           - - - - -
16
17
18
19
20
21
22
23
24

Page 45

1
2
3
4
5
6
7
8   REPLACE THIS PAGE
9
10  WITH THE ERRATA SHEET
11
12  AFTER IT HAS BEEN
13
14  COMPLETED AND SIGNED
15
16  BY THE DEPONENT.
17
18
19
20
21
22
23
24

A-49

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Villanueva                                v.                    Christiana Care Health Services, Inc.
Karen E. McCloud, R.N.              C.A. # 04-258-JJF                              April 26, 2006

Page 46

1   State of Delaware )
2              )
3   New Castle County )
4
5            CERTIFICATE OF REPORTER
6
7            I, Kathleen White Palmer, Registered Merit
    Reporter and Notary Public, do hereby certify that there
8   came before me on the 26th day of April, 2006, the
    deponent herein, KAREN E. McCLOUD, RN, who was duly sworn
9   by me and thereafter examined by counsel for the
    respective parties; that the questions asked of said
10  deponent and the answers given were taken down by me in
    Stenotype notes and thereafter transcribed into
11  typewriting under my direction.
12           I further certify that the foregoing is a
    true and correct transcript of the testimony given at
13  said examination of said witness.
14           I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17
18
19               Kathleen White Palmer, RPR, RMR
                 Certification No. 149-RPR
20               (Expires January 31, 2008)
21
    DATED:  April 27, 2006
22
23
24

A-50

13 (Page 46)



## WILCOX & FETZER LTD.

### In the Matter Of:

# Villanueva

## v.

# Christiana Care Health Services, Inc.

### C.A. # 04-258-JJF

---

### Transcript of:

### Carole Dye, L.P.N.

### April 26, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A-51

Villanueva
Carole Dye, ...                                    v.                  Christiana Care Health Services, Inc.
                                         C.A. # 04-258-JJF                              April 26, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NICOLE VILLANUEVA,            )
                             )
              Plaintiff,     )
                             )      Civil Action
v.                           )      No. 04-258-JJF
                             )
CHRISTIANA CARE HEALTH        )
SERVICES, INC.               )
                             )
              Defendant.     )

        Deposition of CAROLE DYE, LPN, taken
pursuant to notice at the law offices of Morris, James,
Hitchens & Williams, 222 Delaware Avenue, Tenth Floor,
Wilmington, Delaware, beginning at 10:00 a.m. on
Wednesday, April 26, 2006, before Kathleen White Palmer,
RMR, CSR-DE, CLR and Notary Public.

APPEARANCES:

        LORI A. BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19806
          for the Plaintiff

        THOMAS S. BLOOM, ESQUIRE
        MORGAN LEWIS & BOCKIUS LLP
          1701 Market Street
          Philadelphia, Pennsylvania   19103-2921
          for the Defendant

ALSO PRESENT:

        NICOLE VILLANUEVA
        KERRY DELGADO          A-52
--------------------------------------------------
                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

Wilcox & Fetzer, Ltd.        Professional Court Reporters          (302)655-0477

Villanueva                                    v.              Christiana Care Health Services, Inc.
Carole Dye, L.P.N.                     C.A. # 04-258-JJF                              April 26, 2006

Page 2

1          CAROLE DYE, LPN,
2      the witness herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5   BY MS. BREWINGTON:
6      Q.  Good morning, Ms. Dye.
7      A.  Good morning.
8      Q.  My name is Lori Brewington and I have the
9   privilege of taking your deposition today. I represent
10  Nicole Villanueva in a discrimination action against
11  Christiana Care. I'm going to ask you a series of
12  questions.
13         My effort will be to ask them one at a
14  time. If for some reason you do not understand the
15  question, just let me know and I will repeat it. But if
16  you do answer the question, then I'll assume that you
17  understood the question. Okay?
18         We have a court reporter here and she will
19  be taking down your answers to these questions. I ask
20  that you please be sure that you answer questions yes or
21  no as opposed to un-huh or mm-hmm because they don't tend
22  to show up very clear on the record.
23         If at any time you need to take a break,
24  just let me know and we'll take a break. We'll go off

Page 3

1   the record.
2          If you could begin by stating your name and
3   your professional title?
4      A.  Carole Dye, nurse manager, transitional surgical
5   unit.
6      Q.  How long have you been nurse manager?
7      A.  Two years.
8      Q.  Could you please tell me a little bit about your
9   educational background?
10     A.  I started out as an LPN in '80 and then went
11  back and got my associate's around '86 and finished my
12  bachelor's about 2002. And I'm working on my master's
13  now.
14     Q.  You said that you've been a nurse manager for
15  two years; is that correct?
16     A.  Mm-hmm.
17     Q.  What was your role prior to being a nurse
18  manager?
19     A.  Patient care coordinator.
20     Q.  How long were you a patient care coordinator?
21     A.  Approximately three years.
22     Q.  I am going to give you a time frame of December
23  2002 through April of 2003.
24     A.  Mm-hmm.

Page 4

1      Q.  What was your role during that time?
2      A.  Patient care coordinator.
3      Q.  Patient care coordinator. Okay.
4          Did Nicole Villanueva report to you at that
5   time?
6      A.  Yes.
7      Q.  Did she report directly to you?
8      A.  She would report to both myself and Karen
9   McCloud. Karen was over me.
10     Q.  I see. Miss Dye, what did you do in preparation
11  for your deposition testimony today?
12     A.  Reviewed the material that was given to me by
13  Mr. Bloom.
14     Q.  Did you talk with anyone in preparation for your
15  deposition testimony today?
16         MR. BLOOM:  Hang on one second. I'm just
17  going to object. You can answer the question if you had
18  conversations outside of my presence. But conversations
19  where counsel, meaning me, were present are privileged.
20         THE WITNESS:  Oh.
21     A.  Then no.
22     Q.  I would like to show you this document.
23         MS. BREWINGTON:  If I can have this marked
24  as Dye 1.

Page 5

1          (Dye Exhibit 1 was marked for
2   identification.)
3   BY MS. BREWINGTON:
4      Q.  Could you tell me what this document is?
5      A.  It says it's an Employment/Reference/Education
6   Information form.
7      Q.  Is this an application for Christiana Care?
8      A.  I've not seen this one before.
9      Q.  So your answer is you don't know whether it's an
10  application form?
11     A.  No.
12     Q.  Does it indicate on the form what position
13  Ms. Villanueva was applying for?
14         MR. BLOOM:  Object to the form of the
15  question.
16         You can answer it if you can.
17     A.  It states she's applying for a unit clerk.
18     Q.  Do you know whether she applied for a unit clerk
19  position around October 25th, 2002?
20     A.  I can only -- before I met her, I don't know
21  what she applied for.
22     Q.  So when you met her, was she already employed
23  with Christiana Care?
24     A.  No. She was an external candidate.

**A-53**

Villanueva
Carole Dye, L.P.N.

v.
C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

**Page 6**

1  Q. What position was she applying for?
2  A. We had combination positions. It was a patient
3  care tech/unit clerk combined role.
4  Q. So when she was an external candidate, she was
5  applying for the patient care tech and unit clerk role?
6  A. For the unit that I functioned in, yes.
7  Q. Do you know when that was, approximately?
8  A. I know she started around December, but I don't
9  know when we started the process. At some point before
10  then.
11  Q. Is it your testimony that in December once she
12  started working she was in a dual role as a unit clerk
13  and a patient care tech?
14  A. Yes.
15  Q. I'm finished with that.
16      What are the general responsibilities of a
17  unit clerk at Christiana Care?
18  A. A unit clerk itself?
19  Q. Yes.
20  A. Take off orders, answer phones, stuff charts --
21  Q. I'm sorry?
22  A. Stuff charts.
23  Q. What does that mean?
24  A. Stamp forms and put them in the patient files.

**Page 7**

1  Q. Okay.
2  A. Recopy the medication administration records,
3  deliver mail, pick up mail, break down charts, put
4  together post-op charts, order supplies.
5  Q. Do unit clerks do anything on the computer
6  itself?
7  A. Enter orders.
8  Q. Would you consider this position a sedentary
9  position?
10  A. A straight unit clerk position?
11  Q. Yes.
12  A. Not on a nursing floor.
13  Q. What is a sedentary position in your opinion?
14  A. One that you do from a chair.
15  Q. Solely from a chair; is that correct?
16  A. Mm-hmm.
17  Q. Yes?
18  A. Yes.
19  Q. Why is it that a unit clerk position is not a
20  sedentary position on the nursing floor?
21  A. You need to get up and go retrieve the charts,
22  bring the charts over, deliver them back to the units.
23  You need to be able to break down medical records and put
24  them over in the area to get them picked up, be able to

**Page 8**

1  go to the mailroom, pick up mail, bring it back.
2  Q. Okay.
3  A. There's a degree of bending, lifting, sitting.
4  Q. Now, what percentage of the time, if you can
5  answer this question, would you be sitting in the chair
6  versus walking, bending, and those type of things?
7  A. That would vary day to day.
8  Q. Would there be times where they would sit most
9  of the day versus walking around?
10  A. No.
11  Q. No?
12  A. It's -- you're constantly up and down on the
13  units just to go get the charts.
14  Q. Is this a light-duty position?
15  A. No.
16  Q. Is it a physically demanding job?
17      MR. BLOOM: I object to the form of the
18  question.
19      You can answer it if you understand that.
20  A. (No response.)
21      MR. BLOOM: Do you understand the question?
22      THE WITNESS: I'm not quite sure what she's
23  asking. I mean, you have to -- you have to be able to
24  perform the job.

**Page 9**

1  BY MS. BREWINGTON:
2  Q. Okay. I understand that.
3      Now, you said that there was some bending.
4  A. Yes.
5  Q. Walking?
6  A. Mm-hmm.
7  Q. Retrieving charts?
8  A. Mm-hmm.
9  Q. Do you consider those things physically
10  demanding?
11  A. Yes.
12  Q. So then is it fair to say in your opinion that
13  the unit clerk job is a physically demanding job?
14  A. Yes.
15  Q. Is the patient care tech job a physically
16  demanding job?
17  A. Yes.
18  Q. Is one more physically demanding than the other?
19  A. Yes.
20  Q. Which one?
21  A. The patient tech, patient care tech job.
22  Q. Why is the patient care tech more physically
23  demanding than the unit clerk job?
24  A. Because you're also turning patients, bathing

**A-54**

Villanueva
Carole Dye, L.P.N.

v.
C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 10

1  patients, helping to lift equipment, move equipment.
2      Q.  What is the transitional surgical unit?
3      A.  It's a six-bed intermediate care unit.
4      Q.  What do you mean by "intermediate care unit"?
5      A.  The patients are not as acutely ill as an
6  intensive care unit, but they are too -- they require too
7  much observation and nursing intervention to go to a
8  regular floor bed.
9      Q.  Are they eventually going to transition to
10  another floor?
11      A.  Yes.
12      Q.  Or another bed?
13      A.  Yes.
14      Q.  Where is the transitional surgical unit located
15  in terms of what floor?
16      A.  The second floor at Christiana Hospital.
17      Q.  Second floor?
18          MR. BLOOM:  I'm sorry.  I just want to --
19  were you answering currently?  It may have changed, so I
20  just wanted to --
21          MS. BREWINGTON:  Okay.
22      A.  It's still in the same place at the time that
23  she worked there, but it had moved prior to that.
24

Page 11

1  BY MS. BREWINGTON:
2      Q.  So it was on the second floor and it is now on
3  the second floor?
4      A.  Yes.
5      Q.  Now, what is this 5D?
6      A.  5D?
7      Q.  Yes.
8      A.  Is a 36-bed step-down surgical unit.
9      Q.  Is that located near the transitional surgical
10  unit?
11      A.  It is three flights up and two towers away.
12      Q.  Very specific.  Thanks.
13          Now, is the transitional surgical unit
14  connected in some way to the 5D unit?
15      A.  We shared a nurse manager at that time.
16      Q.  "At that time" meaning the time that Nicole
17  Villanueva was employed?
18      A.  Yes.
19      Q.  Who was the nurse manager that you shared?
20      A.  Karen McCloud.
21      Q.  As Nicole's supervisor, or as a supervisor, are
22  there times when your staff is short unit clerks?  I'm
23  sorry if you don't understand that.
24          Are there times when you're understaffed in

Page 12

1  terms of unit clerks?
2      A.  Are you asking about specific --
3      Q.  No.  Just in general.
4      A.  Yes.
5      Q.  When you're understaffed, what do you do in
6  those situations?
7      A.  We call the nursing coordinator and make them
8  aware and they try to locate us a unit clerk to fill a
9  hole.
10      Q.  Where is the nursing coordinator?  Is she on
11  your floor?
12      A.  No.  They have a -- they're available by
13  beepers.
14      Q.  How many nursing coordinators are there?
15      A.  (No response.)
16      Q.  Approximately.
17      A.  I would be guessing.
18      Q.  Now, the nursing coordinator, you'll call the
19  nursing coordinator; is that correct?
20      A.  Mm-hmm.
21      Q.  She'll try to find you someone.  Is that also
22  correct?
23      A.  Mm-hmm.
24      Q.  Where does she locate them?

Page 13

1      A.  They usually borrow them from another unit.  If
2  one unit has two and another unit only has one scheduled
3  that night and that one called out sick, they would
4  borrow from a unit that has two so that each unit would
5  have one.
6      Q.  So the nurse coordinator would borrow from a
7  unit other than the transitional surgical unit?
8      A.  I didn't know we were talking about just the
9  transitional surgical unit.  I meant in general.
10      Q.  Okay.  Let's go back.
11          When you're understaffed in the
12  transitional surgical unit --
13      A.  Yes.
14      Q.  -- is it fair to say that you would call the
15  nurse coordinator to try to get someone to come into your
16  transitional surgical unit?
17      A.  But you are asking me a different question than
18  you were regarding unit clerks.  I wouldn't be calling
19  for a straight unit clerk for the transitional surgical
20  unit.  I was answering the question as a generalized
21  question across Christiana Care.
22      Q.  Let's go back to general, then.
23      A.  Okay.
24      Q.  Generally, the nurse coordinator will call

4 (Pages 10 to 13)

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Villanueva
Carole Dye, L.P.N.

v.

C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

**Page 14**

1 another floor to find a unit clerk to be on a different
2 floor. Is that fair to say?
3    A. Yes.
4    Q. Does the unit clerk need special training for
5 that floor?
6        MR. BLOOM: I'm going to object to the form
7 of the question, but you can answer it.
8    A. There are certain unit clerks that function
9 differently than other unit clerks depending on the areas
10 that they work in because certain forms are specific for
11 certain nursing areas, so they would be less adept at
12 functioning in those areas.
13    Q. So who trains them?
14    A. Each unit specifically trains their clerks for
15 their needs.
16    Q. So if the nurse coordinator sent a unit clerk to
17 a different floor, would that new floor then train that
18 unit clerk?
19    A. Not for that one specific evening. We would
20 give her a brief overview.
21    Q. Okay.
22    A. And they could do the main functions, but they
23 try to send them to like units.
24    Q. Thank you.

**Page 15**

1        Do you recall a time when one of your unit
2 clerks assisted on another floor?
3    A. Are you talking about while I worked in TSU?
4    Q. Yes.
5    A. I don't — my patient care techs would get
6 pulled, they're tech II's, so they would either get
7 pulled as a patient care tech to go function in patient
8 care or if there might have been a unit clerk needed -- I
9 don't remember a specific time that they got pulled as a
10 straight clerk.
11    Q. Okay.
12    A. To go somewhere else to work.
13    Q. I'm trying to understand what you are saying.
14        Are you saying that your patient care techs
15 are called to other floors to assist in the patient care
16 duty? Is that what you are saying?
17    A. Yes.
18    Q. But you don't recall whether your unit clerks —
19    A. Not as a straight clerk because if I'm -- while
20 we're in the transitional surgical unit, I don't have
21 enough staff. If I'm giving one of them up, I'm not only
22 giving up my clerk, I'm giving up my tech. So I have to
23 keep them because I'm giving up two people technically.
24 They're a hybrid role. So when you're taking my patient

**Page 16**

1 care tech II as a straight clerk somewhere else, you're
2 leaving the unit high and dry.
3    Q. I understand.
4    A. And we don't have such a large multitude of
5 people because it's such a small unit. So they very
6 rarely get pulled.
7    Q. Going back to the time when Villanueva worked
8 there, if you can remember, were your unit clerks
9 trained, all of your unit clerks trained in patient care
10 duties and unit clerk duties?
11    A. In the transitional surgical unit, yes.
12    Q. How about 5D?
13    A. They did not utilize a patient care tech II
14 role. They had either all PCTs or unit clerks. They did
15 either/or.
16    Q. I would like to show you another document if I
17 could.
18        MS. BREWINGTON: We can mark this as Dye 2.
19        (Dye Exhibit 2 was marked for
20 identification.)
21 BY MS. BREWINGTON:
22    Q. Could you tell me what this document is?
23    A. It appears to be a job offer.
24    Q. Who signed off on this document?

**Page 17**

1    A. The recruiter, Kealey Barnes.
2    Q. Is she in human resources?
3    A. Yes.
4    Q. Could you tell me what position was offered to
5 Miss Villanueva in November of 2002?
6    A. It states "Unit Clerk in the Transitional
7 Surgical Unit."
8    Q. So she was not hired as a patient care tech; is
9 that correct?
10    A. She was hired in a dual role.
11    Q. Is this document inaccurate?
12    A. At the time that she was hired, they would
13 receive — the first year they -- this was a new role
14 that we created to function in the transitional surgical
15 unit.
16    Q. The position that was offered to her was a unit
17 clerk; is that correct?
18    A. Not a straight unit clerk position.
19    Q. Even though —
20    A. I read what this states, yes, that did state
21 unit clerk. However, I never had a straight unit clerk
22 role in the transitional surgical unit.
23    Q. Miss Villanueva came to work for you sometime in
24 December of 2002; is that correct?

Wilcox & Fetzer, Ltd.

Professional Court Reporters

5 (Pages 14 to 17)

(302)655-0477

Villanueva                                      v.              Christiana Care Health Services, Inc.
Carole Dye, L.P.N.                      C.A. # 04-258-JJF                              April 26, 2006

Page 18

1   A. Yes.
2   Q. Was she trained as a unit clerk?
3   A. She would -- she was trained to do both roles.
4   Q. Was she trained simultaneously?
5   A. Yes.
6   Q. So did Miss Villanueva receive an increase in
7   pay as a result of being trained in both the patient care
8   tech and the unit clerk position?
9   A. I -- as an assistant manager, we don't handle
10  the money, so I don't know where this would be on the
11  scale.
12  Q. So is it fair to say that Miss Villanueva was
13  trained and qualified to perform the duties of a unit
14  clerk and a patient care tech?
15  A. Yes.
16       MS. BREWINGTON: Dye 3.
17       (Dye Exhibit 3 was marked for
18  identification.)
19  BY MS. BREWINGTON:
20  Q. What is this document?
21  A. The paper for termination, the Performance
22  Review Summary that we fill out at the end of employment.
23  Q. Where it says "Position Title," what does it
24  indicate her position title is?

Page 19

1   A. Unit clerk.
2   Q. Do you know who completed this?
3   A. The signature would be on the back, but it looks
4   like Karen McCloud's handwriting.
5   Q. I want to point your direction to
6   Miss Villanueva's overall performance rating and ask you
7   to read what her overall performance rating was.
8   A. It's "Key Contributor. Consistently produces
9   results that meet or occasionally exceed performance
10  expectations and core value behaviors."
11  Q. Then what else does it say?
12  A. "For new employees performance reflects growth
13  or progress in meeting expectations."
14  Q. Okay. Thank you.
15       MS. BREWINGTON: I think we are on Dye 4.
16       (Dye Exhibit 4 was marked for
17  identification.)
18  BY MS. BREWINGTON:
19  Q. If I could ask you to look at the second page of
20  the stapled documents together, could you tell me what
21  this document is?
22  A. This is the evaluation, the back half of the
23  form we just discussed.
24  Q. I'm not sure it is.

Page 20

1       MR. BLOOM: Wait. Look at the second page
2   of the three-page document.
3       MS. BREWINGTON: Do they all go together?
4   They weren't together when I received them.
5       THE WITNESS: This is the same --
6       MR. BLOOM: I'm sorry to interject. Are
7   you, Lori, on the page that's numbered D286?
8       MS. BREWINGTON: Yes.
9       MR. BLOOM: Okay.
10  BY MS. BREWINGTON:
11  Q. Were there two evaluations done of
12  Miss Villanueva?
13  A. This is --
14  Q. Which one are you pointing to, for the record?
15  A. This is number --
16  Q. That's Dye 4, I believe.
17  A. This one has my writing on the back of it, so
18  this is the one that I filled out the back of because
19  that's my handwriting. So I did the evaluation.
20       And then this, the top of this is not
21  Karen's handwriting, but she filled out the very bottom.
22  And I don't know why there's this one.
23  Q. I'll turn your attention to Dye 4, that second
24  page.

Page 21

1       MR. BLOOM: The second page.
2       THE WITNESS: Okay.
3   BY MS. BREWINGTON:
4   Q. If I could direct your attention to her overall
5   performance rating once again and if you could read to me
6   what her overall performance rating was.
7   A. "Key Contributor. Consistently produces results
8   that meet or occasionally exceed performance expectations
9   and core value behaviors. For new employees performance
10  reflects growth or progress in meeting expectations."
11  Q. Is that an accurate statement?
12  A. Yes.
13  Q. On the third page, page D287, do you see where
14  we are? Did you complete this information? Is this your
15  handwriting?
16  A. Yes.
17  Q. On the third page you indicate that Nicole was
18  competent in her PCT skills; is that correct?
19  A. Yes.
20  Q. And "In addition, she has blended the role of
21  unit clerk well." Is that also correct?
22  A. Yes.
23  Q. Now, this document was signed off on in July of
24  2003; is that correct?

A-57

6 (Pages 18 to 21)

Villanueva
Carole Dye, L.P.N.

v.

C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 22

1    A.  Yes.
2    Q.  Miss Villanueva ended her employment or her
3  employment ended with Christiana Care in April of 2003;
4  is that correct?
5    A.  Yes.
6    Q.  Why was this form not filled out until July of
7  2003?
8    A.  I would have to speculate.
9    Q.  What is your opinion as to why it wasn't filled
10  out until July?
11    A.  I'm assuming that she probably thought I did it
12  and I thought --
13    Q.  Who is "she"?
14    A.  Karen.
15    Q.  Okay.
16    A.  As the manager, she thought I did it. As the
17  assistant manager, I thought she did it. That neither
18  one of us filled out the form.
19    Q.  Was it brought to your attention in July of
20  2003?
21    A.  I don't recall.
22    Q.  Is it your normal practice to complete these
23  three months after the employee has left employment?
24    A.  It has happened occasionally.

Page 23

1    Q.  Can you give me a time or a name of where this
2  has happened?
3    A.  A specific name, no. It's just we do these when
4  they show up in our mailboxes to do them.
5    Q.  Who puts them in your mailboxes?
6    A.  Nursing resources.
7    Q.  So when you received this in your mailbox in
8  July, that's when you filled it out?
9    A.  I don't recall.
10    Q.  Miss Villanueva, she began her employment in
11  December of 2002; correct?
12    A.  Yes.
13    Q.  When did you first learn that she was pregnant?
14    A.  I don't know a specific date.
15    Q.  Do you know an approximate month?
16    A.  It would have been when she came back and
17  started having issues after the in vitro, so --
18    Q.  Do you recall whether you learned that she was
19  pregnant shortly after being hired?
20    A.  When she had the in vitro shortly after being
21  hired and then she had the issues.
22    Q.  So do you remember when she had the in vitro?
23    A.  From looking at the documents, it was around the
24  18th of December, something like that. Mid December.

Page 24

1    Q.  So is it fair to say that you learned of her
2  pregnancy around that same time?
3    A.  Yes.
4    Q.  Did there come a time when she came to you to
5  discuss physical limitations as a result of the
6  pregnancy?
7    A.  She -- I received a note from her, from her
8  doctor.
9    Q.  Did she give that note to you?
10    A.  Yes.
11        MS. BREWINGTON:  I would like this to be
12  marked as Dye 5.
13        (Dye Exhibit 5 was marked for
14  identification.)
15  BY MS. BREWINGTON:
16    Q.  Is this a copy of the note that she gave to you?
17    A.  If you are asking me if I recall this specific,
18  yes, I read this specific note. More than likely, this
19  is it. I mean, yes, I received a note because I would
20  send her to Employee Health.
21    Q.  Are you saying that you don't remember whether
22  that's the note or not?
23    A.  Right. I receive notes from every employee --
24  for five years, I receive all their -- but this could be

Page 25

1  it, yes.
2    Q.  You indicated that she presented you with a
3  note. Did she say anything to you when she presented
4  this note to you?
5    A.  I don't recall the conversation, but when I
6  received a note that would limit ability like this, I
7  would send her to Employee Health.
8    Q.  What does the note say?
9    A.  "Nick Villanueva has pregnancy induced cardiac
10  arrythmia. Physical activities precipitate her
11  arrythmia. At this time I have suggested a sedentary
12  position."
13    Q.  What is your understanding of pregnancy-induced
14  cardiac arrythmia?
15    A.  That since she had -- since this person had
16  become pregnant, now she's having irregular heartbeats
17  secondary to her pregnancy.
18    Q.  Do you have any other understanding of cardiac
19  arrythmia? Is there anything else you can tell me about
20  cardiac arrythmia that you can tell me that you know of?
21    A.  In this particular case or in general?
22    Q.  In general.
23    A.  In general -- cardiac arrhythmias can be
24  life-theatening.

Villanueva
Carole Dye, L.P.N.

v.

C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 26

1   Q.  Are they generally life-theatening?
2   A.  It depends on which type of arrythmia it is.
3        MR. BLOOM:  I'm going to interpose an
4   objection here. Miss Dye is not here an as expert
5   witness.
6        MS. BREWINGTON:  I'm just asking her
7   understanding.
8        MR. BLOOM:  If you have any further answer
9   to the question, you can answer.
10  A.  I think I've answered the question.
11  BY MS. BREWINGTON:
12  Q.  Do you have experience in dealing with patients
13  who have arrhythmias?
14  A.  Yes.
15  Q.  Is that the type of patient you normally treat?
16  A.  We treat surgical patients and trauma patients.
17  However, we do monitor the heart rhythms while there.
18  Q.  So you do treat some patients with arrhythmias?
19  Is that what you are saying?
20  A.  We deliver the meds that are prescribed and we
21  would, if we see an arrhythmia, report the arrythmia.
22  Q.  Have any of those patients died as a result of
23  the arrythmia?
24  A.  Oh, I'm sure. I mean, but they have -- they

Page 27

1   have other problems, too.
2   Q.  So have you told me everything that you can
3   recall about the time that Miss Villanueva presented this
4   doctor's note to you?
5   A.  Yes.
6   Q.  Did you send her to Employee Health Services?
7   A.  Yes.
8   Q.  Is that something that you normally do?
9   A.  Yes.
10  Q.  For every person that comes in with a doctor's
11  note, you send them to Employee Health Services; is that
12  correct?
13  A.  Yes.
14  Q.  Is that the standard procedure of Christiana
15  Care?
16  A.  Yes.
17  Q.  Did Miss Villanueva say anything to you?
18       MR. BLOOM:  You mean when she handed her
19  the note?
20       MS. BREWINGTON:  Yes. I'm sorry. We are
21  still on the whole interaction with the note.
22  A.  I am sure at that time we would have had a
23  conversation. What the specifics of it were --
24

Page 28

1   BY MS. BREWINGTON:
2   Q.  Well, do you remember anything about the
3   conversation?
4   A.  I would remember saying that in a sedentary
5   position, we would not be able to accommodate it, so I
6   have to send her down to Employee Health.
7   Q.  Do you recall her responding in any way?
8   A.  I'm sure she was upset about it.
9   Q.  Did she say anything about it to you?
10  A.  (No response.)
11  Q.  If you recall. If you don't recall, then say "I
12  don't recall."
13  A.  I don't recall.
14  Q.  Do you recall whether Miss Villanueva told you
15  how long she may need to work in a sedentary position?
16  A.  I recall vaguely something about the last time
17  it had resolved itself after a certain period of time,
18  but I don't know what that period of time was.
19  Q.  Did you tell Miss Villanueva that you may not be
20  able to use her on your floor?
21  A.  Yes.
22  Q.  Did you also tell her that Christiana Care may
23  be able to use her on another floor?
24  A.  Yes, because -- I had mistakenly told her that

Page 29

1   because I had told her yes. But then when I followed up
2   with Karen, I had found out that they only accommodate
3   the restrictions if it's a work-related injury. So then
4   I had to go back and tell her that I was wrong.
5   Q.  So you went back to Miss Villanueva and told her
6   that you were wrong?
7   A.  And what I had found out.
8   Q.  What did Miss Villanueva say to you then?
9   A.  I just recall her still being upset.
10  Q.  Are you aware of a written policy that
11  Christiana Care has indicating that they can only
12  accommodate work-related individuals, individuals that
13  are injured in work-related activities?
14  A.  That would fall under workmen's compensation.
15  Q.  So are you saying that it would fall under
16  Christiana Care's workmen's compensation plan or policy?
17  A.  I have not personally looked that policy up to
18  know where it is or what it states.
19  Q.  So just so I understand for my understanding,
20  Karen McCloud advised you, did she not, that
21  Christiana Care makes accommodations for individuals that
22  are injured at work only?
23  A.  Yes.
24       MR. BLOOM:  I'm going to interpose an

A-59

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Villanueva                                    v.              Christiana Care Health Services, Inc.
Carole Dye, L.P.N.                    C.A. # 04-258-JJF                              April 26, 2006

Page 30

1   objection to the term "accommodations," but you can
2   answer the question.
3         THE WITNESS:  Oh, okay.
4   BY MS. BREWINGTON:
5         Q.  We can go back.  I think you said yes, but tell
6   me what exactly your understanding is of what Karen told
7   you.
8         A.  My understanding was that because of why she was
9   unable to perform her full duties, because it was not an
10  injury related to patient care, a slip/fall at work, that
11  was not a work-related problem, that Christiana Care does
12  not place the person in a position that let's her work at
13  the level that she can function at.
14        Q.  When you say "let's her work at the level that
15  she can function at," could you explain that for me?
16        A.  Less than performing all of her full duties.
17        Q.  So Miss Villanueva came to you with the note.
18        A.  Yes.
19        Q.  You advised her that you couldn't use her on
20  your floor; correct?
21        A.  Yes.
22        Q.  And that you may be able to use her on another
23  floor.  Is that also correct?
24        A.  Yes.

Page 31

1         Q.  Then what happened after that?  Let me be more
2   specific.
3         Did you speak with Karen McCloud about
4   Miss Villanueva?
5         A.  Yes.
6         Q.  Was there anything else discussed in that
7   conversation besides what we just talked about?
8         A.  No.
9         Q.  Do you recall Karen McCloud saying anything else
10  to you?
11        A.  No.
12        Q.  Karen McCloud at that time, if you could refresh
13  my memory, was she a nurse manager?
14        A.  Yes.
15        Q.  She was the nurse manager of 5D and the
16  transitional surgical unit?
17        A.  Yes.
18        Q.  You were the patient care coordinator?
19        A.  Yes.
20        Q.  Okay.
21        A.  But I only --
22        Q.  Did the transitional surgical unit?
23        A.  Yes.
24        Q.  What procedure do you follow as a supervisor

Page 32

1   when an employee advises you that he or she has physical
2   limitations as a result of a medical condition?
3         A.  Send them down to Employee Health for their
4   advisement.
5         Q.  What is Christiana Care's policy for employees
6   who have physical limitations with respect to their
7   job --
8         MR. BLOOM:  Object to the form.
9         Q.  -- due to physical injuries?
10        MR. BLOOM:  Object to the form of the
11  question.
12        You can answer the question if you can.
13        A.  I am not an expert on those policies.
14        Q.  But as a patient care tech coordinator and a
15  supervisor of employees that may come to you, what is
16  your understanding of Christiana Care's policy?
17        A.  In the nursing realm of where I focus my care
18  delivery in and my management -- now I forgot the
19  question.  Can you repeat the question?
20        Q.  My question is:  What is your understanding as a
21  supervisor of Christiana Care's policy with respect to
22  employees who have physical limitations with their job as
23  a result of physical injuries?
24        A.  Physical injuries on the job or not related to

Page 33

1   the job?
2         Q.  That's my question.  Can you tell me what your
3   understanding is?
4         A.  There's a difference.
5         Q.  Okay.  Tell me about that.
6         A.  If the physical injury is not related to -- it
7   did not occur while performing their job function, then
8   they are not found -- it goes to -- if it's an injury
9   from the job, it goes to workers' compensation.  Workers'
10  compensation decides -- works with that employee to find
11  a job to determine whether they can work at all, and if
12  they can work, in what job capacity.  However, if it's
13  not a work-related injury, then Christiana is not
14  obligated to place them in any particular position.
15        Q.  You mentioned that it goes to workers' comp.; is
16  that correct?
17        A.  Mm-hmm.
18        Q.  Is workers' comp. a specific department in
19  Christiana Care?
20        A.  I send them to Employee Health and I know the
21  lady works from the Employee Health area.
22        Q.  So there's a person that works in Employee
23  Health that does workers' comp. --
24        A.  Yes.

A-60

Villanueva                                    v.                    Christiana Care Health Services, Inc.
Carole Dye, L.P.N.                    C.A. # 04-258-JJF                          April 26, 2006

Page 34

1    Q. — work? Okay.
2         You indicated that if the person is not
3    injured at work, your understanding is that
4    Christiana Care is not obligated to place them in a
5    position; is that correct?
6    A. Yes.
7    Q. Do you recall instances in your experience
8    working there where Christiana Care has placed people in
9    different positions because of physical restrictions?
10   A. Work related?
11   Q. No.
12   A. Can you ask the question again?
13        MS. BREWINGTON: Can you repeat the
14   question, court reporter?
15        (The reporter read the previous two
16   questions and answer from the record as requested.)
17   A. Work-related injuries placed, not work related?
18   BY MS. BREWINGTON:
19   Q. Not work related.
20   A. Not work related.
21   Q. Yes.
22   A. Other than the discussions -- other than the
23   discussions --
24        MS. BREWINGTON: She cannot look to you for

Page 35

1    answers.
2         THE WITNESS: I'm just --
3         MR. BLOOM: Is this a privilege issue?
4         THE WITNESS: That's what -- yes.
5         MR. BLOOM: All right. Let's go off the
6    record and see if we have a privilege issue.
7         MS. BREWINGTON: Okay. That's fine.
8         THE WITNESS: I don't know.
9         MR. BLOOM: Let's step outside for one
10   seconds.
11        (A recess was taken at this time.)
12        MR. BLOOM: Back on.
13        Could you just read that back? Was there a
14   question pending or was there not a question pending?
15        MS. BREWINGTON: There is a question
16   pending. Maybe we have to take a break.
17        MR. BLOOM: Let's just wait so you can hear
18   the question.
19        (The reporter read from the record as
20   requested.)
21   A. The reason I question is because my personal
22   experience, I've not done this for anyone. I've not
23   placed anyone personally in any other position.
24        At the time that I read the deposition by

Page 36

1    Nicole, it stated regarding Kathryn Ross that she had an
2    auto accident, and prior to the auto accident, I don't
3    know, was either a tech or a student nurse extern. I'm
4    not sure which one she was because I didn't -- I didn't
5    work with her. That she had been involved in an auto
6    accident and then coming back had physical restrictions
7    so she could not function as that. So she was interested
8    in another position.
9    BY MS. BREWINGTON:
10   Q. I'll ask you more about Kathryn Ross in a
11   minute.
12        Is there anyone else?
13   A. Not in my experience.
14   Q. Going back to when you received the note,
15   because we got a little off track, did you place
16   Miss Villanueva on desk duty after receiving this note?
17   A. Till I figured out what to do with her, till I
18   asked questions.
19   Q. So yes?
20   A. And got some answers, because I didn't want to
21   let her work, because I was afraid she would injure
22   herself or harm the baby.
23   Q. What desk duty did you have her doing?
24   A. She pretty much sat and answered the phones a

Page 37

1    little bit.
2    Q. Was that like a sedentary position?
3    A. It was having her sit down. I mean, I didn't
4    have a position to put her in. I just couldn't let her
5    function until I found out what to do with her.
6    Q. Is it fair to say that you temporarily placed
7    her in a sedentary position?
8         MR. BLOOM: Object to the form of the
9    question. Mischaracterizes the prior testimony.
10        You can answer it.
11   A. I did not allow her to function as a PCT until I
12   found out what to do with her. Once again, I don't have
13   a sedentary position to place her in. I just had her sit
14   down.
15   Q. You don't meaning the transitional surgical unit
16   does not have a position?
17   A. Yes.
18   Q. Did you meet with Miss Villanueva and someone
19   from human resources at some point after that?
20   A. Yes.
21   Q. Who did you meet with?
22   A. Nicole, Kerry, and I.
23   Q. Kerry --
24   A. Delgado.

A-61                                    10 (Pages 34 to 37)

Villanueva                                    v.                    Christiana Care Health Services, Inc.
Carole Dye, L.P.N.                      C.A. # 04-258-JJF                              April 26, 2006

Page 38

1   Q.  Delgado.
2       How did that meeting come about?
3   A.  I recall having to call Kerry to ask advice on
4   what to do from human resources' standpoint.
5   Q.  What did you say to Miss Delgado?
6   A.  I don't recall the specifics of the
7   conversation.
8   Q.  Do you recall anything about the conversation?
9   A.  It was so long ago, I would be piecing -- it's
10  like Swiss cheese. I would be trying to piece together
11  from memory what the chain of events were.
12  Q.  So is it your testimony you don't recall
13  anything about the conversation?
14  A.  I recall I would have had -- I obviously called
15  her because we had a meeting. But, no, I don't recall
16  the specifics of the conversation.
17  Q.  I know, and I don't need the specifics. I
18  understand that it was awhile ago.
19  A.  Yes.
20  Q.  But if you can recall generally what was
21  discussed. I mean, what was discussed when you said you
22  called her?
23  A.  What alternatives we had in path forward for
24  Nicole.

Page 39

1   Q.  What was Miss Delgado's response?
2   A.  That because she was ineligible for FMLA because
3   she didn't have the time requirement in at
4   Christiana Care, that her hands were tied.
5   Q.  Is that it?
6   A.  And she told me that Nicole would need -- this
7   is kind of what -- what I recall from the -- what I
8   needed after the conversation to talk to Nicole about was
9   that because her limitation was not secondary to a
10  work-related injury, that it was her responsibility to --
11  Q.  "Her" meaning --
12  A.  -- Nicole to seek another position within
13  Christiana Care and apply for it. Okay? That we -- not
14  "we," but that Christiana Care would not find the
15  position for her; that it was her responsibility to go
16  through Kealey. That's why I referred her back to Kealey
17  Barnes.
18      And that in the event that that did not
19  happen, that she could not find a place, that she had to
20  come back -- she had to either, A, have the ability to
21  come back to work full duty in the position that she was
22  presently in, which was that hybrid role, or if she was
23  out longer than two weeks, be removed from payroll.
24  Q.  So is it fair to say that Miss Delgado advised

Page 40

1   you that Miss Villanueva would have to -- one of her
2   options would be to reapply for a position inside
3   Christiana Care?
4   A.  Well, she was already employed, but she has to
5   bid.
6   Q.  She has to bid?
7   A.  It's a bid process like the rest of the
8   employees.
9   Q.  So tell me about the bid process.
10  A.  Available positions throughout Christiana Care
11  are posted and you -- now you bid online. I'm not sure
12  how they did it a few years ago.
13  Q.  Okay.
14  A.  But you bid for the positions.
15  Q.  So she would have to post internally for the
16  position; is that correct?
17  A.  Yes, yes.
18  Q.  You mentioned Kathryn Ross earlier; is that
19  correct?
20  A.  Yes.
21  Q.  Did she report to you?
22  A.  No. I read it. That's why -- that's why I
23  didn't quite know how to answer the question, because I
24  had read it through the deposition.

Page 41

1   Q.  Who did Kathryn Ross report to?
2   A.  Karen McCloud.
3   Q.  What unit was Kathryn Ross in?
4   A.  5D.
5   Q.  Did she report directly to Kathryn Ross?
6       MR. BLOOM: You mean Karen McCloud?
7   Q.  Is that why you were looking at me?
8   A.  Yes.
9   Q.  I'm sorry.
10      Did Kathryn Ross report directly to Karen
11  McCloud?
12  A.  Yes.
13  Q.  What was Kathryn Ross' position, if you can
14  recall?
15  A.  That's what I had answered earlier. Either
16  patient care tech, student nurse extern, I don't know,
17  because I didn't work with her.
18  Q.  Is it your testimony that the only knowledge
19  that you have of Kathryn Ross getting in a different
20  position is through reading Villanueva's deposition
21  testimony?
22  A.  Yes.
23  Q.  So do you have concerns whether that's accurate
24  testimony?

A-62

Villanueva                                          v.                    Christiana Care Health Services, Inc.
Carole Dye, L.P.N.                          C.A. # 04-258-JJF                              April 26, 2006

Page 42

1    A.  I can only take it at face value from what I
2    read.
3       Q.  Do you know Kathryn Ross or did you know Kathryn
4    Ross?
5       A.  I know that I, like, met her.  I was introduced
6    to her and met her because if I would go see Karen, I'd
7    have to go up to the fifth floor.
8       Q.  You indicated she went out on a leave of absence
9    as a result of a car accident; correct?
10      A.  Yes.
11      Q.  Do you know what physical restrictions she had?
12      A.  No.
13      Q.  Christiana Care placed her in a unit clerk
14   position; is that correct?
15      A.  My understanding was that she was able to obtain
16   a unit clerk position.
17      Q.  How was she able to obtain a unit clerk
18   position?
19      A.  Once again, it's what I read in the deposition.
20      Q.  What do you recall reading about her being in
21   the unit clerk position?
22      A.  That she ended up working in a unit clerk
23   position on 5D.
24      Q.  Didn't Miss Villanueva in her deposition

Page 43

1    indicate how Kathryn Ross received the position as a unit
2    clerk on 5D?
3       A.  How she worded it?
4       Q.  Not how she worded it.  Do you just recall how?
5            MR. BLOOM:  I'm sorry.  Just so I'm clear,
6    is the question whether or not the witness remembers the
7    plaintiff's testimony?
8            MS. BREWINGTON:  Yes, because she's saying
9    that she's basing this knowledge of Kathryn Ross on
10   Miss Villanueva's testimony and her testimony alone as I
11   understand it.
12           MR. BLOOM:  I thought the witness testified
13   that she has no personal knowledge, that she just read
14   the plaintiff's --
15           MS. BREWINGTON:  So I'm asking her if she
16   can recall.
17           MR. BLOOM:  What the plaintiff's testimony
18   was?
19           MS. BREWINGTON:  Yes.
20           MR. BLOOM:  Okay.
21           If you remember what you read in the
22   transcript, you can answer.
23      A.  That -- somebody about Kathryn Ross was in an
24   accident and was unable to function as a tech and that

Page 44

1    ended up as a clerk on 5D.
2    BY MS. BREWINGTON:
3       Q.  Ended up as a clerk.
4       A.  That's -- I mean, you know...
5       Q.  Did Kathryn Ross post for the position?
6       A.  (No response.)
7       Q.  Do you remember reading that in the deposition?
8       A.  No.
9       Q.  Did Christiana Care place her in that position?
10      A.  I don't recall that from reading it.
11      Q.  To your knowledge, was Kathryn Ross pregnant?
12      A.  Not that I know of.
13      Q.  Was Kathryn Ross trained as a unit clerk?
14      A.  I guess when she got the job as a unit clerk.
15      Q.  So is it fair to say she trained for that
16   position?
17      A.  Yes.
18      Q.  Because she wasn't a unit clerk prior to getting
19   that position?
20      A.  Yes.
21           MS. BREWINGTON:  That's Dye 6.
22           (Dye Exhibit 6 was marked for
23   identification.)
24

Page 45

1    BY MS. BREWINGTON:
2       Q.  If you could review this document for me.
3       A.  (The witness reviews the document.)
4       Q.  Have you had an opportunity to review it?
5       A.  Mm-hmm.
6       Q.  Do you know what this document is?
7       A.  Looks like job postings.
8       Q.  Miss Villanueva, she came to you around April of
9    2003 --
10      A.  Yes.
11      Q.  -- with a doctor's note requesting a change in
12   her duties based on her physical restrictions; correct?
13      A.  Yes.
14      Q.  If you could look at this document, and we
15   already established it was the job postings, if you can
16   tell me how many unit clerk positions were open at
17   Christiana Care during that time.
18      A.  Nine.
19      Q.  Who is Diana Stewart?
20      A.  She was a student nurse extern that worked
21   primarily on 5D.
22      Q.  What other floor did she work on?
23      A.  She would occasionally pick up some shifts in
24   TSU, and I don't know if she worked anywhere else.

**A-63**

12 (Pages 42 to 45)

Villanueva
Carole Dye, L.P.N.

v.

C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 46

1   Q.  Did she report to you?
2   A.  No.  Karen McCloud.
3   Q.  Was she involved in a car accident?
4   A.  I recall something that she had injured herself
5   somehow.
6   Q.  Do you know whether she injured herself at work?
7   A.  It was not work related.
8   Q.  So it's fair to say that she injured herself
9   outside of work?
10  A.  Yes.
11  Q.  Do you know whether she presented a doctor's
12  note with restrictions to someone at Christiana Care?
13  A.  She did not present a note to me because she
14  didn't answer -- you know, she didn't work under me, so I
15  would not know.
16  Q.  You would not know?
17  A.  I would not know because she would not have
18  presented one to me.
19  Q.  What can you tell me about Diana Stewart in
20  terms of her auto accident?  You didn't know it was an
21  auto accident?
22  A.  No.
23  Q.  Her injury and her job at Christiana Care?
24  A.  I don't know much about her injury other than

Page 47

1   she had complaints of neck pain.  As far --
2   Q.  I'm sorry.
3   A.  Complaints of neck pain.
4   Q.  Okay.
5   A.  And her job at Christiana Care as a student
6   nurse extern, it's a casual position.  There's no
7   obligation to a number of hours or weekend commitments or
8   holiday commitments.  And she, as an extern, functioned
9   in a patient care tech capacity.  And that she also had
10  computer skills.  So if she functioned in TSU, she could
11  do a dual role.
12  Q.  The computer skills would be used for --
13  A.  As a unit clerk, so she could do both.
14  Q.  So with the unit clerk position, are you sitting
15  down at a computer?
16  A.  Not in TSU.  I mean, when you are sitting
17  doing -- but she always did the two things, both roles in
18  my unit, while in TSU.
19  Q.  Would you say that a unit clerk position in TSU
20  is more demanding than a unit clerk on another floor?
21       MR. BLOOM:  Object to the form of the
22  question.
23       You can answer it.
24  A.  Are you asking just the unit clerk portion?

Page 48

1   Q.  Yes.
2   A.  The unit clerk portion of the job description in
3   TSU is less demanding because there's not -- that's why
4   there's not a straight unit clerk position at TSU.
5   There's not enough work.
6   Q.  Okay.  Thanks.  I went off the mark a little
7   bit.  You were telling me what you know about Diana
8   Stewart.
9   A.  Yes.
10  Q.  You talked to me about her injury, what you knew
11  about her injury; is that correct?
12  A.  Mm-hmm.
13  Q.  Now I want to ask you what you know about her
14  job.  Do you know anything about what her position was
15  after her injury?
16  A.  Just that she still functioned as an extern, but
17  that if -- because we had trained her to do the dual role
18  in TSU, that if she worked -- if they had a unit clerk
19  need, she could pick up time as a unit clerk, and if they
20  had PCT needs, she could pick up time there.
21  Q.  Do you know whether she functioned as a patient
22  care tech after she came back with restrictions, work
23  restrictions?
24  A.  Not while in TSU that I was aware of.

Page 49

1   Q.  So is it your testimony today that she worked as
2   a patient care tech and a patient care tech only?
3   A.  Where?
4   Q.  In TSU.
5   A.  No.  There's always dual roles.
6   Q.  I'm sorry.  I guess I'm trying to understand,
7   but maybe you're not the best person to ask.  Maybe I
8   should ask Karen McCloud.  Who is Nicole Markel?
9   A.  Markel?
10  Q.  Yes, Markel.  Who is that?
11  A.  A registered nurse that was in TSU that now
12  works on 3D.
13  Q.  Did she report to you?
14  A.  Yes.
15  Q.  How do you spell her last name?
16  A.  M-a-r-k-e-l.
17  Q.  Did she have physical restrictions placed on her
18  duties?
19  A.  Yes.
20  Q.  Did Christiana Care allow her to work in a
21  different capacity?
22  A.  She worked in light duty.  It was a work-related
23  injury.
24  Q.  What light-duty did Christiana Care give her?

**A-64**

Villanueva                                    v.                    Christiana Care Health Services, Inc.
Carole Dye, L.P.N.                    C.A. # 04-258-JJF                              April 26, 2006

Page 50

1    A. She worked in TSU.
2    Q. What did she do in TSU?
3    A. Patient assessments, medications, transports.
4    She did everything but the turning pretty much. Had some
5    trouble every once in a while hanging an IV because of
6    the shoulder.
7    Q. So was there a title for what she did? Was
8    there a job title?
9    A. She just functioned in her position, worked her
10   normal hours.
11   Q. With light duty?
12   A. Yes.
13   Q. Is that correct? Okay.
14       To your knowledge, was Nicole Markel
15   pregnant?
16   A. No.
17       MS. BREWINGTON: This one I'm not going to
18   have entered as an exhibit. I just want her to identify
19   it for me, if she can.
20   Q. Do you know whose handwriting that is?
21   A. (The witness reviews the document.) No.
22       MS. BREWINGTON: This one I would like to
23   identify.
24       (Dye Exhibit 7 was marked for

Page 51

1    identification.)
2    BY MS. BREWINGTON:
3    Q. Have you ever seen this document?
4    A. I know she returned a document that said she
5    didn't have any restrictions, so I'm assuming this is it.
6    Q. I'm sorry. I cut you off.
7       Did she return it to you?
8    A. I'm assuming she did. Either which way, she
9    needs to take it to Employee Health, which is where it
10   needed to go.
11   Q. So every time an employee returns to work with a
12   note, the supervisor is to send them to Employee Health;
13   is that correct?
14   A. Yes.
15   Q. Every single time?
16   A. Well, if somebody's out for two days with a cold
17   or something and said they were seen in the office and
18   it's just an occurrence like I don't necessarily -- but
19   if they're gone for five days or if they've been put on
20   restrictions or if they've been put on light duty, if
21   it's a safety -- then yes.
22   Q. So anyone that receives restrictions should go
23   to Employee Health? The supervisor should send them to
24   Employee Health?

Page 52

1    A. Yes.
2    Q. According to this document, is it true that
3    Miss Villanueva was able to work with no restrictions as
4    of April 10, 2003?
5    A. That's what this states, yes.
6    Q. It's your testimony that you instructed her to
7    present this to Employee Health?
8    A. Yes.
9    Q. Did you discuss her return to work full duty
10   with anyone?
11   A. I know I expressed concerns because she was
12   still symptomatic, but I don't recall who I talked to. I
13   was concerned for her safety.
14   Q. So you, as her supervisor, discussed her
15   symptoms with someone else?
16   A. It may have been with her. I don't know. I
17   remember discussing it because they cleared her, but she
18   was still symptomatic and I didn't want her injured. I
19   didn't want to harm her or the baby.
20   Q. Were you aware that she was on medication?
21   A. Yes.
22   Q. Do you know what medication she was on?
23   A. Lopressor.
24   Q. Did you do a physical exam on Miss Villanueva?

Page 53

1    A. No.
2    Q. Did you consult with her treating physician?
3    A. No. I left all that to Employee Health.
4    Q. But you did discuss her symptoms with someone
5    else; is that correct?
6    A. The staff came to me because she would be
7    symptomatic while delivering care to the patients.
8    Q. What staff members came to you?
9    A. One specifically that I recall is Angela
10   Drummond.
11   Q. Do you recall what Angela Drummond said?
12   A. That she would grab her belly and get
13   uncomfortable. And there were times where she got short
14   of breath and we would have her sit down.
15   Q. Did Miss Villanueva ever miss any time from
16   work?
17   A. She missed the time for the in vitro and she
18   called out an emergency day because her son was sick.
19   Q. But did she miss any time from work as a result
20   of these symptoms you said she was having?
21   A. When she had -- after the first note, the
22   sedentary position, because she couldn't function, she
23   went home after that.
24   Q. That note was dated what, if you could tell me?

A-65

14 (Pages 50 to 53)



Villanueva
Carole Dye, L.P.N.

v.
C.A. # 04-258-JJF

Christiana Care Health Services, Inc.
April 26, 2006

Page 54

1   A. 4/8/03.
2   Q. So prior to 4/8/03, was she out of work as a
3   result of any symptoms?
4   A. No.
5       MS. BREWINGTON: If I can have a minute --
6       MR. BLOOM: Sure.
7       (Discussion off the record.)
8       MS. BREWINGTON: I have nothing further.
9       THE WITNESS: Okay.
10      MR. BLOOM: I have nothing.
11      She will read and sign.
12      (The deposition was then concluded at
13  11:15 a.m.)
14          - - - - -
15          INDEX TO TESTIMONY
16
17
    CAROLE DYE, LPN                    PAGE
18
19  Examination by Ms. Brewington         2
20
            - - - - -
21
22
23
24

Page 56

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

Page 55

1
2       INDEX TO EXHIBITS
3
    DYE EXHIBIT NO.:               PAGE
4   1  A one-page copy of an Employment/Reference/
       Education Information sheet dated 10/25/2002     5
5
    2  A one-page copy of a letter dated November 8,
6      2002, to Nicole Villanueva from Kealey Barnes   16
7   3  A one-page copy of a Performance Review
       Summary                                         18
8
    4  A one-page copy of a handwritten note with
9      a two-page Performance Review Summary attached  19
10  5  A one-page copy of a handwritten note from
       Ed Goldenberg                                   24
11
    6  A one-page copy of a Job Classification form    44
12
    7  A one-page copy of a memo signed by Edward M.
13     Goldenberg, M.D.                                50
14
            - - - - -
15
16
17
18
19
20
21
22
23
24

Page 57

1   State of Delaware )
2               )
3   New Castle County )
4
5       CERTIFICATE OF REPORTER
6
7       I, Kathleen White Palmer, Registered Merit
    Reporter and Notary Public, do hereby certify that there
8   came before me on the 26th day of April, 2006, the
    deponent herein, CAROLE DYE, LPN, who was duly sworn by
9   me and thereafter examined by counsel for the respective
    parties; that the questions asked of said deponent and
10  the answers given were taken down by me in Stenotype
    notes and thereafter transcribed into typewriting under
11  my direction.
12      I further certify that the foregoing is a
    true and correct transcript of the testimony given at
13  said examination of said witness.
14      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17
18
19          Kathleen White Palmer, RPR, RMR
            Certification No. 149-RPR
20          (Expires January 31, 2008)
21
    DATED: April 27, 2006
22
23
24

A-66



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Villanueva

## v.

# Christiana Care Health Services, Inc.

### C.A. # 04-258 JJF

---

### Transcript of:

### Edward M. Goldenberg, M.D.

### May 4, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A-67

Villanueva
Edward M. Goldenberg, M.D.

v.

C.A. # 04-258 JJF

Christiana Care Health Services, Inc.
May 4, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NICOLE VILLANUEVA,                )
                                  )
        Plaintiff,                )
                                  )
        v.                        ) C.A. No. 04-258 JJF
                                  )
CHRISTIANA CARE HEALTH            )
SERVICES, INC.,                   )
                                  )
        Defendant.                )


        Deposition of EDWARD M. GOLDENBERG, M.D.,
taken pursuant to notice at the offices of Cardiology
Consultants, B-86 Omega Drive, Omega Professional Center,
Newark, Delaware, beginning at 5:55 p.m., on Thursday,
May 4, 2006, before Kimberly A. Hurley, Registered Merit
Reporter and Notary Public.

APPEARANCES:

        LORI A. BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware 19806
          for the Plaintiff
        THOMAS S. BLOOM, ESQUIRE
        MORGAN LEWIS & BOCKIUS, LLP
          1701 Market Street
          Philadelphia, Pennsylvania 19103-2921
          for the Defendant

ALSO PRESENT:

        NICOLE VILLANUEVA

**A-68**

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Villanueva
Edward M. Goldenberg, M.D.

v.

C.A. # 04-258 JJF

Christiana Care Health Services, Inc.
May 4, 2006

Page 2

1       EDWARD M. GOLDENBERG, M.D.,
2       the witness herein, having first been
3       duly sworn on oath, was examined and
4       testified as follows:
5   BY MR. BLOOM:
6       Q.   Good afternoon, Dr. Goldenberg. My name is
7   Tom Bloom and, as you may know, I represent Christiana
8   Care in a lawsuit that's been brought by
9   Nicole Villanueva.
10      Have you ever given a deposition before?
11      A.   Yes.
12      Q.   We do have a court reporter here and it would
13  be helpful if you keep your responses audible, and, also,
14  if you'll let me finish the question, I'll let you finish
15  your answer, and that way, it helps the court reporter
16  keep track of who's saying what.
17      Will you do that?
18      A.   Sure.
19      Q.   How many times have you given a deposition
20  before?
21      A.   Maybe four, five.
22      Q.   So you're somewhat familiar with it. I'm going
23  to ask you questions and ask you to give me the most
24  candid answers that you can. I don't think we're going

Page 3

1   to be very long today. If for some reason you need a
2   break, just speak up and we can.
3       A.   Okay.
4       Q.   If you don't understand a question of mine or
5   you think a question's ambiguous, please let me know so
6   we can clarify that, because, otherwise, I'll assume you
7   understood the question and that your answer's responsive
8   to it.
9       A.   Okay.
10      Q.   Lastly, Ms. Brewington, she's Ms. Villanueva's
11  lawyer, it may be during the deposition that she makes
12  objections to certain questions which the court may rule
13  upon later, but for today you're required to answer all
14  the questions regardless of whether there's an objection.
15      A.   Okay.
16      Q.   Could you briefly just tell me what your
17  educational background is?
18      A.   Let's see --
19      Q.   Starting with college.
20      A.   I went to college. You want to know where I
21  went to college?
22      Q.   Sure.
23      A.   Temple University. I went to medical school at
24  Creighton University. I did my internship, residency,

Page 4

1   and fellowship at Temple University. I have been in
2   practice here since 1978.
3       Q.   When you say "here," do you mean --
4       A.   Wilmington, Delaware.
5       Q.   How long have you worked at Cardiology
6   Consultants?
7       A.   I was one of the original five starting
8   partners.
9       Q.   You're an owner of Cardiology Consultants?
10      A.   Yes.
11      Q.   We're now here at Cardiology Consultants. Are
12  we in Newark?
13      A.   Yes. Don't you know where you are?
14      Q.   Is this the only location for Cardiology
15  Consultants?
16      A.   No.
17      Q.   How many locations are there?
18      A.   Fifteen.
19      Q.   Are they all in Delaware?
20      A.   Yes.
21      Q.   As of today, how many cardiologists are there
22  at Cardiology Consultants?
23      A.   I think 30.
24      Q.   Are all of the cardiologists part owners of the

Page 5

1   business?
2       A.   If they're not full partners, they will be full
3   partners after they have been here a period of time.
4       Q.   Do you know approximately how many people work
5   in this office where we're sitting right today?
6       A.   I have got no idea.
7       Q.   Is it more than 20?
8       A.   Probably not.
9       Q.   Ms. Villanueva currently works here. Do I have
10  that right?
11      A.   Correct.
12      Q.   She has also been a patient of yours at times.
13  Is that also true?
14      A.   Correct.
15      Q.   Am I correct that Ms. Villanueva worked here at
16  Cardiology Consultants before she became a patient of
17  yours? Is that true?
18      A.   Correct.
19      Q.   Can you tell me what it was that prompted you
20  to first treat Ms. Villanueva as a physician?
21      A.   She was pregnant with her first child and she
22  was having arrhythmic symptomatology, meaning she had
23  fast-racing heartbeats.
24      Q.   She was still working for you at that time?

A-69

Villanueva
Edward M. Goldenberg, M.D.
      v.
C.A. # 04-258 JJF
Christiana Care Health Services, Inc.
May 4, 2006

Page 6

1    A.  I don't know. Were you working for us then,
2  Nicole?
3       MS. VILLANUEVA: Uh-huh.
4       THE WITNESS: Yes.
5    Q.  Are you aware that one of Ms. Villanueva's
6  claims in this case is that the defendant, Christiana
7  Care, should have given her sedentary duty in April of
8  2003 because of that medical condition you just
9  described?
10      MS. BREWINGTON: I'm going to object.
11  Mischaracterization.
12    A.  First of all, you asked me about 2000, not
13  2003.
14    Q.  I meant to say 2003 if I didn't.
15    A.  That was her second pregnancy. She had had a
16  pregnancy in 2000. She had the exact same symptoms in
17  2000. They went away between 2000 and 2003 after the
18  pregnancy. Then with the second pregnancy they returned.
19    Q.  Was it your understanding as her treating
20  physician that in both instances the arrythmia was
21  related to the pregnancy?
22    A.  That was my feeling, yes.
23    Q.  My question is: Do you have any understanding
24  that the claims in this case relate to whether or not

Page 7

1  Ms. Villanueva should have been restricted to sedentary
2  duty because of her arrythmia?
3    A.  I'm totally unaware of what the concerns are.
4  I have not read the complaint.
5    Q.  Have you had any conversations with
6  Ms. Villanueva about this lawsuit?
7    A.  Yes.
8    Q.  When was the last time you discussed this
9  lawsuit with Ms. Villanueva?
10    A.  About 45 minutes ago.
11    Q.  Did you discuss the substance of your testimony
12  here today with her?
13    A.  No.
14    Q.  What was the substance of your conversation
15  with Ms. Villanueva?
16    A.  I think I went back over her history and she
17  needed to clarify — I couldn't remember why she was here
18  in 2000, what happened. There's gaps in her pregnancy.
19  So she came here, she was symptomatic, we made some
20  maneuvers, she disappeared. She didn't have any specific
21  follow-up. Her first pregnancy I said I'll see her if
22  she needs it. She felt better, so she didn't come back.
23      The second pregnancy, after the letter that
24  I wrote to Christiana, then there was another thing that

Page 8

1  occurred. She didn't come back, either. So I wanted her
2  to fill in what had happened during those times.
3    Q.  What did she tell you?
4    A.  She felt better and she continued employment
5  the second time. She continued employment but not at
6  Christiana. She worked for a day-care center, child
7  day-care center.
8    Q.  You referred a moment ago to a letter that you
9  had written. What letter are you referring to in terms
10  of the substance of it?
11    A.  I can't remember the substance, but it was
12  basically that she could work, but I wrote that she
13  should have restricted activities.
14    Q.  Was it your belief that the reason for that was
15  related to her arrythmia?
16    A.  It was related to the symptoms she had.
17    Q.  What were the symptoms?
18    A.  When she got the arrythmia, she would get a
19  little short of breath.
20    Q.  Any other symptoms?
21    A.  Not that I remember.
22    Q.  When you say "restricted" —
23    A.  Do you have the letter in front of you?
24    Q.  I do. We're going to get to it.

Page 9

1    A.  Maybe I could read it and see what I wrote.
2    Q.  We will get to the letter, I promise you.
3      Are there any other symptoms other than
4  shortness of breath that are associated with the
5  arrythmia that Ms. Villanueva had?
6    A.  There could have been, but I don't remember.
7    Q.  When you say "arrythmia," is that different
8  than tachycardia?
9    A.  She actually had a sinus tachycardia, which is
10  a normal heart rhythm but occasionally it is
11  inappropriate, and in her particular situation, the
12  tachycardia or the heart rate was inappropriate to the
13  amount of activity that she was doing. So it's called an
14  inappropriate sinus tachycardia. It is a benign
15  arrythmia. I can't tell you the percentage of pregnant
16  women who have it, but it's an uncommon problem. I
17  probably have seen four or five women in my career in
18  that have had the exact same problem. They all go away when
19  the pregnancy goes away.
20    Q.  I thought you said that it's an uncommon
21  problem.
22    A.  I said I can't tell you how common it is. I
23  said I have taken care of four or five women in my career
24  that have had that particular problem.

A-70

Villanueva                                    v.                    Christiana Care Health Services, Inc.
Edward M. Goldenberg, M.D.              C.A. # 04-258 JJF                              May 4, 2006

Page 10

1    Q.  Okay. Dr. Goldenberg, I'm going to put in
2    front of you what's previously been marked as
3    Goldenberg 8, and could you flip through it? It's a
4    five-page document. And after you have looked at it, let
5    me know when you're done.
6    A.  Okay.
7    Q.  What is Goldenberg 8?
8    A.  What is Goldenberg 8?
9    Q.  That's the document that I just put in front of
10   you. Can you tell me what these five pages are?
11   A.  They're my clinical evaluation of Nicole during
12   her first pregnancy in 2000.
13   Q.  These entries are your notes; am I right?
14   A.  Correct.
15   Q.  Do you personally type them into a computer?
16   A.  No.
17   Q.  How do you record your notes?
18   A.  Dictation.
19   Q.  So somebody else, then, types them?
20   A.  Transcribes them, yes.
21   Q.  At the top of page 1 there's an entry May 31st,
22   2000, and the name next to it is Edward M. Goldenberg.
23   That's you, right?
24   A.  Yes.

Page 11

1    Q.  I take it this is the first time that you met
2    with Ms. Villanueva as a patient?
3    A.  Correct.
4    Q.  Can you tell me from this document or from your
5    recollection what your examination of her entailed?
6    A.  First of all, none of it's by recollection.
7    What did it entail, like what did I physically do?
8    Q.  Yes.
9    A.  I checked her blood pressure, I checked her
10   pulse, and the beginning of page 2, the upper part is
11   what I did to her and evaluated, which is listen to her
12   lungs, listen to her heart, felt her belly, felt her
13   pulses, looked for swelling in her extremities.
14   Q.  Return your attention to the first page of
15   Exhibit Goldenberg 8. Do you know who
16   Dr. Robert Wisniewski is?
17   A.  It was her gynecologist. Or obstetrician.
18   Q.  Did Ms. Villanueva's gynecologist refer to
19   you or are you just -- let me just ask it that way.
20   A.  I have no idea.
21   Q.  Could you read aloud, please, the three
22   paragraphs that are under "History of Present Illness"?
23   A.  "Nicole is a 25 year old white female who is
24   now 4 and a half months pregnant. She for three

Page 12

1    months prior to her pregnancy had to be on high
2    doses of Prednisone because of a positive ANA.
3    This was administered by a Dr. Elroy. During
4    the first 12 weeks of her pregnancy she was
5    intermittently at bedrest because of separation
6    of her placenta and also bleeding. Her
7    pregnancy is a single pregnancy and was induced
8    by
9    in vitro fertilization.
10   "Since the middle of last week she has had
11   activity related episodes of tachycardia and
12   breathlessness. There has been rare occasions
13   when these have occurred at rest. They are
14   generally relieved just by stopping her
15   activities. She has had no tachycardic symptoms
16   prior to the past one week.
17   "A review of systems is relatively
18   unremarkable except for a great deal of
19   indigestion."
20   Q.  In the first paragraph there's a reference to
21   high doses of prednisone because of a positive ANA. Can
22   you tell me what that means?
23   A.  I'm not a gynecologist. I can't answer that.
24   Q.  Your understanding is it's related to

Page 13

1    gynecology?
2    A.  Right.
3    Q.  Was it your understanding that Dr. Elroy was
4    Ms. Villanueva's gynecologist?
5    A.  No.
6    Q.  Do you know who Dr. Elroy is?
7    A.  No.
8    Q.  The last two sentences in this first paragraph
9    which refer to separation of the placenta and bleeding
10   and the way in which the pregnancy was induced, do those
11   factors or did they have any relevance to your treatment
12   of Ms. Villanueva for the tachycardic symptoms that we're
13   discussing?
14   A.  No.
15   MS. BREWINGTON:  If I could lodge an
16   objection just to this line of questioning in terms of
17   relevance. This is a pregnancy from 2000.
18   Q.  Am I correct from the middle paragraph of the
19   history of present illness that sometimes Ms. Villanueva,
20   and we are talking about 2000, had breathlessness that
21   was sometimes not relieved by stopping her activities?
22   A.  It says, "They are generally relieved just by
23   stopping her activities."
24   Q.  Yes.

A-71

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Villanueva                                    v.            Christiana Care Health Services, Inc.
Edward M. Goldenberg, M.D.        C.A. # 04-258 JJF                              May 4, 2006

Page 14

1    A.  Can you assume what?
2    Q.  Your note here says, "There has been rare
3    occasions when these have occurred at rest."
4    A.  Right.
5    Q.  Can you skip down to the physical examination
6    section? And I want you to read the entry next on the
7    blood pressure.
8    A.  114 over 60 with a pulse of 88. With the
9    assumption of the upright position, her pulse was 88 and
10   her blood pressure was 124 over 79.
11   Q.  What was the significance of that difference in
12   the blood pressure that you just read?
13   A.  I wanted to see whether her pulse changed by
14   changing her position.
15   Q.  And did it?
16   A.  No.
17   Q.  If you will skip down on the second page of
18   Goldenberg 8, there's an entry, "Electrocardiogram." Can
19   you please read the second paragraph there?
20   A.  "Her rhythm strip at rest with the upright
21   position revealed her to be in sinus rhythm at 115 beats
22   her minute. With exercise she remained in a sinus rhythm
23   at 135 beats her minute."
24   Q.  Were those, in your judgment, within the range

Page 15

1    that they should have been?
2    A.  I thought they were kind of fast.
3    Q.  Both of them?
4    A.  The first one definitely. The second one I
5    can't comment on.
6    Q.  Her rhythm strip at rest which is 115, that one
7    is definitely too fast?
8    A.  Correct. It's faster than it's expected.
9    Q.  What would be expected?
10   A.  Could be anywhere from 40 to 80 or 90.
11   Q.  The next section on this page says
12   "Assessment." And the first entry is "Normal myocardial
13   function." Can you tell me what that means?
14   A.  Means her heart muscle is normal.
15   Q.  And the second entry I know I'm going to
16   mispronounce this word, says "Intra --
17   A.  -- "uterine pregnancy." Means she's pregnant.
18   Q.  And the third entry says "Positive ANA."
19   A.  She had an abnormal blood test which she had
20   before explained in the first paragraph of the history of
21   present illness.
22   Q.  And the fourth entry, could you read that for
23   me, please?
24   A.  "Abnormal heart rate response with the

Page 16

1    assumption of the upright position and physical
2    activity."
3    Q.  What's the physical activity that you're
4    referring to?
5    A.  It says here they are generally related to
6    physical activities. So whatever physical activities she
7    was doing that caused her to have the tachycardia.
8    Q.  Let me ask the question this way: Did you do
9    anything in your office to exercise Ms. Villanueva to
10   test her arrhythmia during activity?
11   A.  I have already testified to that effect.
12   Q.  I'm sorry. Maybe I missed it.
13   A.  It says, "Her rhythm strip at rest with the
14   upright position revealed her to be in sinus rhythm
15   115 beats per minute. With exercise she remained in a
16   sinus rhythm at 135 beats her minute."
17   Q.  Can you tell me what the exercise is that
18   you're referring to?
19   A.  I don't have any idea. I assume I probably
20   asked her to walk up and down the hallway.
21   Q.  Is it true that you tested Ms. Villanueva's
22   heart rate in three different positions: One was lying
23   down, the second was sitting upright, resting, and the
24   third during physical activity?

Page 17

1    A.  Correct.
2    Q.  The next entry says "Plan." Am I correct that
3    that is the plan for treatment of Ms. Villanueva?
4    A.  Correct.
5    Q.  Can you tell me what the first entry is?
6    A.  "Thyroid profile and CBC."
7    Q.  What does that mean?
8    A.  Blood tests that may account for some of her
9    symptoms. And they were normal.
10   Q.  Does this entry here indicate to you that the
11   results were normal?
12   A.  No. Subsequent -- the results of the tests
13   were normal, but I didn't know them at that time.
14   Q.  You're going by memory?
15   A.  No. I think I said it later on in the
16   document.
17   Q.  We will get to it, then.
18        The second entry under "Plan" is "No
19   medications at this point."
20        Were there medications that you considered
21   at that time?
22   A.  It's five years ago. I can't answer the
23   question honestly.
24   Q.  The third paragraph, would you please read

A-72

Villanueva
Edward M. Goldenberg, M.D.    v.    C.A. # 04-258 JJF    Christiana Care Health Services, Inc.
May 4, 2006

Page 18

1 that?
2    A.  "We may need to restrict her physical
3 activities or she may actually be representative of the
4 orthostatic tachycardia syndrome."
5    Q.  First, when you indicate "We may need to
6 restrict her physical activities," in what way do you
7 think her physical activities should have been
8 restricted?
9    A.  At that time?
10    Q.  Yes.
11    A.  Well, I probably would have restricted her
12 activity so she wouldn't have gotten the symptoms.
13    Q.  What would that mean, though, in terms of what
14 should she not be doing that would lead to the symptoms?
15    A.  I would have had to ask her what it was that
16 precipitated the symptoms at that time and made specific
17 suggestions as to what she should or shouldn't have done
18 at that point.
19    Q.  She was working here at Cardiology Consultants
20 at that time, right?
21    A.  Yes.
22    Q.  Did you restrict her activities during the
23 workplace?
24    A.  I can't remember.  Doesn't sound like I did

Page 19

1 because it says that she continued to work.
2    Q.  Where does it say that?
3    A.  The next thing.
4    Q.  I'm sorry.  Are you referring to --
5    A.  The next page, page 3.  At no time did I
6 document that I restricted her activity.  Even on the
7 last note of 6/7/2000 says, "Perhaps restriction of
8 physical activity at this point may be beneficial."
9    Q.  You have now skipped ahead to -- which page are
10 you looking at?  Can you give me a number?
11    A.  Page 4.
12    Q.  I'm going to direct you back to page 2 and
13 we're going to get through all the -- you have no
14 recollection sitting here today of what it means when you
15 say, "We may need to restrict her physical
16 activities"...?
17    A.  Sure.  We may need to restrict, but you asked
18 me in what way and I can't tell you what I would have
19 thought about five years ago.
20    Q.  Would it involve limiting the amount you go up
21 and down stairs?
22    A.  She doesn't go up and down stairs in this
23 office.
24    Q.  What about walking around the office?

Page 20

1    A.  I would have had to have asked her what she was
2 doing at that time that seemed to have precipitated it
3 and tried to have made accommodations if it was really
4 bothersome.  You have to realize that the problems she
5 has is neither life-threatening to either her or the
6 baby.  It's like treating somebody with a headache.  You
7 try to make them feel better.  And that's all I was
8 trying to do is make her feel better.
9    Q.  Was it your view that she would restrict
10 herself?
11    A.  Well, most people do.  If you don't feel good,
12 it's kind of hard to do something if it makes you feel
13 bad.
14    Q.  The work that Ms. Villanueva did at that time
15 in your office, was it conducive to that, to her being
16 able to limit her own activities when she felt she needed
17 to?
18    A.  I can't answer that.  I don't remember what she
19 did.
20    Q.  In your understanding, what does Ms. Villanueva
21 do now?
22    A.  She acts as a clinical coordinator and she does
23 EKGs, gets patients ready for my evaluation.
24    Q.  Have her duties significantly changed during

Page 21

1 the time that she's worked for you?
2    A.  From 2000 till now?
3    Q.  Yes.
4    A.  Well, I can't answer that because I don't
5 remember what she did in 2000.
6    Q.  Also, in note No. 3, and we're still on page
7 No. 2 of Goldenberg 8, you say, quote, she may actually
8 be representative of the orthostatic tachycardia
9 syndrome, close quote.
10    What does that mean?
11    A.  If she would have had the symptoms when she
12 wasn't pregnant or in between the pregnancy, it may have
13 been another explanation for her symptom complex.
14    Q.  Could you turn the page, please, to -- it's
15 your page 3 and it has in the lower right-hand corner
16 D130?
17    A.  D0130?
18    Q.  Yes.  In the middle of the page there's an
19 entry, June 2nd, 2000.  There's a reference to Holter
20 full test.  Can you tell me what that is?
21    A.  It's just a recording that that test was done.
22    Q.  What is that test?
23    A.  If you go to the top of page 4, it says, "24
24 hour Holter monitor: Revealed a sinus rhythm, rates

A-73

Villanueva                                    v.                    Christiana Care Health Services, Inc.
Edward M. Goldenberg, M.D.          C.A. # 04-258 JJF                                    May 4, 2006

Page 22

1  varying between 74 and 144 beats her minute. During the
2  patient's complaints of fluttering on 17 occasions, the
3  patient was predominantly in a sinus tachycardia."
4  That's what it was.
5      Q.  But can you tell me what exactly the Holter
6  test is, how it's done?
7      A.  Do you have any idea what it is or how it's
8  done?
9      Q.  I'm asking you.
10     A.  It's a recording of the heartbeat for 24 hours.
11     Q.  So the patient, in this case Ms. Villanueva,
12  wears some sort of monitor for 24 hours.
13         Can you please read the subjective section?
14     A.  "Nicole continues with activity related
15  tachycardia and shortness of breath. In addition she's
16  noted some swelling especially at the end of the day.
17  She's had some of her rapid heart beats at times even at
18  rest."
19     Q.  Was it your understanding that the swelling
20  that's referred to here is related in some way to the
21  tachycardia or the shortness of breath?
22     A.  Probably related to the pregnancy.
23     Q.  Can you tell from your notes here whether or
24  not you repeated the testing that you had done the week

Page 23

1  before in terms of checking Ms. Villanueva's blood
2  pressure and heart rate in three different positions?
3      A.  According to the note, I did not.
4      Q.  Do you know why you did not?
5      A.  I have no idea. I already did it once, so I
6  probably wouldn't have done it twice.
7      Q.  Can you tell me what role Ms. Villanueva's
8  self-reporting of her symptoms plays in your diagnosis or
9  treatment of her?
10     A.  As a physician, 90 percent of the diagnoses are
11  made by talking to people.
12     Q.  Was that true in Ms. Villanueva's case, too?
13     A.  Correct.
14     Q.  Am I correct that the other 10 percent are
15  things like the blood pressure and cardiograms that you
16  performed?
17     A.  And the Holter and the echocardiogram.
18     Q.  But 90 percent of it is based on conversations
19  with her about the symptoms that she is having?
20     A.  Correct.
21     Q.  If you will turn the page to the page
22  numbered 4. You read this paragraph before about the
23  results of the 24-hour Holter monitor. Did you request
24  that that monitoring test be performed?

Page 24

1      A.  I assume I did, but it's not documented as to
2  who requested it.
3      Q.  What is the significance of the varying rates
4  between 74 and 144 beats per minute that you indicate on
5  page 4?
6      A.  Just tells the range of the heart rhythm — the
7  heart rate during the day. That can be a normal span for
8  you or I or anybody else in the room, too.
9      Q.  So that's the full range for 24 hours of
10  monitoring?
11     A.  Right. The slowest heart rate was 74. The
12  fastest was 144.
13     Q.  What does the second sentence mean where it
14  says, "During the patient's complaints of fluttering on
15  17 occasions, the patient was predominantly in a sinus
16  tachycardia"?
17     A.  I was looking for pathologic arrhythmias; in
18  other words, mechanisms other than sinus tachycardia that
19  may have been significant in threatening either Nicole or
20  the baby and may have required specific drug
21  intervention, but I didn't find any of those.
22     Q.  The next entry refers to a Doppler
23  echocardiogram?
24     A.  The next one is laboratory studies.

Page 25

1      Q.  Fair enough. The next one I'm going to ask you
2  about is the Doppler echocardiogram. Can you tell me
3  what this is?
4      A.  Doppler echocardiogram ultrasound test, that is
5  used to evaluate the function of the heart muscle and the
6  valves. That was reported to be normal.
7      Q.  If you will skip down to your assessment and
8  the first entry and tell me if I read this right: "Sinus
9  tachycardia without evidence of underlying organic heart
10  disease," close quote. Did I get that right?
11     A.  Correct.
12     Q.  What was the significance to you that there was
13  sinus tachycardia without an underlying organic heart
14  disease?
15     A.  The significance of an arrythmia is related to
16  the presence and/or absence of heart disease. If there
17  is no heart disease, then the significance of the
18  arrythmia is minimal, if anything. If she would have had
19  organic heart disease, then the sinus tachycardia would
20  have been significant, more significant. It's like the
21  difference between having a headache because you have got
22  a headache and having a headache because you have a brain
23  tumor. The first one is just a headache. The second one
24  is serious.

A-74

Villanueva                                              v.                    Christiana Care Health Services, Inc.
Edward M. Goldenberg, M.D.              C.A. # 04-258 JJF                                    May 4, 2006

Page 26

1    Q.   Well, then, why, if you can tell me, are we
2    looking at all of these repeated visits over a short
3    period of time where you're examining Ms. Villanueva over
4    what you're now characterizing as a headache?
5    **A.   Well, it took I don't know how many visits**
6    **before all the testing was done.**
7    Q.   Your plan for Ms. Villanueva, at least point 2
8    of your plan, says, quote, Perhaps restriction of
9    physical activity at this point may be beneficial. Did I
10   get that right?
11   **A.   Correct.**
12   Q.   As you sit here now, this is the second time
13   you've examined Ms. Villanueva in 2000, in what way
14   should she have restricted her physical activity?
15   **A.   Can you ask the question again?**
16          MR. BLOOM: Sure. Can you read that last
17   one back?
18          (The reporter read back as instructed.)
19          THE WITNESS: I said "perhaps," so we
20   didn't definitely -- I assume we didn't fire her. I
21   assume that we didn't put her on restricted activities.
22   It would have been a conversation between the two of us
23   to get her to a point where she could continue to be
24   employed and still feel -- and not have a lot of

Page 27

1    symptoms.
2    BY MR. BLOOM:
3    Q.   So when we're talking about restricting
4    physical activity, we are talking about at work?
5    **A.   Well, at home, too.**
6    Q.   Was it your view that Ms. Villanueva could
7    manage that herself, deciding when she needed to slow it
8    down or to sit down to restrict her activities?
9    **A.   Yes.**
10   Q.   Is there anything in Ms. Villanueva's job here
11   that involves tasks that would not permit that sort of
12   self-limitation?
13          MS. BREWINGTON: I'm going to object. Just
14   for clarification, are we talking about now or 2000?
15          MR. BLOOM: We're talking about when these
16   medical notes --
17   **A.   I don't remember.**
18   Q.   Is there anybody who works here, to your
19   knowledge, whose job would be inconsistent with them
20   self-regulating their activity to deal with tachycardia?
21          MS. BREWINGTON: I'm going to object.
22   Relevance.
23   **A.   Say the question again. Is there anybody here**
24   **who could not self-regulate their activity if they were**

Page 28

1    feeling poorly?
2    Q.   What I'm trying to get at here is: Is there
3    any sort of work that goes on in your office -- since you
4    don't remember specifically what Ms. Villanueva did, is
5    there any sort of work that there is of a nature where a
6    person could not, consistent with their job,
7    self-regulate their activities?
8    **A.   I don't know. I've never really done a lot of**
9    **the activities of the people. Some of them just sit all**
10   **day long; not a lot of physical activities. It's a tag**
11   **team match. I don't remember when we worked it then, but**
12   **Nicole could sit at the computer and work at the computer**
13   **and somebody else could have done things that perhaps are**
14   **bothersome to her.**
15   Q.   Is it accurate, then, that, even though you
16   don't specifically remember what Ms. Villanueva's
17   position was in 2000, by virtue of how your office
18   operates, that she would be able to restrict her herself
19   to sedentary functions if she needed to regulate herself?
20   **A.   I assume she probably could.**
21   Q.   If you would please turn the page to page
22   No. 5. This is your page No. 5. We're still on
23   Goldenberg 8. The first entry is a note by you from
24   August 17th, 2000?

Page 29

1    **A.   Correct.**
2    Q.   Could you please read your office note?
3    **A.   "Nicole is still having bouts of tachycardia**
4    **which occurred with physical activity, but also at times**
5    **of rest."**
6    Q.   By August 17th when this note is entered, are
7    you able to tell whether you had already received
8    whatever tests you were waiting to get results from?
9    **A.   There were no tests.**
10   Q.   There were no tests that you were waiting for?
11   **A.   Correct.**
12   Q.   So can you tell me why for this condition
13   that -- you analogized to a headache before -- why you're
14   continuing to have office visits with Ms. Villanueva
15   about it?
16   **A.   See how her headache's doing.**
17   Q.   Am I correct that, again, you didn't repeat the
18   testing of her blood pressure or heart rate in three
19   different positions?
20   **A.   Correct.**
21   Q.   That was only done during the first visit?
22   **A.   Correct.**
23   Q.   You can put that exhibit aside, Doctor. Thank
24   you.

A-75

Villanueva
Edward M. Goldenberg, M.D.                     v.                     Christiana Care Health Services, Inc.
                                          C.A. # 04-258 JJF                                    May 4, 2006

Page 30

1          I'm going to put in front of you what's
2   been previously marked as Goldenberg 14, and just read it
3   to yourself and tell me when you're done.
4      A.   What was your question?
5      Q.   Have you finished reading it?
6      A.   Yes.
7      Q.   This is an e-mail dated April 19th, 2001. Do I
8   have that right?
9      A.   Correct.
10     Q.   Carol Wissler who authored this e-mail, does
11  she work here in your office?
12     A.   Correct.
13     Q.   What is her position?
14     A.   Supervisor.
15     Q.   Supervisor of whom?
16     A.   Of personnel.
17     Q.   She's not your supervisor, is she?
18     A.   No.
19     Q.   Who does she supervise?
20     A.   She supervises at that time a collection of
21  secretaries.
22     Q.   Who's Luann Bellman?
23     A.   Luann Bellman would be our HR person.
24          MS. BREWINGTON: I'm going to object to

Page 31

1   this line of questioning. This is, again, from 2000, not
2   the current pregnancy.
3      Q.   Who is Robin Vaughn?
4      A.   Robin Vaughn is a woman who runs our Coumadin
5   center.
6      Q.   Who runs — I'm sorry?
7      A.   Our Coumadin center.
8      Q.   What's that?
9      A.   It's a center that does testing of blood.
10     Q.   Having now read this e-mail, do you recall the
11  events that are described in this e-mail?
12     A.   No.
13     Q.   You can put that aside. Thank you.
14          Dr. Goldenberg, I'm going to show you
15  what's previously been marked as Exhibit Goldenberg 7,
16  and take a minute to review it and let me know when
17  you're done.
18     A.   Okay.
19     Q.   Is this an April 8, 2003, letter from you to
20  Dr. Gordon Ostrum?
21     A.   Correct.
22     Q.   Who is Dr. Ostrum?
23     A.   Her gynecologist.
24     Q.   Can you tell me why you wrote this in a letter

Page 32

1   form to Ms. Villanueva's gynecologist as opposed to just
2   keeping it in your own records?
3      A.   We always share information between the
4   doctors. All those other letters from the one before
5   also went to the doctors. Just different format.
6      Q.   I see. The ones that we were looking at before
7   from 2000, it just wasn't put in a letter form?
8      A.   Right. But they were all copied to the
9   gynecologist.
10     Q.   Do you recall treating Ms. Villanueva at any
11  time between the notes we were just looking at from 2000
12  and this note we're now looking at, Goldenberg 7, in
13  April 2003?
14     A.   No.
15     Q.   You don't remember whether you did or didn't?
16     A.   Well, there's no documentation that I saw her,
17  so, therefore, I assume I didn't.
18     Q.   Do you recall what prompted this visit that you
19  write about in your April 8, 2003, letter?
20     A.   It says she's four and a half months pregnant
21  and two weeks ago she developed similar symptoms that she
22  had during her first pregnancy.
23     Q.   Would you actually, please, read the first two
24  paragraphs of your letter of April 8.

Page 33

1      A.   "I saw Nicole during her last pregnancy at
2   which time she seemed to have inappropriate sinus
3   tachycardia. She had" — it says, "She had no
4   pregnancy." That doesn't make sense. I would assume it
5   meant she had no complications with the pregnancy. "She
6   went through a successful delivery. She had no
7   underlying organic heart disease.
8          "She is now 4 and a half months into her
9   pregnancy and about two weeks ago she again
10         noted the onset of resting tachycardia and with
11         physical activities she develops dyspnea,
12         tightness in her chest up into her neck and at
13         times down her left arm. Similar symptoms are
14         precipitated just by lying down."
15         "She has been evaluated"...
16     Q.   If you think it's significant, you can read the
17  last line, as well.
18     A.   "She is not anemic and her thyroid level is
19  normal," which was last tested three years before that.
20     Q.   What you're reporting here on April 8, 2003, in
21  connection with Ms. Villanueva's second pregnancy, is it
22  different in any significant way, to your mind, from what
23  you had observed with respect to the first pregnancy in
24  2000?

A-76

Villanueva                                          v.                    Christiana Care Health Services, Inc.
Edward M. Goldenberg, M.D.                  C.A. # 04-258 JJF                                    May 4, 2006

Page 34

1    A.   I'm not sure, although this one I had said that
2    she was having chest discomfort which I did not mention
3    on the previous one.
4    Q.   When you say "chest discomfort," chest
5    discomfort that would be related to the tachycardia or
6    the arrythmia?
7    A.   Correct.
8    Q.   What's resting tachycardia?
9    A.   That means heart rate greater than 100 without
10   physical activity.
11   Q.   There's also a reference here that she, meaning
12   Ms. Villanueva, develops dyspnea.
13   A.   Shortness of breath.
14   Q.   That's just another word for shortness of
15   breath?
16   A.   Correct.
17   Q.   Does there come a point when somebody's
18   experiencing tachycardia while lying down or sitting that
19   physical exertion at that point could pose health risks
20   to the patient?
21        MS. BREWINGTON:  Objection. Calls for
22   speculation.
23        MR. BLOOM:  You can answer it.
24   A.   If there was -- if it was a malignant

Page 35

1    arrhythmia, yes. But generally the kind of arrhythmia that
2    Nicole had, probably not. With 90 percent degree of
3    certainty.
4    Q.   If you will turn the page. This is the second
5    page of your April 8, 2003, letter. There's a section
6    that's listed, "Medications." The medications that are
7    listed, are you just taking a history of medications that
8    she's currently taking at that time?
9    A.   Correct.
10   Q.   Is there a difference between sinus tachycardia
11   and just tachycardia?
12   A.   Yes.
13   Q.   What is the difference?
14   A.   There's a sinus tachycardia, there are
15   supraventricular tachycardias, there are ventricular
16   tachycardias. There's a whole host of them. It defines
17   the origin of the tachycardia, which part of the
18   electrical system of the heart it comes from.
19        So we describe a normal rhythm as a sinus
20   rhythm. All of us that are sitting in this room probably
21   have a normal sinus rhythm. Once the rating's over 100,
22   we just call it a sinus tachycardia. So it's actually if
23   you were running down the street, you would be in sinus
24   tachycardia.

Page 36

1    Q.   I'm sorry. Could you say that again?
2    A.   A normal person who would be running down the
3    street would be in sinus tachycardia.
4    Q.   Then what's the difference between that and
5    inappropriate sinus tachycardia?
6    A.   If your heart rate's fast for no reason sitting
7    around doing nothing, then it's inappropriate.
8    Q.   That's what Ms. Villanueva had?
9    A.   Correct.
10   Q.   In the assessment section of your letter, it
11   does say, "Inappropriate sinus tachycardia," right?
12   A.   Correct.
13   Q.   And the third thing it says in the assessment
14   is, quote, Exercise induced symptomatology sounds anginal
15   in nature, close quote. Can you tell me what that means?
16   A.   Well, she was actually having chest discomfort
17   besides just the awareness of the rapid heartbeat. I
18   guess that's kind of a little inappropriate because it
19   also said similar symptoms are precipitated by lying
20   down. So I guess it's not exercise. It's just
21   associated with the tachycardia. I can't be 100 percent
22   sure. Just seems that that's what would have been more
23   appropriate to write.
24   Q.   What would have been more appropriate to write?

Page 37

1    A.   Just that tachycardic-associated symptoms sound
2    anginal in nature.
3    Q.   I see. You're saying the phrase "exercise
4    induced" is probably not appropriate there?
5    A.   Well, because in the second paragraph of my
6    history it says, "Similar symptoms are precipitated by
7    lying down." So, therefore, she has the same symptoms
8    lying as she does up and about, and it can't be
9    exercise-induced. It occurs with exercise but also
10   occurs when she's not exercising.
11   Q.   Is it correct, based on your notes as we have
12   been reviewing them, that Ms. Villanueva's tachycardic
13   symptoms during her second pregnancy in 2003 were more
14   serious than they were in 2000?
15   A.   I would assume because it said, "I have started
16   her on propranolol hopefully to improve her functional
17   exercise capacity by limiting the rapid acceleration of
18   her heart rate."
19   Q.   So that's sort of a stepped-=up response by
20   you?
21   A.   Correct.
22   Q.   That I take it is in response to more
23   significant --
24   A.   Complaints.

A-77

Villanueva
Edward M. Goldenberg, M.D.
v.
C.A. # 04-258 JJF
Christiana Care Health Services, Inc.
May 4, 2006

Page 38

1  Q.  By Ms. Villanueva?
2  A.  Correct.
3  Q.  So the complaints of symptoms by Ms. Villanueva
4  were more severe in April 2003 than they had been in
5  2000?
6  A.  I would have to assume that.
7  Q.  What is Propranolol?
8  A.  It's a beta blocker. It's used to slow the
9  heart rate down.
10  Q.  Is that a medication that would have been
11  available to you to prescribe in 2000?
12  A.  Yes.
13  Q.  So the reason it wasn't prescribed in 2000 was
14  not related to changes in medical knowledge or drug
15  certifications or anything like that.
16  A.  Correct. It was available.
17  Q.  Could you please read point No. 1 under your
18  plan for Ms. Villanueva?
19  A.  I have started her on propranolol
20  10 milligrams twice a day and subsequently 20, hopefully
21  to improve her functional exercise capacity by limiting
22  the rapid acceleration her heart rate.
23  Q.  What does it mean when you say 10 milligrams
24  twice a day and subsequently 20 milligrams?

Page 39

1  A.  Building up slowly.
2  Q.  So actually at one time you're making a
3  decision that she's going to start with 10 milligrams and
4  then move up from there?
5  A.  Correct. I may have even told her to do it.
6  But I don't know.
7  Q.  When you say in this note, quote, hopefully to
8  improve her functional exercise capacity, close quote,
9  what does that mean?
10  A.  Well, her symptoms were related to her heart
11  rate, so if I could improve her heart rate, then she
12  would be less symptomatic.
13  Q.  What is the second entry, "Stress
14  echocardiogram"?
15  A.  Stress echocardiogram is an ultrasound done
16  under physical activities.
17  Q.  Do you know whether that was done?
18  A.  I don't think it was done.
19  Q.  Do you know why not?
20  A.  I have no idea.
21  Q.  Is that something that you would do here?
22  A.  In this office?
23  Q.  Yes.
24  A.  No.

Page 40

1  Q.  Is that something that needs to be done in a
2  hospital?
3  A.  No. It can be done at an outpatient facility.
4  Q.  What's involved in performing a stress
5  echocardiogram?
6  A.  Somebody walks on the treadmill and they do an
7  ultrasound and you see the response of the heart to the
8  walking.
9  Q.  And the third item on your plan says, quote,
10  She will be seen in follow-up in one month and will give
11  me a call next week to let me know how she is doing,
12  close quote. Did I read that right?
13  A.  Correct.
14  Q.  Why a month?
15  A.  Could have been two days. Just to see how she
16  was doing. It was arbitrary.
17  Q.  When you placed Ms. Villanueva on the beta
18  blocker medication, what's your expectation for how
19  quickly that should have a beneficial effect?
20  A.  Maximum effect of a drug occurs after five
21  half-lives. So every three days you should get a maximum
22  effect of the drug. So she should have felt better in a
23  week, four, five days.
24  Q.  Four, five days from starting taking it?

Page 41

1  A.  Yes.
2  Q.  Would you expect that that medication you
3  prescribed, the beta blocker, would totally eliminate the
4  tachycardic symptoms?
5  A.  Ameliorate it.
6  Q.  You can put that aside. Thank you.
7      Dr. Goldenberg, I'm going to put in front
8  of you what's previously been marked as Goldenberg 15.
9  This is a note that you wrote on April 8, 2003?
10  A.  Correct.
11  Q.  Could you please read the note?
12  A.  "Nicole Villanueva has pregnancy induced
13  cardiac arrythmia. Physical activities precipitate her
14  arrythmia. At this time I have suggested a sedentary
15  position."
16  Q.  Is that your signature at the bottom?
17  A.  Correct.
18  Q.  And all of this is your handwriting?
19  A.  Correct. I have a question. Can you read it?
20  You didn't answer my question.
21  Q.  I'm not answering questions.
22      Did Ms. Villanueva ask you for this note?
23  A.  I have got no idea.
24  Q.  In April 2003 she was no longer working for you

A-78

Villanueva                                  v.                  Christiana Care Health Services, Inc.
Edward M. Goldenberg, M.D.        C.A. # 04-258 JJF                              May 4, 2006

Page 42

1  here at Cardiology Consultants?
2     A.   Correct.
3     Q.   Is it your understanding that she was working
4  at Christiana Care at that point?
5     A.   I don't remember -- I don't remember now, but I
6  know she was working at Christians, yes. Now I know.
7     Q.   Did you have any understanding when you wrote
8  this note what Ms. Villanueva's job was at Christiana
9  Care?
10    A.   I hope I would have, but I have got no idea.
11    Q.   Do you remember whether Ms. Villanueva provided
12  you with a job description or if she described her job
13  functions to you?
14    A.   Can I honestly say that she told me what her
15  job description was at that time? I would have assumed
16  that we discussed it, but I don't know.
17    Q.   But based upon your conversations with
18  Ms. Villanueva, which I think you said you don't
19  remember, you wrote this note which is Goldenberg 15?
20    A.   Correct.
21    Q.   This is a note to Ms. Villanueva's employer
22  restricting her duties to a sedentary position.
23    A.   Sedentary position.
24    Q.   Is that true?

Page 43

1     A.   Correct.
2     Q.   I think you said you don't remember what her
3  job functions actually were.
4     A.   No, I don't.
5     Q.   Is it accurate, though, that, because you're
6  restricting her to sedentary work, you understood that
7  her position at that time was not sedentary?
8     A.   Correct.
9     Q.   As her treating physician, what was the basis
10  of your medical judgment that Ms. Villanueva should be
11  restricted to sedentary work?
12    A.   I'm not quite sure how I should answer this,
13  but, you know, as a physician, what you try to do is keep
14  people as functional as they possibly can in the work
15  situation, depending upon what their financial
16  requirements are. So if somebody came in to me and said,
17  you know, I don't need this job, that will be one set of
18  recommendations. What I was trying to do was maintain
19  Nicole's employment -- I assume that's what I was
20  doing -- but make it easier for her to maintain her
21  employment. So that's what I was probably trying to do.
22    Q.   Does that mean that, without restricting
23  her, Ms. Villanueva, to sedentary work, your
24  understanding was that she wouldn't be able to do her

Page 44

1  job?
2     A.   Say that question again.
3          MR. BLOOM:  Could you repeat that one?
4          (The reporter read back as instructed.)
5          THE WITNESS:  Did I understand that she
6  would not be able to be employed or that she would not be
7  able to do the job that she was doing before?
8  BY MR. BLOOM:
9     Q.   The job that she was doing because you were
10  restricting her work activities.
11    A.   I assume that there was probably -- yes, that
12  she was not capable of doing what she was doing before.
13    Q.   That's why you wrote a note restricting her to
14  a sedentary position.
15    A.   I didn't restrict her. I suggested a sedentary
16  position. There's a difference.
17    Q.   In writing this note on Ms. Villanueva's
18  behalf, was it your expectation that Christiana Care and
19  Ms. Villanueva's employer should, on the basis of this
20  note, restrict her to sedentary work?
21    A.   I would have expected in Christiana, the way it
22  was, they would have gone out of their way to give her an
23  easier job than what she was doing and maintain her
24  employment.

Page 45

1     Q.   And this note that you wrote on April 8, 2003,
2  was a note attempting to justify that sort of
3  accommodation.
4     A.   Correct.
5     Q.   Your intent, I assume, in writing this note on
6  April 8 is to convey to Christiana Care that there's a
7  medical reason for restricting Ms. Villanueva's
8  activities to sedentary work?
9     A.   Right. She was not a malingerer just trying to
10  get out of work.
11    Q.   I understand that, but your intent also was, I
12  take it, to communicate to Christiana Care that there was
13  a medical reason to justify restricting her to sedentary
14  work?
15         MS. BREWINGTON:  Objection to form.
16    A.   Yeah. There was a good reason for her to have
17  an easier job.
18         MR. BLOOM:  What's the objection to form to
19  the last question?
20         MS. BREWINGTON:  It wasn't a question. It
21  was just a statement.
22         THE WITNESS:  Can I ask the process? So
23  this testimony goes to a jury or goes to a court -- a
24  judge, or like what goes on from what I'm saying here?

A-79

Villanueva                                    v.              Christiana Care Health Services, Inc.
Edward M. Goldenberg, M.D.           C.A. # 04-258 JJF                              May 4, 2006

Page 46

1      MR. BLOOM: Maybe I made too many
2  assumptions on the basis of how many depositions you've
3  had before.
4      THE WITNESS: The next thing is arbitration
5  and settlement or something like that. Never mind. It
6  shouldn't be on the record. I'm just curious in the
7  legal profession how things go from one step to the
8  other.
9  BY MR. BLOOM:
10     Q.   I'm going to put in front of you what's been
11  marked Goldenberg Exhibit 5. First, before I ask you
12  specifically about this note that's Exhibit 5, this
13  appears to be sort of an internal messaging system that
14  you have here. Is that right?
15     A.   Correct.
16     Q.   How does that work, in general terms?
17     A.   The mechanism? Well, I can tell you how the
18  mechanism works today as opposed to 2003. This gets put
19  into the computer. I have a work list that gets shown in
20  front of me and the work list -- and I answer the
21  question. I give -- and the secretary reads it at her
22  convenience.
23     Q.   What about in 2003, what's reflected in this
24  Exhibit 5?

Page 47

1      A.   I don't think it worked exactly that way. I
2  think the note was handed to me, I answered the note, and
3  then my secretary wrote the action down, as opposed to me
4  writing it down or typing it in.
5      Q.   Exhibit Goldenberg 5 is an April 9th, 2003,
6  exchange of notes between you and your secretary?
7      A.   Correct.
8      Q.   So this is the day after you wrote the note
9  regarding sedentary work on April 8?
10     A.   Correct.
11     Q.   It says it's a patient-generated call. What's
12  the patient-generated call there? You can just read it.
13     A.   Read what it says?
14     Q.   Yes.
15     A.   "She was seen yesterday and you gave her a note
16  for work saying she had restrictions. When she gave it
17  to them they sent her home and told her she would have to
18  find another job so she needs to know if she can have
19  another note saying she can return to work with no
20  restrictions?"
21     Q.   When it says "Ok" under that, does that mean?
22     A.   That's me.
23     Q.   That means the note is directed to you?
24     A.   Yes.

Page 48

1      Q.   And then the action item, what's the action?
2      A.   Okay. I meant that we could write the note
3  that's requested.
4      Q.   That's a decision you made that it was okay?
5      A.   Correct.
6      Q.   When you said okay, you mean you would write
7  her another note?
8      A.   Correct.
9      Q.   You did, in fact, the next day write her a note
10  saying that Ms. Villanueva had no restrictions. Do you
11  remember that?
12     A.   No. But I think it's documented in the
13  records.
14     Q.   Had anything changed between April 8 when you
15  wrote your first note and April 9th or 10th when you
16  wrote the second note?
17     A.   No.
18     Q.   Why did you write a new note?
19     A.   Because she was going to lose employment and
20  her symptoms by her own, I guess, discussion were not so
21  bad that she was willing to give up her job. You have to
22  realize certain people go to jobs every day with a
23  headache and certain people don't. Some people go home
24  and lay in bed all day. Other people plod on. So she

Page 49

1  had a headache, but we tried to make the headache a
2  little bit better. Didn't work, but she was willing to
3  work with the headache.
4      Q.   I think you answered this before, but please
5  correct me if I'm wrong, that you don't have any
6  recollection of what Ms. Villanueva's job functions were
7  at that time in 2003?
8      A.   I do not.
9      Q.   In terms of your writing a new note that
10  Ms. Villanueva could return to work without restrictions,
11  does it matter what the level of physical exertion is for
12  her job to you?
13     A.   Well, I mean, I work in a hospital. I assume
14  that she wasn't lifting -- she was working with patients.
15  She was not a nurse. So she was probably a nurse
16  assistant. And then she had to care for the physical
17  needs of patients. But I don't know. I would assume in
18  retrospect that's probably what she was doing.
19     Q.   Am I correct that you didn't examine
20  Ms. Villanueva between writing the April 8 note and the
21  next note?
22     A.   I did not examine her.
23     Q.   Also on Goldenberg 5, the last typed written
24  things under -- after it says, "Action: Ok," it says

A-80