## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NICOLE VILLANUEVA,                         :
                                           :       C.A. No. 04-258-JJF
                        Plaintiff,         :
                                           :
            v.                             :
                                           :
CHRISTIANA CARE HEALTH SERVICES, INC. :
                                           :
                        Defendant.         :

---

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

MARGOLIS EDELSTEIN
Jeffrey K. Martin, Esquire (DE #2407)
Lori A. Brewington, Esquire (DE #4522)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
jmartin@margolisedelstein.com
lbrewington@margolisedelstein.com
Attorneys for Plaintiff

DATED: June 30, 2006

# TABLE OF CONTENTS

TABLE OF CITATIONS ....................................................... iv

I.      NATURE AND STAGE OF PROCEEDINGS ...................... 1

II.     SUMMARY OF ARGUMENT ....................................... 1

III.    SUMMARY OF FACTS ............................................ 4

      A.      PLAINTIFF WAS QUALIFIED AND TRAINED
           TO WORK AS BOTH A UNIT CLERK AND A
           PATIENT CARE TECH II.................................... 4

      B.      ON APRIL 8, 2003, PLAINTIFF'S TREATING
           PHYSICIAN SUGGESTED THAT PLAINTIFF
           WORK IN A SEDENTARY CAPACITY. THE
           PLAINTIFF PRESENTED THIS NOTE TO
           CHRISTIANA CARE WITH EXPECTATION
           THAT SHE WOULD BE TREATED LIKE
           SIMILARLY SITUATED COMPARATORS................ 5

      C.      ON APRIL 10, 2003, DR. GOLDENBERG,
           VILLANUEVA'S TREATING PHYSICIAN,
           ISSUED ANOTHER NOTE CLARIFYING THAT
           VILLANUEVA WAS ABLE TO WORK REGULAR
           DUTY BECAUSE IN HIS OPINION NEITHER
           VILLANUEVA OR THE BABY WAS AT RISK............ 9

      D.      DESPITE HER DOCTOR'S NOTE INDICATING
           THAT VILLANUEVA IS ABLE TO RETURN TO
           WORK REGULAR DUTY, COLLINS REFUSED
           TO CLEAR HER AND AS A RESULT, VILLANUEVA
           WAS TERMINATED FROM CHRISTIANA CARE
           ON APRIL 24, 2003.......................................... 13

IV.     ARGUMENT......................................................... 14

      A.      Standard of Review ........................................... 14

      B.      Plaintiff Can Establish Both Direct And Indirect
           Evidence Of Discrimination Based on Pregnancy............ 15

1.   The Statements Made by Both Kerry Delgado
     of Employee Relations and Chris Collins of
     Employee Health Services Are Direct Evidence
     of Discrimination Against the Plaintiff................    16

2.   Plaintiff Can Establish A Prima Facie Case
     of Pregnancy Discrimination ...........................    18

     a.   There Are Genuine Issues of Material Fact
          As To Whether Christiana Care Treated
          Plaintiff Differently Than Similarly
          Situated Non-Pregnant Employees.
          Therefore, Summary Judgment Should
          Not Be Granted................................    19

     b.   There Are Genuine Issues of Material Fact
          As To Whether Plaintiff Was Qualified To
          Work As A Unit Clerk In April 2003.
          Therefore, Summary Judgment Should
          Not Be Granted................................    20

C.   There Is Sufficient Evidence To Conclude That Collins'
     Rationale For Refusing To Clear Plaintiff To Return
     To Regular Duty Was A Pretext For Pregnancy
     Discrimination Which Ultimately Led To Plaintiff's
     Termination From Employment................................    23

V.   CONCLUSION......................................................    27

**Unreported Cases**                                                    **Tab No.**

McQueen v. Airtran Airways, Inc.,
No. 3:04-cv-00180, 2005 WL 3591100,
at *4-5 (N.D. Fla. Dec. 30, 2005), 2005 U.S. Dist. LEXIS 37461.............    1

# TABLE OF CITATIONS

<u>Cases</u>                                                                      <u>Page No.</u>

<u>Atchley v. Nordam Group, Inc.,</u>
180 F. 3d 1143, 1148-49 (10th Cir. 1999)……………………………………..         23

<u>Adickes v. S.H. Kress & Co.,</u>
398 U.S. 144, 157 (1970)………………………………………………………         14

<u>Anderson v. Liberty Lobby, Inc.,</u>
477 U.S. 242, 255 (1986)………………………………………………………     14, 15

<u>Byrd v. Lakeshore Hospital,</u>
30 F.3d 1380 (11th Cir. 1994)………………………………………………..         20

<u>Chiaramonte v. Fashion Bed Group, Inc.,</u>
129 F.3d 391, 396 (7th Cir. 1997)……………………………………………         17

<u>Ensley Gaines v. Runyon,</u>
100 F. 3d 1220 (6th Cir. 1996) at 1126…………………………………………         21

<u>Horowitz v. Fed. Kemper Life Assurance Co.,</u>
57 F.3d 300, 302 n.1 (3d Cir. 1995)……………………………………………         14

<u>Kennedy v. Schoenberg, Fisher & Newman, Ltd.,</u>
140 F.3d 716, 723 (7th Cir. 1998)…………………………………………...         18

<u>Laxton v. Gap, Inc.,</u>
No. 02-40406, (5th Cir. 2003)………………………………………………         25

<u>Leeker v. Gill Studios, Inc.,</u>
21 F. Supp. 2d 1267, 1271-73 (D. Kan. 1998)…………………………………         20

<u>Logan v. Commerical Un. Ins. Co.,</u>
96 F.3d 971, 978 (7th Cir. 1996)………………………………………………         15

<u>MacDonald v. Delta Air Lines, Inc.,</u>
94 F.3d 1437, 1440 (10th Cir. 1996)…………………………………………...         15

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,</u>
475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)…………….         14

<u>McDonnell Douglas Corp. v. Green,</u>
411 U.S. 792, 802-04, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)………………….         16

McQueen v. Airtran Airways, Inc.,
No. 3:04-cv-00180, 2005 WL 3591100,
at *4-5 (N.D. Fla. Dec. 30, 2005), 2005 U.S. Dist. LEXIS 37461................... 20

Mitchell v. Toledo Hosp.,
964 F.2d 577 at 583 (1992)........................................................... 21

Mullet v. Wayne-Dalton Corp.,
338 F. Supp. 2d 806 (District of Ohio 2004)........................................ 22

Pa. Coal Ass'n v. Babbitt,
63 F.3d 231, 236 (3d Cir. 1995)..................................................... 14

Phillips v. Swift & Co.,
137 F. Supp. 2d 1126, 1140(S.D. Iowa 2001)........................................ 24

Piraino v. International Orientation Resources, Inc.,
84 F.3d 270, 274-75 (7th Cir. 1996)................................................ 26

Rodgers v. Monumental Life Ins. Co.,
289 F.3d 442, 448 (6th Cir. 2002).................................................. 15

Sarsha v. Sears, Roebuck & Co.,
3 F.3d 1035, 1040 (7th Cir. 1993).................................................. 26

Sheehan v. Donlen Corporation,
173 F.3d 1039 (7th Cir. 1999) at 1044.............................................. 17

Shorter v. ICG Holdings, Inc.,
188 F. 3d 1204, 1207 (10th Cir. 1999).............................................. 16

Texas v. Dep't of Community Affairs v. Burdine,
450 U.S. 248, 252-53, 67 L.Ed. 2d 207, 101 S. Ct. 1089 (1981)..................... 16

Troy Chemical Corp. v. Teamsters Union Local No. 408,
37 F.3d 123, 126 (3d Cir. 1994).................................................... 15

Venters v. City of Delphi,
123 F.3d 956, 972 (7th Cir. 1997).................................................. 17

Wade v. Lerner New York, Inc.,
243 F.3d 319, 325 (7th Cir. 2001).................................................. 24

**Statutes**                                                              **Page No.**

Pregnancy Discrimination Act, 42 U.S.C. §2000e-1 et seq............................ 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NICOLE VILLANUEVA,                          :
                                            :        C.A. No. 04-258-JJF
                    Plaintiff,              :
                                            :
        v.                                  :
                                            :
CHRISTIANA CARE HEALTH SERVICES, INC. :
                                            :
                    Defendant.              :

## CERTIFICATE OF SERVICE

I, Lori A. Brewington, do hereby certify that two (2) true and correct copies of the

***Plaintiff's Answering Brief in Opposition to Defendant's Motion for Summary***

***Judgment*** were sent by U.S. Mail, First Class, postage prepaid, on June 30, 2006 to the

following:

David H. Williams, Esquire
James H. McMackinn III, Esquire
Morris, James, Hitchens & Williams, LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899-2306

Michael J. Ossip, Esquire
Thomas S. Bloom, Esquire
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103


MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Lori A. Brewington, Esquire (#4522)
1509 Gilpin Avenue
Wilmington, Delaware 19806
(302) 777-4680 phone
Attorneys for Plaintiff

vi

I.    **NATURE AND STAGE OF PROCEEDINGS**

On April 21, 2004, Plaintiff Nicole Villanueva (hereinafter "Villanueva" or "Plaintiff")

filed the instant Complaint against Defendant Christiana Care Health Services, Inc. (hereinafter

"Christiana Care" or "Defendant"), asserting a claim of pregnancy discrimination arising out of

Christiana Care's failure to treat Plaintiff in a manner similar to her non-pregnant counterparts

and ultimately terminating Plaintiff from her employment based on her pregnancy in violation of

Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42

U.S.C. §2000e-1 et seq. ("Title VII") ('PDA'). Discovery in this case has ended. Christiana Care

filed its Opening Brief in support of its Motion for Summary Judgment on May 31, 2006.

This is the Plaintiff's Answering Brief in Opposition to Defendant's Motion for Summary

Judgment.

II.    **SUMMARY OF ARGUMENT**

1.    Contrary to Christiana Care's bold assertion, Dr. Goldenberg, Plaintiff's treating

physician, did not restrict Plaintiff to work only sedentary duty. Rather, in April of 2003, Dr.

Goldenberg, *suggested* that Plaintiff work in a sedentary capacity rather than perform her normal

duties of a Patient Care Tech II due to a pregnancy induced heart problem. Plaintiff merely

wanted to be treated like her similarly situated non-pregnant counterparts who were afforded the

opportunity to work in a less than full duty capacity as a result of physical limitations. There was

alternative work available both in and outside her department that Plaintiff could perform

consistent with her doctor's suggestion of sedentary duty. Christiana Care sent Plaintiff home

and she returned to work one week later with a note from her doctor indicating that she was able

to work regular duty. Despite her treating physician's clearly stated opinion that Plaintiff was

1

fully capable of working regular duty as a Patient Care Tech II, Plaintiff was told by Christiana Care that she could not return to work and thereafter, Plaintiff was removed from Christiana Care's payroll.

2.    Christiana Care is correct in its assertion that the issue in this case is not one of whether Plaintiff was entitled to a "reasonable accommodation" under the Americans with Disabilities Act ("ADA"). There are three primary issues in this case: (1) whether the Plaintiff was treated differently than her non-pregnant counterparts; (2) whether Plaintiff was qualified to work as a unit clerk; and (3) whether the decision-makers with respect to Plaintiff's employment were motivated by anti-pregnancy animus. In this case, there is both direct and indirect evidence of discrimination against Plaintiff on the basis of her pregnancy. Kerry Delgado (hereinafter "Delgado") and Chris Collins (hereinafter "Collins") both made comments to Plaintiff which offer direct evidence into the motivation surrounding Plaintiff's termination. Further, Plaintiff can satisfy her *prima facie* burden that she was treated differently than her non-pregnant counterparts and that she was qualified and able to work as either a Unit Clerk or a PCT. Finally, Plaintiff is able to prove that Christiana Care's legitimate, non-discriminatory reason for treating Plaintiff differently than her similarly situated non-pregnant counterparts and ultimately terminating her employment is a pretext for pregnancy-based discrimination.

3.    There is abundant evidence that the Plaintiff was treated differently than similarly situated non-pregnant employees. Specifically, Christiana Care allowed non-pregnant employees with physical limitations to work in less than full duty positions; including the Unit Clerk position. There was available work both in and outside Plaintiff's department and at least one of Plaintiff's comparators was allowed to work in her department in a less than full duty capacity when there was not an open position. What is more, not only was Plaintiff qualified and trained

2

to work as a Patient Care Tech, she was also qualified and trained to work as a Unit Clerk. Dr. Goldenberg's note in April 2003 which suggested a sedentary position did not negate her ability to work in her regular duty capacity as a Patient Care Tech, as he clarified in his note of April 10, 2003.

4.      While Plaintiff can establish the *prima facie* elements of a PDA claim, there is also direct evidence of Christiana Care's pregnancy discrimination against Plaintiff based on statements made to Plaintiff by Delgado and Collins. In addition, Christiana Care's reasons for not allowing Plaintiff to work in a sedentary capacity and thereafter, sending Plaintiff home when she was clearly able to work full-duty is nothing more than a pretext for terminating Plaintiff *before* she was eligible for a medical leave of absence with respect to her pregnancy.

3

III.    **SUMMARY OF FACTS**

A.    **PLAINTIFF WAS QUALIFIED AND TRAINED TO WORK AS BOTH A UNIT CLERK AND A PATIENT CARE TECH II**

In December 2002, Plaintiff was hired as a Unit Clerk for Christiana Care. (B-0002, Villanueva 24:18 at A-8)[1]. From December 2002 until April 24, 2003, Plaintiff worked at Christiana Care as a Patient Care Technician II ("PCT-II"). A PCT-II is a "split position" that combines the job functions of a Patient Care Technician and a Unit Clerk. (Villanueva Dep. 24:14; 25:21 at A-8). Plaintiff was trained and qualified to perform the duties of both a unit clerk and a Patient Care Tech. (Dye at 18:12-15 at A-57). The Unit Clerk position is a desk position, or in other words a "sitting position" wherein Plaintiff would enter records into the computer with limited walking. (Villanueva at 31:19-20 at A-10). According to the Unit Clerk job description for the Transitional Surgical Unit (hereinafter "TSU") at Christiana Care, the duties of a Unit Clerk may include "answering phones, scheduling appointments, registering patients, ordering tests, maintaining patient charts, coordinating paperwork, taking messages, filing, faxing, inputting data into a computer system, answering patient, nurse and physician questions and assisting other staff in the department." (B-0003)[2] . The Unit Clerk position is a sedentary position[3]. A Patient Care Technician II has to perform organized clerical duties, hygiene/comfort measures and selected nursing procedures for patients, under the supervision and direction of the professional nurse. (A-102). When a unit is understaffed, the unit's supervisor contacts the nurse coordinator who will "borrow" a Unit Clerk from another unit. (Dye at 13:1 at A- 55). On other

---

[1] Christiana Cares Appendix, referred to as "A-8", was filed with Christiana Cares Opening Brief in Support of their Motion for Summary Judgment.

[2] Plaintiff's Appendix, referred to as "B-0003", is being filed with this brief.

[3] Sedentary is defined as an occupation or mode of living requiring minimal physical exercise. Taber's Cyclopedic Medical Dictionary, Ed. 19, editor Donald Venes; coeditor, Clayton L. Thomas, 2001 by F.A. Davis Company.

4

occasions, a Patient Care Tech II in the Transitional Surgical Unit may be pulled to work on a different floor to assist in the Patient Care Tech II duties. (Dye at 15: 14 at A-56).

As a PCT-II in the TSU, Plaintiff's direct supervisor was Carol Dye (hereinafter "Dye"), the TSU Patient Coordinator. (Dye at 3:19 at A-53; 4:9 at A-53). Karen McCloud (hereinafter "McCloud") was Dye's supervisor and the nurse manager of both the TSU and 5D units. Plaintiff told Dye during the interview process that she was going to "need time off" but Plaintiff did not provide Dye with a reason for needing time off. (Villanueva at 55:18 at A- 16). Dye learned that Plaintiff was pregnant *after* Plaintiff had been hired because Plaintiff began to have problems with the pregnancy. (Dye at 24:20 at A-58).

**B.    ON APRIL 8, 2003, PLAINTIFF'S TREATING PHYSICIAN SUGGESTED THAT PLAINTIFF WORK IN A SEDENTARY CAPACITY. THE PLAINTIFF PRESENTED THIS NOTE TO CHRISTIANA CARE WITH THE EXPECTATION THAT SHE WOULD BE TREATED LIKE SIMILARLY SITUATED COMPARATORS.**

In or around April 8, 2003, Plaintiff saw her cardiologist, Dr. Goldenberg, for pregnancy-related heart problems, (Villanueva at 3:23 at A-3) and he suggested that Plaintiff work sedentary duty for one month while taking Lopressor, a medication to assist with her condition. (B-0014, Villanueva at 33:7 at A-10). According to Dr. Goldenberg, the problem Plaintiff was having is neither life-threatening to either her or the baby. (Goldenberg at 20:4 at A-73) "It's like treating someone with a headache." Id. At no time did Dr. Goldenberg restrict the Plaintiff to sedentary duty. (Goldenberg at 44:15) at A-79). According to Dr. Goldenberg, restricting a patient to sedentary duty means that the patient could not work unless there was a sedentary job available. (Goldenberg at 64:21 at A-84). In Villanueva's case, Dr. Goldenberg testified that he merely *suggested* a sedentary position because he thought it would probably be better for the Plaintiff and because of his belief that Christiana Care would have gone out of their way to

5

maintain her employment. (Id., Goldenberg at 44:21 at A-79) With medication, Villanueva would be feeling better within a week, or four or five days. (Goldenberg at 40:22 at A-78).

On April 9, 2003, Villanueva returned to work and presented Dr. Goldenberg's April 8 note to her supervisor, Dye. Dye told Villanueva that she did not know if she could use Plaintiff on that floor, but they might be able to use Villanueva on other floors. (Villanueva at 28:22 at A-9; Dye at 28:19 at A-59). Dye advised Villanueva that she would have to talk with McCloud and it would have to be cleared by Employee Health Services (hereinafter "EHS"). Id. Villanueva sat as a unit clerk while Dye went to speak with McCloud. (Villanueva at 4:12 at A-3). McCloud testified that Christiana Care's policy is that they "cannot accommodate light duty for a non-occupational injury." [4] (McCloud at 13:15 at A-41). McCloud discussed Christiana Care's policy with Dye that Christiana Care "does not have light duty available for non-occupational injuries." (McCloud at 12:17 at A-41). McCloud and Dye, did not discuss the availability of a sedentary position for Ms. Villanueva. Rather, Dye testified that she was informed by McCloud that Christiana Care only accommodates restrictions if it is work-related. (Dye at 29:2-3 at A-59 ). Thereafter, Plaintiff went to EHS, and EHS was aware that Plaintiff worked as "Unit Clerk/PCTII", cleared the Plaintiff to "return to work" "sedentary duty" (B-0013). When she presented the clear to return to work note from EHS to Dye, she was informed that Christiana Care did not have a sedentary position for her because Christiana Care only accommodates employees with work-related injuries. (Dye at 29:3 at A-59).

However, Chris Collins of EHS testified that, whether an employee will be accommodated depends on the department, the job and the restrictions that the employee has.

---

[4] Discovery in this case has ended and Christiana Care did not produce any documents that outline a specific policy that indicates that Christiana Care "cannot accommodate for a non-occupational injury or that it only accommodates for non-occupational injuries." Collins testified that there is no specific written policy with respect to the rules that are followed when an employee cannot do the regular duties of their job. (Collins 8:13 at A- 29).

6

(Collins at 13:4 at A-30). Collins testified that on occasion an employee with work restrictions will be allowed to work in a sedentary capacity without regard to whether the injury occurred at work or not. (Collins at 28:8 at A-34; 29:7 at A-34) Collins gave the example of an ICU nurse who had surgery, was cleared to come back in a sedentary capacity and was cleared to return to work at Christiana Care doing administrative work while she recovered from surgery. (Collins at 27:21 at A-34). Additionally, McCloud testified that Diana Stewart (hereinafter "Stewart"), a nurse extern and an employee on 5D, was restricted to no patient care tech duties as a result of a non-occupational injury involving both neck and arm pain. (McCloud 27:9; 25:14 at A-45). McCloud allowed her to work as a Unit Clerk because she had restrictions; despite the fact that there was no open Unit Clerk position on 5D. (McCloud at 27:22;40:18 at A-45). According to McCloud, Stewart was cross-trained as a Unit Clerk and because she was able to function fully as a unit clerk, McCloud used her sometimes on 5D as a Unit Clerk. (McCloud 28:2 at A-45). Also, McCloud also testified about an employee named Kathryn Ross (hereinafter "Ross") who was originally hired as a PCT on 5D. (McCloud at 18:9 at A-43). Ross was injured in a serious motor vehicle accident that was not job-related and returned to work as a Unit Clerk with lifting, standing and sitting restrictions. (McCloud at 19:3 at A-43; 20:9 at A-43). According to McCloud, Ross bid for the Unit Clerk position that may or may not have been posted at the time of the bidding. (McCloud at 22:17 at A-44). Unlike the instructions given to Villanueva by Kealey Barnes (hereinafter "Barnes") in Human Resources, Ross did not have to re-apply for a position. (McCloud at 23:2 at A-44; Villanueva at 9:23 at A- 4).

McCloud also testified concerning other employees who were injured in work-related accidents and were able to continue working at Christiana Care with restrictions. McCloud testified that Nicole Markel, a registered nurse had a work-related injury and Christiana Care

7

allowed her to work in the Transitional Surgical Unit (TSU) in a light duty capacity. (McCloud at 29:24 at A-45; 31:7 at A-46). Additionally, McCloud testified about Laura Crosby, an employee who was unable to work in her patient care tech position due to a work-related injury. According to McCloud, she contacted Barnes and bid for a Unit Clerk position. (McCloud at 16:15 at A-42).

Aware that Christiana Care had allowed other employees to work with restrictions in the past, Villanueva met with Dye and Delgado in Employee Relations. Delgado did not discuss any "bidding process" with Villanueva. Further, there was no discussion about the work needs within TSU. Instead, Delgado advised Villanueva that Delaware is an at-will state and that Christiana Care can fire her for any reason. (Villanueva at 5:21 at A-3) Delgado also told Plaintiff that since she was not eligible for FMLA, if Villanueva did not return to work in 12 days, she would be terminated. (Villanueva at 5:21 at A-3). Also, Villanueva was informed that because her limitation was not secondary to a work-related injury, it was her responsibility to find another position in Christiana Care and "*apply for it*".[5] (Dye at 39:12 at A-62). Thereafter, Villanueva called Barnes after she spoke with Delgado and asked her what positions were available as far as Unit Clerk positions. (Villanueva at 8:7 at A-4). Villanueva was informed by Barnes that there were some unit clerk positions, but Villanueva was again told that she would have to "*re-apply*" as if she was never hired at Christiana Care. Id. Villanueva responded to her, "Obviously, that's not going to happen in 12 days." Id. There were at least nine *internal* Unit Clerk positions at Christiana Care. (See B-0004) Additionally, there was at least one external Unit Clerk position

---

[5] Villanueva did not re-apply for a position at Christiana Care because it took at least three months for her to get her present position as a PCTII in the TSU unit. There was no possible way that Villanueva would be able to complete the application and interview process before she was going to be terminated in 12 days. When addressing this concern with Barnes, Barnes failed to respond (Villanueva 12:7-23 at A-5).

on 5D from 11:00am to 7:00pm that was posted on Christiana Care's website. (Villanueva at 10:7 at A-5).[6]

### C. ON APRIL 10, 2003, DR. GOLDENBERG, VILLANUEVA'S TREATING PHYSICIAN, ISSUED ANOTHER NOTE CLARIFYING THAT VILLANUEVA WAS ABLE TO WORK REGULAR DUTY BECAUSE IN HIS OPINION NEITHER VILLANUEVA OR THE BABY WAS AT RISK.

Faced with the possibility of having a family to support, a baby on the way and losing her job, Plaintiff went back to her doctor the next day to request that he write another note specifying that Villanueva was able to work regular duty as a PCTII. (Villanueva at 33:2-19) at A-10). Dr. Goldenberg issued a note dated April 10, 2003, that indicated that Villanueva was able to work regular duty. (B-0013). Dr. Goldenberg testified that he would not have written a note indicating that she was able to work regular duty if he thought that Villanueva or the baby were at risk. (Goldenberg at 66:4 at A-85). Dr. Goldenberg's normal operating procedure was to consider the duties of Villanueva's job when he suggested sedentary duty and also when he issued the note that Villanueva was able to work regular duty. (Goldenberg at 64:3 at A-84; 64:10 at A-84). He also testified that when he released her to regular duty it was his opinion that she could do the regular duties of her job. (Goldenberg at 64:19 at A-84).   In support of his regular duty note, Dr. Goldenberg testified:

> Because she was going to lose employment and her symptoms by her own, I guess, discussion were not so bad that she was willing to give up her job. You have to realize certain people go to jobs every day with a headache and certain people don't. Some people go home and lay in bed all day. Other people plod on. So she had a headache but we tried to make the headache a little bit better. Didn't work but she was willing to work with the headache.

(Goldenberg at 48:19 at A-80).

---

[6] As previously noted, Karen McCloud was the nurse manager of both Villanueva's unit, the Transitional Surgical Unit, as well as, 5D. As such, employees in the Transitional Surgical Unit worked on 5D as well.

The next day, April 11, 2003, Villanueva brought the regular duty note to her supervisor, Dye, who informed her that she had to be cleared by EHS. (Villanueva at 5:23 at A-3). Villanueva took the note down to EHS but the office was closed, and Dye inexplicably advised Villanueva to clock-out and go home for one week and then come back. (Villanueva at 6:3 at A-4). Villanueva returned to Christiana Care and reported to EHS one week later on April 15, 2003. However, EHS did not clear her to return to work. (Villanueva at 6:12 at A-4). Villanueva requested to speak with Collins, to find out why she was not being cleared to go back to work since EHS had not conducted a physical nor checked her heart rate or blood pressure. (Villanueva at 6:15 at A-4). The EHS employee responded, "Here's her phone number. Call her. Go home and call her." (Villanueva at 6:21 at A-4).    When Villanueva returned home she contacted Collins who informed Villanueva that she was "a heart attack waiting to happen". (Villanueva at 6:24 at A-4). Villanueva responded that Collins should speak with her cardiologist, Dr. Goldenberg, because he has cleared her to work full duty. (Villanueva at 7:1 at A-4). Collins responded that she planned to contact Dr. Colmorgen in High Risk at Christiana Care to see if it was acceptable for Villanueva to return to work. (Villanueva at 7:3 at A-4).

On April 16, 2003, Collins contacted Dr. Colmorgen as a consult and he suggested contacting Dr. Goldenberg, Villanueva's treating physician. (B-0011; Collins at 22:12 at A-33). Neither Collins nor Dr. Colmorgen examined Ms. Villanueva nor did they even meet to discuss her medical history with Villanueva. (Collins at 24:21-24 at A-33; 19:9-10 at A-32). Thereafter, Collins called Dr. Goldenberg's office and awaited a return call from Dr. Goldenberg (B-0011). In the meantime, Villanueva called Collins and spoke with her a second time. (B-0011); (Villanueva at 7:14 at A-4). At this time, Villanueva informed her that Collins had put her in a "terrible position" and asked Collins, "What are you expecting me to do?" (Villanueva at 7:15 at

10

A-8). Collins responded, "I don't know what to tell you. You picked a poor time to get pregnant." (Villanueva at 7:16-17 at A-4). Villanueva responded, "Well that's not really your calling. I am not asking, you know, when it's an appropriate time." (Villanueva at 7:18-20 at A-4). Collins did not clear Villanueva to return to work.

Finally, on April 21, 2003, *after* Collins had already advised Villanueva that Collins was not going to clear her to return to work, Collins spoke with Villanueva's treating physician, Dr. Goldenberg. (B-0012). Collins does not recall Dr. Goldenberg stating that Villanueva could not return to regular duty or that she could not do the duties of a PCT. (Collins 32:3 at A-35; 32:6 at A-35). Collins testified that after speaking with Dr. Goldenberg, he did *not* change his opinion that Villanueva was capable of working regular duty. (Collins at 31:6 at A-35).

Christiana Care does have a policy that states that it reserves the right to have the employee examined if there is a question about the employee's ability to return to work; however, Collins did not feel that this was necessary based on Villanueva's "medical history". (Collins at 26:11-20 at A-34). However, Collins did not have an accurate understanding of Plaintiff's history of arrhythmia during her first pregnancy, as well as an accurate history of her present pregnancy. Collins testified that one of the reasons that she decided not to clear the Plaintiff to return to work is because she had similar physical limitations during her first pregnancy. (Collins at 20:1 at A-32). However, Villanueva testified that during her first pregnancy, her cardiac arrhythmia did not affect her ability to do tasks. (Villanueva at 18:22 at A-7). Villanueva continued to work during her first pregnancy as an EKG technician and there were *no* alterations made to her work requirements in order to accommodate the arrhythmia. (Villanueva at 19:8 at A-7). As such, Collins did not have a complete understanding of Villanueva's medical history as evidenced by the fact that Collins was not aware that Villanueva

11

continued to work regular duty with no restrictions when she had this condition with her first pregnancy. (Collins at 27:10 at A-34). In addition, Villanueva testified that her arrhythmia did not make it more difficult for her to do any of those physical tasks, like moving patients around or lifting, associated with her job as a PCT at Christiana Care. (Villanueva at 26:13 A-9). Also, Villanueva testified that at no point while working at Christiana Care did she restrict her own activities. (Villanueva at 27:3 at A- 9). Additionally, Villanueva testified:

> Q:     Did you feel that you were being forced to go against your doctor's orders in order to keep your job at Christiana Care?
>
> A:     I don't know that I felt that I was going against his orders. I think that, looking back on it, I could have done the job if I needed to. I didn't need a light-duty note. But I was following his orders. I mean, I had worked the previous pregnancy. I worked through the whole time my cardiac arrhythmias with my son. Nothing happened. I did not fall over dead. I was fine. So nothing made me think this would be any different.
>
> Q:     Well, you just said, looking back on it now, you think you could have done the job fine.
>
> A:     Mm-hmm.
>
> Q:     Did you look at it differently at the time in April 2003?
>
> A:     No. I mean, my responsibilities were the same. I was still - - you know, I was going to work. I was caring for my son. Nothing changed. I went along about my business. I took my medicine like I was supposed to, and it resolved.

(Villanueva at 38:5-24 at A-12; 39:1-2 at A-12).

**D.    DESPITE HER DOCTOR'S NOTE INDICATING THAT VILLANUEVA IS ABLE TO RETURN TO WORK REGULAR DUTY, COLLINS REFUSED TO CLEAR HER AND AS A RESULT, VILLANUEVA WAS TERMINATED FROM CHRISTIANA CARE ON APRIL 24, 2003.**

On April 24, 2003, McCloud sent Villanueva a letter terminating her employment because Villanueva was not at work and in order to be eligible for a Leave of Absence an employee must be employed for at least six months. (B-0015). However, Ms. Villanueva did not request a Leave of Absence. Rather, Villanueva was ready and able to work and medically cleared to work regular duty by her treating physician, Dr. Goldenberg. It was Collins who would not allow her to return to work. Shortly thereafter, McCloud contacted Villanueva to advise her that she was welcome to come back to work *after* she had the baby. (Villanueva 52:15 at A-15).[7] Had Villanueva not been fired, she would have been employed with Christiana Care for at least six months prior to the birth of her child. Therefore, she would have been eligible for a leave of absence when she went out on maternity leave; thereby ensuring that she had a job upon her return to work. (B-0005 – B-0010, B-0015). Within one week of her termination from Christiana Care, Villanueva worked full-time as a Head Teacher for 12 one year olds at Little Caboose, a day care center for children. (Villanueva 21:17 at A- 7). Although Plaintiff called into Dr. Goldenberg's office on April 22, 2003, with a report of stabbing chest pains, these pains were completely unrelated to the tachycardia and the arrhythmia. (Goldenberg 55:23 at A-82). In fact, Villanueva did not make any follow up appointments with Dr. Goldenberg after April 8. 2003 for her cardiac arrhythmia condition. (Goldenberg at 59:24 at A-83).

---

[7] Villanueva testified that she had no desire to return to Christiana Care after they fired her. She felt as though Christiana Care was not a "family-oriented" place and that having two children and a lot of demands that she could not work there. (Villanueva 54:21 at A-16 ). Additionally, she had already filed a discrimination action against Christiana Care by the time she received McCloud's phone call. (Villanueva at 8:22 at A-4).

13

## IV.    ARGUMENT

### A. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome under the governing substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute over a material fact must be "genuine", i.e., the evidence is such "that a reasonable jury could return a verdict in favor of the non-moving party." Id. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995).

To survive a motion for summary judgment, Defendant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). The court will "view the underlying facts and all reasonable inferences there from in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

In meeting its burden of showing an absence of a genuine issue as to any material fact, "the material it lodge[s] must be viewed in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "[E]vidence of nonmovant is to be

14

believed and all reasonable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

To properly apply the summary judgment standard in Rule 56, it becomes necessary to unpack the phrase "genuine issue of material fact." The substantive identifies whether the fact is "material." That is, a fact is only material if the "establishment thereof might affect the outcome of the lawsuit under governing substantive law." Rodgers v. Monumental Life Ins. Co., 289 F.3d 442, 448 (6th Cir. 2002); see also Logan v. Commerical Un. Ins. Co., 96 F.3d 971, 978 (7th Cir. 1996) ("The nonmovant must do more . . . than demonstrate some factual disagreement between the parties; the issue must be 'material.' Irrelevant or unnecessary facts do not preclude summary judgment even when they are not in dispute."). A material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." MacDonald v. Delta Air Lines, Inc., 94 F.3d 1437, 1440 (10th Cir. 1996); see also Troy Chemical Corp. v. Teamsters Union Local No. 408, 37 F.3d 123, 126 (3d Cir. 1994) (holding that factual issues are not "genuine" unless a reasonable jury could return a verdict for nonmovant based on nonmovant's submissions).

This is a case of drawing inference from fact (i.e., the inference that the Defendant's practices were based their intent to discriminate against the Plaintiff based on her pregnancy). Drawing inferences is typically reserved for a jury at trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (holding that drawing inferences is a jury's function so long as competing inferences are reasonable under the law).

**B.      Plaintiff Can Establish Both Direct And Indirect Evidence Of Discrimination Based on Pregnancy.**

15

To prevail under Title VII, a Plaintiff must show, through either direct or indirect evidence, that the discrimination complained of was intentional. Shorter v. ICG Holdings, Inc., 188 F. 3d 1204, 1207 (10th Cir. 1999). A Plaintiff who lacks direct evidence of intentional discrimination may use the burden-shifting framework first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), to demonstrate intentional discrimination. To establish a *prima facie* case of disparate treatment on the basis of pregnancy, the charging party must show (1) they are members of a protected group; (2) they were qualified for the modified-duty positions sought; (3) they were denied modified-duty positions; and (4) they were denied the modified duty assignments "under circumstances that give rise to an inference of unlawful discrimination". Texas v. Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L.Ed. 2d 207, 101 S. Ct. 1089 (1981).

### 1. The Statements Made by Both Kerry Delgado of Employee Relations and Chris Collins of Employee Health Services Are Direct Evidence of Discrimination Against the Plaintiff.

In the instant case, Villanueva is able to prove direct evidence that Christiana Care discriminated against her based on her pregnancy. Once Villanueva was informed by Dye that she would be sent home because Christiana Care's policy only accommodated for work injuries, she requested to speak with Delgado, Senior Employee Relations Representative. It was at this time that Delgado informed Villanueva that Christiana Care could fire her for any reason and that Delaware is an at-will state. (Villanueva at 5:21 at A-3). Also, Delgado threatened to terminate Villanueva if she did not return to work in 12 days. (Villanueva at 5:21 at A-3). Approximately one week later, Villanueva contacted Collins, Director of EHS, to advise her that Collins should speak with Villanueva's doctor because he was allowing her to work her regular duty as a PCT. (Villanueva 7:14 at A-4). It was at this time that Villanueva informed Collins that she had put her in a "terrible position" and asked Collins, "What are you expecting me to do?"

16

(Villanueva at 7:15 at A-4). Collins responded, "I don't know what to tell you. You picked a poor time to get pregnant."[8] (Villanueva at 7:16-17 at A- 4).

Delgado's remarks threatening to terminate Villanueva for requesting modified duty based on her pregnancy and Collins' negative remarks concerning the timing of Villanueva's pregnancy are without a doubt direct evidence of Christiana Care's discrimination, "evidence which in and of itself suggests" that someone with managerial authority was "animated by an illegal employment criterion." Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997). Direct evidence typically "relates to the motivation of the decisionmaker responsible for the contested decision." Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 396 (7th Cir. 1997).

During the time of Villanueva's employment, Delgado served as the head of Christiana Care's Human Resources Department and Collins served as the Director of EHS. Although Delgado did not state that Villanueva's pregnancy would be the reason for firing her, direct evidence of discrimination does not require "a virtual admission of illegality." Venters, 123 F.3d at 973. It would cripple enforcement of the employment discrimination laws to insist that direct evidence take the form of an employer's statement to the effect that "I'm firing you because you're in a protected group." Sheehan v. Donlen Corporation, 173 F.3d 1039 (7th Cir. 1999) at 1044. While it is true that Delaware is an at-will State, Deglado's remarks clearly suggest that accommodating Villanueva, as had been done with other similarly situated individuals, was not foremost in her mind.

Although McCloud, Villanueva's manager, testified that it was ultimately her decision to terminate Villanueva, McCloud testified that the decision to terminate her was because she was not cleared by Employee Health. (McCloud at 35:17 at A-47). In other words, Collins, with her

---

[8] According to Christiana Care's Leave of Absence policy, an employee must be employed for at least six months before the employee is eligible for a Leave of Absence. (Collins at 16:20-24 at A- 31). If Plaintiff got pregnant a few months after April 2003, she would have been eligible for a leave of absence.

discriminatory and derogatory statements, refused to clear Villanueva to return to regular duty; despite her physician's statement that she had no restrictions. As a direct consequence, Villanueva was fired. Isolated comments may constitute direct evidence of discrimination if they are "causally related to the discharge decision making process." Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 723 (7th Cir. 1998).

### 2.    Plaintiff Can Establish A Prima Facie Case of Pregnancy Discrimination

Christiana Care asserts that the Plaintiff cannot establish a *prima facie* case of pregnancy discrimination because, according to Christiana Care, (1) McCloud did not treat Plaintiff differently than other similarly situated non-pregnant employees; and (2) Villanueva was not qualified to work as a unit clerk. (Def. Mem. at 15). Although, McCloud testified that Christiana Care did not have a sedentary position for Villanueva because Christiana Care's policy is that it "*cannot* accommodate light duty for a non-occupational injury" (emphasis added) (McCloud at 13:15 at A-41). There is undisputed evidence that Christiana Care does allow its employees to work in less than full duty capacities when its employees are unable to do the regular duties of their job; regardless of whether the employee's injuries occurred at work or not. (Collins at 13:4 at A-30). Further, Villanueva was more than qualified to work as a Unit Clerk because she had previously been trained to work as both a Unit Clerk and a PCT. (Dye at 18:12-15 at A-57). Also, the position of a Unit Clerk is a "desk position" or in other words a "sitting position" wherein Villanueva would enter records into the computer with limited walking. (Villanueva at 31:12-20 at A-10). What is more, however, Villanueva's treating physician, Dr. Goldenberg, never restricted her to sedentary duty. (Goldenberg at 44:15 at A-79). Rather, he suggested that she work in a sedentary capacity and later clarified his doctor's note to indicate, "Nicole has been under my care and from cardiac standpoint may return to work with no restrictions. Please

18

contact my office if you should have any questions 302-366-1929." (emphasis added). (B-0013).

Accordingly, Plaintiff has met the *prima facie* requirements that (1) Christiana Care treated her

differently than other similarly non-pregnant employees; and (2) that Plaintiff was qualified to

work as a unit clerk.

> a.    **There Are Genuine Issues of Material Fact As To Whether Christiana Care Treated Plaintiff Differently Than Similarly Situated Non-Pregnant Employees. Therefore, Summary Judgment Should Not Be Granted.**

Christiana Care contends that Plaintiff's comparators – Kathryn Ross, Laura Crosby and

Diana Stewart –were not similarly situated because (1) their medical restrictions, unlike

Plaintiff's, occurred during period when McCloud had specific Unit Clerk positions or needs in

the same unit and (2) none of these three employees was restricted to sedentary duty. Id. When

Plaintiff's physician suggested a sedentary position there were at least nine internal unit clerk

positions at Christiana Care (B-0004), as well as one Unit Clerk position on 5D, one of the units

that McCloud managed. (Villanueva at 10:7 at A-5). In total, there were at least ten open Unit

Clerk positions at Christiana Care. Although McCloud testified that she could not transfer

Villanueva to another department, the evidence is clear that both PCT and Unit Clerks are

"borrowed" from other floors to assist in different areas of the hospital on occasion. (McCloud at

4:10 at A-39). When Unit Clerks are pulled to work in different areas, they do not have to be

trained on how to do the job because the computer systems, chart orders and order sheets are

generally the same. (McCloud 9:19-12 at A-40).

More importantly, however, McCloud admitted that there was not an open Unit Clerk

position in 5D when she allowed Stewart, one of Villanueva's comparators, to work as a Unit

Clerk rather than do her regular duties similar to that of a PCT. (McCloud at 36:17-19 at A-47;

42:23, 43:1-2 at A-49). Thus, there did not have to be an open position in the department in order

for McCloud to allow Villanueva to work in a less than full-duty capacity in the Transitional Surgical Unit (hereinafter "TSU"). Yet, McCloud denied Villanueva's request for modified duty because there was not an open unit clerk position on her floor. The only material difference between Villanueva and Stewart was that Villanueva was pregnant and Stewart was not. What is also telling is the fact that Villanueva was permitted to work as a Unit Clerk in the afternoon on the day that she informed Christiana Care that she had a doctor's note for modified duty. (Villanueva at 4:12 at A-3). Obviously, there was a need in the department or Christiana would not have allowed her to work as a Unit Clerk for that day.

Further evidence of discrimination against Plaintiff is the fact that Christiana Care allowed Villanueva's comparators to bid for internal positions. However, Plaintiff was denied this benefit and was instructed by Barnes that she would have to "re-apply" as if she was never employed with Christiana Care. (Villanueva at 8:7 at A-4). An employer violates the PDA when it denies a pregnant employee a benefit generally available to temporarily disabled workers holding similar job positions. Byrd v. Lakeshore Hospital, 30 F.3d 1380 (11th Cir. 1994).

### b. There Are Genuine Issues of Material Fact As To Whether Plaintiff Was Qualified To Work As A Unit Clerk In April 2003. Therefore, Summary Judgment Should Not Be Granted.

Additionally, Christiana Cares' attempt to distinguish Villanueva from her comparators by arguing that she was restricted to sedentary duty but the others were not is without merit. First, Dr. Goldenberg never restricted Plaintiff to sedentary duty. (Goldenberg at 64:21 at A-84 ; B-0014). Christiana Care cites to Leeker v. Gill Studios, Inc., 21 F. Supp. 2d 1267, 1271-73 (D. Kan. 1998) and McQueen v. Airtran Airways, Inc., No. 3:04-cv-00180, 2005 WL 3591100, at *4-5 (N.D. Fla. Dec. 30, 2005), 2005 U.S. Dist. LEXIS 37461, for the proposition that a Plaintiff is not qualified for a position under PDA where pregnancy-related restrictions prevented her

from performing essential functions of her job. However, Dr. Goldenberg merely suggested a sedentary position because he thought it would probably be better for the Plaintiff and because of his belief that Christiana Care would have gone out of their way to help Villanueva. (Goldenberg at 40:22 at A-78). On day later, Dr. Goldenberg re-issued a note clarifying that Villanueva had no restrictions. (B-0013). Thus, Plaintiff had no restrictions on her employment. Additionally, the McQueen case is clearly distinguishable from the present case because the plaintiff in McQueen did not request a second letter from her physician clarifying that her physician's letter was merely a suggestion and that she was, in fact, able to lift up to seventy pounds. McQueen, *supra* at *14. In the instant case, Villanueva went back to her doctor's office the very next day and she received a note clarifying his restrictions.

Secondly, while Title VII generally requires that a plaintiff demonstrate that the employee who received more favorable treatment be similarly situated "in all respects," Mitchell v. Toledo Hosp., 964 F.2d 577 at 583 (1992), the PDA requires only that the employee be similar in his or her "ability or inability to work." 42 U.S.C.§ 2000e(k). Accordingly, when a Title VII litigant alleges discrimination on the basis of pregnancy in violation of the PDA, in order to establish a prima facie case of discrimination, she must demonstrate only that another employee who is similarly situated in her or his ability or inability to work received more favorable benefits. Ensley Gaines v. Runyon, 100 F. 3d 1220 (6th Cir. 1996) at 1126.

There are several comparators in the instant case that were similar to Villanueva with respect to their inability to do the regular duties of their job. Each one of Villanueva's comparators was afforded the opportunity to work in a less than full duty capacity because of physical limitations. The only material difference between Plaintiff and her comparators is that she was pregnant and her comparators were not.

21

> Under [the PDA], the treatment of pregnant women in covered employment must focus not on their condition alone but on the actual effects of that condition on their ability to work. Pregnant women who are able to work must be permitted to work on the same conditions as other employees; and when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working. (emphasis added).

Mullet v. Wayne-Dalton Corp., 338 F. Supp. 2d 806 (District of Ohio 2004).

First, Collins gave the example of an ICU nurse who had surgery, was cleared to come back in a sedentary capacity and was cleared to return to work at Christiana Care doing administrative work while she recovered from surgery. (Collins at 27:21 at A-34). Secondly and as previously noted, Stewart, a nurse extern and an employee in 5D, was restricted to no Patient Care Tech duties as a result of a non-occupational injury involving both neck and arm pain (McCloud 27:9; 25:14 at A-45). McCloud allowed her to work as a Unit Clerk because she had restrictions. Third, Kathryn Ross, a PCT on 5D was injured in a serious non job-related car accident and returned to work as a Unit Clerk with lifting, standing and sitting requirements after bidding for the position. (McCloud at 19:3 A-43; 20:9 at A-43). Fourth, Nicole Markel, a registered nurse had a work-related injury, and she allowed to work in TSU in a light duty capacity. (McCloud at 29:24 at A-45; 31:7 at A-46). Fifth, Laura Crosby, a PCT, was injured in a work accident and she bid for a unit clerk position. (McCloud at 16:15 at A- 42).

Christiana Care contends that the Unit Clerk position is a "physically demanding" job and therefore, Villanueva, unlike her comparators, was not qualified for the Unit Clerk position. However, Christiana's contention is completely contradictory to the evidence in this case. Most if not all of Villanueva's comparators could no longer do the regular duties of their job because of serious physical limitations (i.e. shoulder and arm pain, recent surgery, serious car accidents etc). If the Unit Clerk position was so physically demanding, then why would these injured

22

employees request and be granted Unit Clerk positions?  Further, Christiana Care allowed Villanueva to work temporarily as a Unit Clerk when she brought the note from her doctor suggesting sedentary duty. Why would Christiana Care allow her to work as a Unit Clerk for the afternoon if it was such a physically demanding job? The duties of a Unit Clerk include answering phones, scheduling appointments, registering patients, ordering tests, maintaining patient charts, coordinating paperwork, taking messages, filing, faxing, inputting data into a computer system, answering patient, nurse and physician questions and assisting other staff in the department. (B-0003)  Villanueva was trained and qualified to perform the duties of a Unit Clerk and testified that the Unit Clerk position is a desk position or in other words a "sitting position" wherein she would enter records into a computer with limited walking. (Villanueva at 32: at A-10). The only obvious conclusion, based on the Unit Clerk job description, Plaintiff's testimony, Plaintiff's comparators and the actions of Christiana Care, is that it is a sedentary position.  Surely, there is a genuine issue of material fact as to whether the Unit Clerk position is sedentary. As such, summary judgment is not proper.

### C. There Is Sufficient Evidence To Conclude That Collins' Rationale For Refusing To Clear Plaintiff To Return To Regular Duty Was A Pretext For Pregnancy Discrimination Which Ultimately Led To Plaintiff's Termination From Employment.

If the defendant is able to articulate a facially nondiscriminatory reason for the adverse employment action, the plaintiff can avoid summary judgment if she can show that her "pregnancy was a determinative factor in the defendant's employment decision, or show the defendant's explanation for its action was merely pretext." Atchley v. Nordam Group, Inc., 180 F. 3d 1143, 1148-49 (10th Cir. 1999). Christiana Care contends that even if Plaintiff could establish a prima facie case, there is no evidence that McCloud's stated reason for her decision are pretextual or that she was otherwise motivated by anti-pregnancy animus. (Def. Mem. at 21).

However, McCloud's ultimate decision to terminate Villanueva is the direct result of Collins' failure to clear Villanueva for regular duty which was in direct conflict with Villanueva's treating physician's orders.

For several reasons, Plaintiff contends that Collins' decision not to clear Plaintiff for regular duty was a pretext to discriminate against Plaintiff which ultimately led to her termination. First and as previously noted, there is direct evidence of discriminatory statements made by Collins to Villanueva concerning the "poor" timing of her pregnancy. (Villanueva at 7:16-17 at A-4).

Second, Collins refused to clear Plaintiff to work; despite Dr. Goldenberg's note, dated April 10, 2003, clarifying his previous note which specifically stated that "From a cardiac standpoint, Plaintiff may return to work with no restrictions." (B-0013). "An employer has no place substituting its judgment of an employee's physical limits in the face of uncontroverted medical opinions. Wade v. Lerner New York, Inc., 243 F.3d 319, 325 (7th Cir. 2001). (See Phillips v. Swift & Co., 137 F. Supp. 2d 1126, 1140(S.D. Iowa 2001)(finding genuine issue of fact whether employer acted wantonly in ignoring doctor's orders with regard to employee's physical abilities).

Third, Collins advised Villanueva that she was not going to clear her to return to work *before* Collins even spoke with Villanueva's doctor (B-0011). According to documents produced by Christiana Care, on April 16, 2003, Collins called Dr. Goldenberg and was awaiting a call back. (B-0011). Also, on April 16, 2003, after Collins left a message for Dr. Goldenberg, Villanueva spoke with Collins for the final time. It was during this conversation that Collins advised Villanueva that she would not clear her to return to work. (B-0011; Villanueva at 7:16-17 at A-4). Finally, on April 21, 2003, Collins spoke with Dr. Goldenberg. (B-0012). What is

more, Dr. Colmorgen advised Collins that she should contact the Plaintiff's treating physician to determine whether or not Plaintiff has any restrictions. (B-0011; Collins at 22:12 at A-33). Finally, Christiana Care has a policy that states that it reserves the right to examine an employee if there is a question about the employee's ability to return to work. But neither Collins nor Dr. Colmorgen examined Villanueva to determine the extent to which she was physically restrictions. (Collins at 24:21-24 at A-34; 19:9-10 at A-32) because Collins did not feel this was necessary (Collins at 26:11-20 at A-34). Surely, Collins had a predisposition to discriminate against Plaintiff, as well as a wanton disregard for Plaintiff's need for employment and the welfare of her and her family when she decided not to clear her to return to work prior to discussing her case with her doctor.

Fourth, the timing of Villanueva's termination is also relevant to the determination that Collins' reason for not clearing Plaintiff was a pretext for discrimination. In April 2003 when Villanueva's doctor suggested a sedentary position, Villanueva was not yet eligible for a leave of absence because she was not employed with Christiana Care for at least six months. (Collins at 16:23-24 at A-31). Had Villanueva not been fired, she would have been employed with Christiana Care for at least six months by the time she was ready to deliver her baby. In accordance with Christiana Care's policy, the Company would have been obligated to hold Plaintiff's position open until she returned from maternity leave. Instead, Plaintiff was terminated and was told that she could come back to work *after* she had the baby. (Villanueva 52:15 at A-15). This could lead a reasonable fact finder to assume that Villanueva's termination was based on Christiana Cares' anticipatory concern regarding her absence. In Laxton v. Gap, Inc., No. 02-40406, (5th Cir. 2003), the Court held that the employer's decision to terminate the plaintiff in mid-August was a pretext for discrimination because it allowed the company "just

25

enough time to permit a new general manager to settle into the job before the busy holiday season." Coupled with the previous reasons shown infra, the timing of Plaintiff's termination is irrefutable evidence that a concern for Villanueva's safety was not the "true reason" for not clearing Plaintiff. Rather, Collins' decision was motivated by discrimination against Plaintiff which ultimately led to her termination.

Further, Christiana Care has not produced any evidence of a written policy concerning the basis for determining whether or not an employee's physical restrictions will be accommodated. According to McCloud, Christiana Care *cannot* accommodate for a non-occupational injury. (McCloud 13:15 at A-41). However, Collins testified that whether an employee will be able to work in a less than full-duty capacity depends on the restriction and the needs of the department and there is no distinction as to whether or not the employee's injury occurred at work. (Collins at 13:4 at A-30). Under these circumstances, the absence of a clearly written policy that explains the circumstances surrounding when an employee will be allowed to work light duty creates a question for the jury as to whether the policy actually exists. Piraino v. International Orientation Resources, Inc., 84 F.3d 270, 274-75 (7th Cir. 1996); Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1040 (7th Cir. 1993).

## V.    CONCLUSION

For the reasons set forth above, there are genuine issues of material fact in dispute and therefore, summary judgment should not be granted.

Respectfully submitted,

Jeffrey K. Martin, Esquire (# 2407)
Lori A. Brewington, Esquire (#4522)
MARGOLIS EDELSTEIN
1509 Gilpin Avenue
Wilmington, Delaware 19806
jmartin@margolisedelstein.com
lbrewington@margolisedelstein.com
(302)777-4680
Attorneys for Plaintiff Nicole Villanueva

Dated: June 30, 2006

27